**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| *Ex rel.* | ) | Case No. __3:11-cv-01464__-JFA |
| | ) | |
| [UNDER SEAL], | ) | |
| | ) | **JURY TRIAL** |
| | ) | **DEMANDED** |
| **Plaintiff-Relator,** | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| [UNDER SEAL], | ) | |
| | ) | |
| **Defendants.** | ) | |

**FILED IN CAMERA AND UNDER SEAL**

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## UNITED STATES DISTRICT COURT
## DISTRICT SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the States of CALIFORNIA, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESTOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO.<br><br>        Plaintiffs,<br><br>        *Ex rel.*<br><br>FRANK KURNIK<br><br>        Plaintiff-Relator,<br><br>        v.<br><br>AMGEN, Inc., OMNICARE, INC., PHARMERICA CORP. and KINDRED HEALTHCARE, INC.<br><br>        Defendants. | **Filed Under Seal pursuant to 31 U.S.C. §3730(b)(2)**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**COMPLAINT**<br><br><br>3:11-cv-01464-JFA |

.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................................... 1

II.     JURISDICTION AND VENUE .................................................................... 3

III.     PARTIES ....................................................................................................... 4

IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ................................................ 8

       A.     Federal Government Health Programs.................................................... 8

       B.     The False Claims Act And The Medicare Fraud & Abuse/Anti-Kickback Statute ...................................................................................................... 9

       C.     Stark Law - The Medicare/Medicaid Self-Referral Statute .................................. 11

       D.     FDCA and FDA Regulations............................................................................ 12

V.     SPECIFIC ALLEGATIONS OF AMGEN'S FALSE CLAIMS.................................... 15

       A.     Amgen's Aranesp and the Erythropetin Stimulating Agent Market..................... 15

             1.     Aranesp's FDA Approved Indications........................................................ 15

             2.     Uses and Abuses of ESAs: Black Box Warning...................................... 16

       B.     Amgen and the LTCPP Defendants, Omnicare, PharMerica and Kindred Conspired To Cause Long Term Care Physicians To Submit False and Fraudulent Claims For Aranesp Prescriptions ....................................................... 18

             1.     Amgen Viewed The Launch of Aranesp As A Failure............................. 18

             2.     In 2002, Amgen Expanded Its Marketing of Aranesp To The Long Term Care Market........................................................................................ 19

             3.     In Order To Secure Aranesp Sales Amgen Paid the LTCPP Defendants Kickbacks Pursuant to Illegal Rebate Contracts ..................................... 23

                   a.     The Omicare and NeighborCare Rebate Contracts....................... 25

                   b.     The PharMerica and Kindred Rebate Contracts ........................... 28

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

4.      Amgen and the LTCPP Defendants Employed Illegal Switching
        Arrangements Called Therapeutic Interchanges In Violation of The
        Anti-Kickback Statute,  the False Claims Act, and the FDCA ................. 31

        a.      The Therapeutic Interchange Programs ....................................... 31

        b.      Speaker's Programs Promoting Switching ................................... 39

        c.      The Anemia Protocols .................................................................. 40

5.      Amgen and the LTCPP Defendants Unlawfully Conspired To
        Misbrand Aranesp In Order to Expand The Market For The Drug ......... 42

6.      Kickbacks:  Defendants Paid Health Care Providers To Induce Aranesp
        Prescriptions and Highjacked CME and Other Ostensibly Independent
        Educational and Scientific Programs For the Unlawful Promotion of
        Aranesp .................................................................................................... 47

        a.      Amgen Transformed Paid Speaker's Events Into Marketing
                Vehicles for Aranesp .................................................................... 47

        b.      Amgen Paid Kickbacks To Physicians To Promote Aranesp
                and Secure Aranesp Prescriptions ................................................ 52

        c.      Amgen Funneled Payments To Physicians Through Regional
                and National Health Care Associations To Disguise Payments
                And Induce Associations To Assist In The Marketing of
                Aranesp ........................................................................................ 54

COUNTS ............................................................................................................. 55

VI.    PRAYER ..................................................................................................... 79

FILED UNDER SEAL

ii

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## I.     INTRODUCTION

1.     For the primary purpose of meeting overly ambitious sales goals for its anemia drug, Aranesp, Defendant Amgen, Inc. ("Amgen")  acting alone and/or in concert with Defendants Omnicare, Inc. ("Omnicare"), PharMerica Corp. ("PharMerica"), and Kindred Healthcare, Inc. ("Kindred") subverted informed and reasoned medical rationale for the purposes of causing patients to be placed on or switched to Aranesp. Defendants' unlawful conduct, orchestrated in the course of a battle over market share with competitor Johnson & Johnson ("J&J"), which was engaged in similar unlawful sales tactics,  was designed to go undetected by federal and state regulators. Through their efforts, the Defendants successfully altered the treatment of tens of thousands of patients, many of whom were/are in long term care facilities, and incapable of detecting that their pharmaceutical regimen was being altered for the primary purpose of  meeting a giant pharmaceutical company's bottom line projections.

2.     Accordingly, on behalf of the United States of America and on behalf of California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Montana, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin, the District of Columbia and the City of Chicago, pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and similar state and municipal law provisions, Plaintiff and "Relator" Frank Kurnik files this *qui tam* Complaint against Defendants and alleges:

3.     In violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and similar state and municipal law provisions, Defendant Amgen knowingly presented or caused to be presented false or fraudulent claims to be submitted in violation of the law for payment or approval by federal and state agencies and/or programs by:

1

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

- providing rebates and other financial incentives to long term care pharmacies, including Defendants Omnicare, PharMerica and Kindred, to induce doctors to switch patients from Procrit to Aranesp in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b);

- paying physicians, nurses and other healthcare professionals to promote and prescribe Aranesp for on-label and off-label uses in violation of violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) and the Stark Law, 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 *et seq*.;

- systematically engaging in illegal misbranding, including off-label marketing, of its anemia drug Aranesp in violation of the Food Drug and Cosmetic Act ("FDCA") 21 U.S.C. §§ 331-(a)-(b), 352 (a),(f); and

- furthering the unlawful marketing of Aranesp through violations of continuing medical education ("CME") rules and regulations by directing and controlling physician speaker programs that purport to be unbiased.

4.     Defendants Omnicare, PharMerica and Kindred (hereafter the Long Term Care Pharmacy Provider Defendants or "LTCPPs") also caused false claims to be submitted for payment in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*., and analogous state and municipal false claims statutes by conspiring with Amgen to engage, aid and/or abet in the proscribed conduct stated above.

5.     Relator Frank Kurnik has knowledge of Defendants' national scheme to illegally market Aranesp.  Relator was tasked with helping to start a new division, created by Amgen in 2002, called Long Term Care/Home Health Care, whose primary purpose was to market Aranesp to long term care facilities such as nursing homes and skilled nursing facilities.  This division had sales representatives serving the entire nation, including the states and municipalities encompassed in this Complaint.

6.     Through Defendants' illegal marketing activities, Amgen exponentially increased the market for Aranesp, which markedly increased its revenue, and the revenue of the LTCPP Defendants at the expense of federal and state governments.  Amgen marketed Aranesp to

2

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

anemia patients whose chronic kidney disease progression was outside the drug's package insert, despite Amgen's knowledge that the drug caused increased risk of cardiovascular events, stroke and death. In 2007, the FDA required Amgen to place a black box warning in Aranesp's package insert regarding these dangerous side effects. Had federal and state programs, including Medicare and Medicaid, known that such prescriptions were induced by illicit incentives (such as the payment of kickbacks) and illegal marketing to physicians, they would not have reimbursed claims for Aranesp.

7.     Relator Frank Kurnik discovered Defendants' wrongful conduct while he was an employee of Amgen. He has conducted his own investigation in furtherance of this False Claims Act *qui tam* action and hereby discloses his findings to the United States Government, twenty-five States, the District of Columbia and the City of Chicago.

## II.    JURISDICTION AND VENUE

8.     Relator brings this action on behalf of himself and on behalf of the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, the States, the District of Columbia and the City of Chicago for violations of their False Claims Act statutes. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts relating to the States, the District of Columbia and the City of Chicago False Claims Act statutes pursuant to 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants can be found in and transact business in this District. In addition, the acts prohibited by 31 U.S.C. §3729 occurred in this District, 31 U.S.C. §3732(a).

10.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

11.     Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).[1]

12.     To the extent that there has been a public disclosure unknown to the Relator, he is the "original source" and meets the requirements pursuant to 31 U.S.C. § 3730(e)(4)(B).[2]

## III.     PARTIES

13.     Relator Frank Kurnik currently is an Amgen Corporate Account Manager working in Reno, Nevada.  Relator is a top performer, winning commendations from Defendant Amgen.  He has been employed by Amgen, Inc. from 1999 to the present.  Mr. Kurnik was the Director of Channel Sales in 1999-2002.  He then served as Amgen's Director of LTC & Home Health Care from 2002-2008.  Working in Amgen's Long Term Care/Home Health Care division, created in or about 2002, Relator managed the sales team for the drug Aranesp.  Relator has direct knowledge of Defendants' concerted and repeated efforts to illegally secure prescriptions for Aranesp through the payment of kickbacks, via rebate contracts, to long term care pharmacy providers, including Defendants Omnicare, PharMerica, Kindred Healthcare, and smaller independent pharmacies that entered into contracts through Group Purchasing Organizations ("GPOs").  Relator also has direct knowledge of Defendants' conspiracy to influence health care professionals to prescribe Aranesp for uses outside the drug's indication and to misbrand the drug in violation of the Food Drug and Cosmetics Act ("FDCA") and the False Claims Act ("FCA").

---

[1] To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e*., 31 U.S.C. § 3730 (e), as amended, October 27, 1986 and May 20, 2009).

[2] *Ibid*.

4

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

14. Defendant Amgen, Inc. is incorporated in Delaware. Its headquarters and principal place of business are in Thousand Oaks, California. Amgen engages in the global business of discovery, development, manufacturing, marketing, and sale of prescription drugs and other products for the prevention, diagnosis, and treatment of diseases. According to its Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 25, 2011, Amgen generated total revenues in excess of $15,053,000,000 in the fiscal year ending December 31, 2010. For years ended December 31, 2010, 2009 and 2008, U.S. Aranesp sales were $1.1 billion, $1.3 billion and $1.65 billion respectively. For the Years ended December 31, 2007, 2006 and 2005, U.S. Aranesp sales were $2.15 billion, $2.79 billion and $2.104 billion respectively.

15. Defendant Omnicare Inc. is incorporated in Delaware. Its principal executive offices are located in Covington, Kentucky. Omnicare is a geriatric pharmaceutical services company, providing pharmaceutical distribution, consulting, medical supplies, and product development and research services to client companies. Omnicare serves residents in long-term care facilities and other chronic care settings in 47 states, the District of Columbia and Canada. Omnicare is the largest U.S. provider of professional pharmacy related consulting and data management services for skilled nursing, assisted living and other institutional healthcare providers as well as for hospice patients in homecare and other settings. In July 2005, Omnicare purchased all of Neighborcare, Inc.'s shares. Neighborcare, Inc. was a long term care pharmacy provider, also serving the pharmacy needs of nursing homes and skilled nursing facilities. Pursuant to a stock sale, Omnicare and Neighborcare, Inc. merged and Neighborcare, Inc. became a wholly owned subsidiary of Omnicare. As of September 30, 2004, Neighborcare was the second largest institutional pharmacy service in the United States serving approximately

5

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

263,000 "beds" or potential patients in long-term care facilities in 32 states and the District of Columbia. According to its 10-K filed with SEC on December 10, 2004 Neighborcare's net revenue from September 30, 2003 to September 30, 2004 was over $1.44 billion.

16.    Defendant Omnicare entered into a Corporate Integrity Agreement with the Office of the Inspector General of the Department of Health and Human Services ("HHS") on November 6, 2006, which was amended on October 26, 2007 ("Omnicare CIA") as part of a False Claims Act settlement with the Government.  The CIA flowed from allegations that Omnicare "improperly switched Medicaid patients from a cheaper version of the drug [drugs Ranitidine, Fluoxetine and Buspirone] to a more expensive version solely to increase reimbursement rate."  See, November 14, 2006 Department of Justice Press Release, "Omnicare, Inc. to Pay $49.5 Million to the United States and 43 States to Settle Medicaid Prescription Drug Fraud."  The CIA required, *inter alia*, Omnicare to implement procedures ensuring that "therapeutic interchange programs," which called for the switching of medication formulations developed by Omnicare, were consistent with state and federal law.  In short, the CIA required a physician to order any change in medication formulation.  The agreement also required Omnicare to create procedures reasonably designed to ensure that all sales reimbursable to Medicare or Medicaid, would not be in violation of the Federal Anti-Kickback Statute. According to Omnicare's 2010 Form 10-K filed with the SEC on February 24, 2011, Omnicare generated net sales for the 2010 fiscal year of over $6.14 billion.

17.    Defendant PharMerica Corp. is incorporated in Delaware.  Its principal executive offices are located in Louisville, Kentucky.  PharMerica is a pharmaceutical distribution and services company serving institutional healthcare providers, such as nursing centers, assisted living facilities, hospitals and other long-term alternative care settings.  PharMerica Corporation

6

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

is the primary source of supply of pharmaceuticals for its customers. Until July 2007, PharMerica was a subsidiary of Amerisource Bergen Corporation. In July 2007, Amerisource Bergen Corporation and Kindred Healthcare Inc. combined their institutional pharmacy businesses, PharMerica Long-Term Care and Kindred Pharmacy Services, to form PharMerica Corporation, headquartered in Louisville, Kentucky. As of September 30, 2007, PharMerica operated more than 120 institutional pharmacies in 40 states. According to PharMerica's 2010 Form 10-K filed with the SEC on February 24, 2011, PharMerica had revenues of over $1.84 billion for the fiscal year ending December 31, 2010 and a net income of $192 million in 2010.

18.     As a result of kickback allegations, Defendant PharMerica entered into Corporate Integrity Agreement with the Office of the Inspector General of the Office of Health and Human Services in March 2005. Part of this agreement required PharMerica to create procedures reasonably designed to ensure that any sales of products or services that are reimbursable to Medicare or Medicaid, do not violate the Anti-Kickback Statute.

19.     Defendant Kindred Healthcare, Inc. ("Kindred") is incorporated in Delaware. Its principal executive offices are located in Louisville, Kentucky. Kindred is a healthcare services company that through its subsidiaries operates hospitals, nursing centers and a contract rehabilitation services business throughout the United States. Until July 2007, Kindred Healthcare Inc. held a subsidiary corporation called Kindred Pharmacy Services ("KPS"), which was a long term care pharmacy provider. In July of 2007, KPS and PharMerica Long-Term Care merged to form PharMerica Corporation, headquartered in Louisville, Kentucky. Kindred Healthcare Inc. still survives and in its Form 10-K filed with the SEC on February 23, 2011, Kindred posted revenues of over $4.26 billion for the fiscal year ending December 31, 2010 and a net income of over $56 million in 2010.

7

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

IV.     **STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS**

A.     **Federal Government Health Programs**

20.     The federal, state and local governments, through their Medicaid, Medicare, Tricare, Veteran's Administration and other Government health care payors, are among the principal purchasers of Amgen's pharmaceutical products.

21.     Medicare is a federal government health program primarily benefiting the elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security Act.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

22.     Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act.  Medicaid is a public assistance program providing payment of medical expenses to low-income patients.  Funding for Medicaid is shared between the federal government and state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid usually provides more expansive coverage than does Medicare.

23.     Medicaid has broad coverage for prescription drugs, including self-administered drugs.  Nearly every state has opted to include basic prescription drug coverage in its Medicaid plan.

24.     Tricare is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and career military retirees and their dependents.  The program operates through

8

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. Tricare is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations and fee-for-service benefits. Five managed care support contractors create networks of civilian health care providers.

25. Whereas Tricare treats active duty military and their dependents, the Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its nationwide network of hospitals and clinics.

26. The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.

**B.    The False Claims Act And The Medicare Fraud & Abuse/Anti-Kickback Statute**

27. The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1)(A)&(B). Twenty-five states, the District of Columbia and the City of Chicago have enacted False Claims Act statutes that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds.

28. The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which also applies to the state Medicaid programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of

9

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

business reimbursable under a federal health benefits program. The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

29.     The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

30.     In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or value of any referrals or business generated. *See* 42 C.F.R. § 1001.952(f).

31.     Such remunerations are kickbacks when paid to induce or reward physicians' prescriptions. Kickbacks increase government-funded health benefit program expenses by inducing medically unnecessary overutilization of prescription drugs and excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

32.     The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protects the Defendants' conduct in this case.

33.     Recently, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security

10

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the False Claims Act. The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id*. at Sec. 6402(h).

34. As detailed below, Amgen's promotion and misrepresentations of Aranesp repeatedly violated provisions of the Anti-Kickback Statute, which in turn resulted in violations of the False Claims Act because Amgen's improper kickbacks and incentives with LTCPPs induced physicians and pharmacists to prescribe Aranesp when they otherwise would not have and many of those prescriptions were paid for by Medicare, Medicaid and other government funded health insurance programs.

35. Knowingly paying kickbacks, including rebates and other incentives, to Defendants Omnicare, PharMerica and Kindred pharmacists to prescribe a prescription drug on-label or off-label (or to influence physician prescriptions) for individuals who seek reimbursement for the drug from a federal government health program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates municipal, state and federal False Claims Acts.

### C.    Stark Law - The Medicare/Medicaid Self-Referral Statute

36. The Medicare/Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn, *et seq.,* known as the "Stark" law, prohibits a pharmaceutical manufacturer from paying remuneration to physicians for referring Medicaid patients to the manufacturer for certain "designated health services," including drug prescriptions, where the referring physician has a nonexempt "financial relationship" with that manufacturer. 42 U.S.C. § 1395nn(a)(1), (h)(6). The Stark law provides

11

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

that the manufacturer shall not cause to be presented a Medicare or Medicaid claim for such prescriptions. The Stark law also prohibits payment of claims for prescriptions rendered in violation of its provisions. 42 U.S.C. §1395nn(a)(1), (g)(1).

37.    Knowingly paying physicians to induce them to prescribe a prescription drug on-label or off-label for individuals seeking reimbursement for the drug from a federal government health program or causing others to do so, while certifying compliance with the Stark law (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates municipal, state and federal False Claims Acts.

38.    Defendants' conduct repeatedly violated the Stark law, which in turn resulted in violations of the False Claims Act, because Defendants' unlawful payments and services to prescribing physicians induced (and still induces) those physicians to prescribe Aranesp when they otherwise would not have done so. Many of those prescriptions were paid for by government funded health insurance programs.

### D.    FDCA and FDA Regulations

39.    The Food and Drug Administration ("FDA") regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a).

40.    The FDA reviews pharmaceutical manufacturers' applications for new drugs to determine whether the drugs' intended uses are safe and effective. *See* 21 U.S.C. § 355. Once a drug is approved for a particular use, doctors are free to prescribe the drug for "non-indicated" or off-label purposes. While doctors may independently request information from drug manufacturers about such off-label uses, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses, *i.e.* "indications," not approved by

12

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

the FDA.  As described above, "off-label" refers to the marketing of an FDA-approved drug for uses that have not undergone FDA review and approval, *i.e*., for purposes not approved by the FDA.

41.     With the exception of purely scientific medical information provided by qualified medical professionals, sales and marketing presentations, promotions, or marketing to physicians for uses other than that approved by the FDA are considered off-label marketing or "misbranding" proscribed by the FDA.  *See* 21 U.S.C. §§ 331(a)-(b), 352(a),(f).  Additional proscribed marketing activity includes any attempts by pharmaceutical sales representatives to solicit discussions with physicians concerning off-label use.

42.     Strong policy reasons exist for strict regulation of off-label marketing. Off-label promotion bypasses the FDA's strict review and approval process and removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

43.     Pursuant to the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301, *et seq*., the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

44.     The FDA interprets "labeling" in its regulations broadly to include items that are "1) descriptive of a drug; 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel."  21 C.F.R. § 202.1.  The FDCA defines both misleading statements and the failure to reveal material facts in a label or product labeling as "misbranding."  21 U.S.C. § 321(n).  Labeling includes, among other things, brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio visual material.  21 C.F.R. § 202.1 (l)(2).

13

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

45.     FDA regulations deem "advertising" to include media-based activities that appear in magazines, newspapers, professional journals and on television, radio, and telephone communications systems.  *See* 21 C.F.R. § 202.1(l)(1).  Courts have consistently held that oral statements made by a company's sales representative relating to a pharmaceutical product constitute commercial advertising or promotion.  *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 10 (7th Cir. 1992) (interpreting the Lanham Act).

46.     Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371;  21 C.F.R. § 202.1(e)(6), (e)(7); 21 C.F.R. § 1.21.

47.     Such violations exist where promotional marketing materials and presentations (*i.e*., advertisements) for an FDA approved drug, among other things:

- Minimize, understate, or misrepresent the side effects, contraindications and/or effectiveness of the drug;

- Overstate or misrepresent the side effects, contraindications, and/or effectiveness of competing drugs;

- Expressly or implicitly promote uses, dosages or combination usage of the drug that is not contained in the FDA approved labeling (*i.e*., off-label uses);

- Fail to reveal material facts with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement;

- Contain representations or suggestions, not approved or permitted in the labeling, that the drug is better, more effective, useful in a broader range of conditions or patients, safer, or has fewer, or less incidence of, or less serious side effects or contraindications than demonstrated by substantial evidence or substantial clinical experience;

- Present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does;

14

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

- Use a quote or paraphrase out of context to convey a false or misleading idea; and/or

- Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

*See* 21 C.F.R. § 202.1 (e)(4)(5)(6), (7).

48.    Oral statements and written materials presented at industry-supported activities, including lectures and teleconferences, provide evidence of a product's intended use.  If these statements or materials promote a use inconsistent with the product's FDA-approved labeling, the drug is misbranded, as the statements and materials fail to provide adequate directions for all intended uses.

49.    Amgen's unlawful marketing and misrepresentations of Aranesp repeatedly violated the FDCA, which in turn resulted in violations of the False Claims Act, because Amgen's unlawful activity induced physicians to prescribe Aranesp, when physicians otherwise would not have done so for prescriptions paid for by government funded health insurance programs.  *U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 53 (D. Mass. 2001). Defendants Omnicare, PharMerica, and Kindred conspired with Amgen to violate the FDCA. Had federal, state and local Governments known about the kickbacks, they would not have paid for the prescriptions. *Id.*

## V.    <u>SPECIFIC ALLEGATIONS OF AMGEN'S FALSE CLAIMS</u>

### A.    Amgen's Aranesp and the Erythropetin Stimulating Agent Market

#### 1.    Aranesp's FDA Approved Indications

50.    Erythropoetin stimulating agents ("ESAs") are bioengineered versions of a natural protein made by a healthy kidney that stimulates the bone marrow to grow red blood cells.  There are two such drugs on the market: epoetin alfa and darbepoetin.  Amgen holds the patents for both and manufactures them both.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

51.     Epoetin was approved by the FDA in 1989 for treating "a lower than normal number of red blood cells (anemia) caused by chronic kidney failure in patients on dialysis."

52.     Amgen markets epoetin alfa as Epogen.  Amgen also licenses epoetin to J&J, which distributes it as Procrit.  In order to raise capital for the clinical trials of Epogen, Amgen licensed to Ortho Biotech L.P., a subsidiary of J&J, all potential uses of epoetin except the treatment of anemia related to chronic kidney failure on dialysis.[3]

53.     Despite the limitations of the licensing agreement, Epogen has become a blockbuster drug with sales of over $2 billion a year.

54.     Amgen developed darbepoetin, a second generation ESA, to compete with Procrit in precisely the markets it had given away to J&J in the licensing agreement for epoetin.  In 2001, the FDA approved Aranesp for the "treatment of anemia associated with chronic renal  on dialysis and patients not on dialysis."

55.     In 1989, J&J secured FDA approval for additional indications for epoetin alfa, including the treatment of anemia associated with AZT or cancer chemotherapy, or prior to surgery to reduce transfusion requirements.  Amgen obtained an indication for darbepoetin in the anemia of cancer chemotherapy in July 2002.

56.     The gravamen of the complaint involves the schemes Amgen developed to promote its drug Aranesp and cut into J&J's market share of Procrit.

### 2.     Uses and Abuses of ESAs: Black Box Warning

57.     Until the development of ESAs, the only treatment for anemia from any cause (anemia is a deficiency of red blood cells, which contain the hemoglobin molecules that carry oxygen to the tissues) was blood transfusion.  Frequent blood transfusions were problematic,

---

[3] See, Kerry A. Dolan, *Amgen's Enemies*, Forbes.com (Oct. 30, 2006) *available at* http://www.forbes.com/forbes/2006/1030/126_print.html.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

because patients developed antibodies against proteins in the "foreign" blood. Therefore transfusions were kept to a minimum, particularly in patients who would need them regularly for an indefinite period: the goal was to transfuse patients up to a level where they would be more comfortable and not in danger. Transfusions sufficient to reach a "normal" hemoglobin was not necessary and might reduce the total number of transfusions a patient could ultimately receive.

58. Anemia is known to be associated with the development of cardiovascular disease and the progression of chronic kidney disease to chronic kidney failure (End-Stage Renal Disease or "ERSRD"). When epoetin was first approved, however, no one knew whether treating anemia to normal hemoglobin levels (i.e. 12.0 mg/dl) would improve cardiovascular outcomes. A few small studies[4] suggested it might. The three much larger randomized controlled trials conducted to test this proposition showed just the opposite: morbidity and mortality increased with increasing hemoglobin (beyond 10.0 mg/dl to 11.0 mg/dl).[5]

59. The last trial, conducted by Amgen itself, published in 2009, with Aranesp, on 1432 patients with chronic kidney disease (not chronic kidney failure), showed "no evidence of benefit and a trend toward overall harm."[6] Patients who received Aranesp had twice the risk of stroke, a finding that was statistically significant ($p<0.001$).

60. In 2007, Epogen, Procrit and Aranesp all received a black box warning, the FDA's most stringent warning, for the use of ESAs for anemia patients suffering from chronic renal failure. The warning states:

Chronic Renal Failure:

---

[4] Kuriyama S., et al, *Reversal of anemia by erythropoietin therapy retards the progression of chronic renal failure, especially in nondiabetic patients*. 77;2 Nephron 176 (Abstract) (1997).

[5] Anatole Besarab, et al., *The Effects Of Normal As Compared With Low Hematocrit Values In Patients With Cardiac Disease Who Are Receiving Hemodialysis And Epoetin*, 339;9 NEW ENG. J. MED. 584 (1998).

[6] Ellis F. Unger, et al., *Erythropoiesis-Stimulating Agents-Time for a Reevaluation*, 362;3 NEW ENG. J. MED. 189 (2010).

17

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

- In clinical studies, patients experienced greater risks for death, serious cardiovascular events, and stroke when administered erythropoiesis-stimulating agents (ESAs) to target hemoglobin levels of 13 g/dL and above.

- Individualize dosing to achieve and maintain hemoglobin levels within the range of 10 to 12 g/dL.

**B.     Amgen and the LTCPP Defendants, Omnicare, PharMerica and Kindred Conspired To Cause Long Term Care Physicians To Submit False and Fraudulent Claims For Aranesp Prescriptions**

**1.     Amgen Viewed The Launch of Aranesp As A Failure**

61.     The development and launch of Aranesp was designed to allow Amgen to capture the very business that it gave away to J&J in 1985.  At the time of Aranesp's  2001 launch, pharmaceutical industry analysts viewed Amgen as having a near-monopoly on the ESA market.[7]   When Epogen was launched in 1989, Amgen held  an unprecedented 26 year patent on Epogen (that ends in 2015) and, by the terms of its 1985 deal with J&J, Amgen was able to secure most of the ESA market for dialysis patients with anemia associated with chronic kidney failure.  *Id.*  The Amgen deal precluded J&J from marketing Procrit to dialysis patients, but J&J was left free to market Procrit to non-dialysis patients who had anemia associated with chronic kidney failure and for other uses for which J&J later secured FDA approval.

62.     At Aranesp's launch, Procrit sales were $2 billion per year.  Through a conversion strategy, Amgen believed that it could cut into J&J's ESA market share.  In support of this goal, Amgen recruited George Morrow ("Morrow"), as the company's Vice President of Sales and Marketing, to run the Aranesp launch in 2001.  Morrow,  a pharmaceutical industry veteran with GlaxoSmithKline, set the company's sights on capturing as much of Procrit's $2 billion sales as possible.

---

[7] See, Andrew Pollack, *Amgen's Blockbuster Anemia Drugs Facing Patent Challenge*, N.Y. Times, Dec. 25, 2005.
.

18

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

63.    At Aranesp's launch, J&J had marketed Procrit in a variety of  health care markets, including the long term care market.  J&J successfully sold Procrit at a discount through rebate contracts, making it difficult for Amgen to penetrate the ESA market.

64.    While Amgen dispatched significant nephrology, oncology and hospital sales forces, each containing approximately 150 to 250 Aranesp sales representatives, it vastly underestimated Procrit's strength in the market place, which was a factor of its market longevity and J&J's unlawful sales tactics.  At the end of its first year, Aranesp returned a profit of $40 million and Amgen executives viewed the drug's launch as a complete failure. In 2003, Aranesp's market share in the LTC segment was below 5%.

65.    Even though Kevin Shear, Amgen's CEO, recognized market share barriers for Aranesp, he still predicted a dramatic increase in sales for Amgen in 2003.[8]  By earning a total revenue between $7.3 to $7.8 billion dollars, Amgen publicly predicted that its 2003 earnings would be higher than analysts' projections.

## 2.    In 2002, Amgen Expanded Its Marketing of Aranesp To The Long Term Care Market

66.    Pressed by representations to the financial markets, and struggling to meet the aggressive sales goals for Aranesp set by Morrow and Amgen's upper level management, Amgen decided to expand its Aranesp marketing efforts to the long term care ("LTC") market. This market included private and state-run nursing homes and skilled nursing facilities (collectively called "LTC facilities") that were primarily serviced by long term care pharmacies providers ("LTCPPs"), such as Defendants Omnicare, PharMerica, and Kindred.  Amgen determined the market for ESA drugs in the long term care market was approximately $163

---

[8] Transcript of Amgen Inc.'s Investor Conference Call (Dec. 12, 2002) (Fair Disclosure Financial Network).

19

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

million per year and the long term care market ("LTC") was one of fastest growing markets – growing 15% year -- in the pharmaceutical industry at large.

67.     In 2002, Amen promoted Mike Ryan to Vice President of Corporate Accounts, which encompassed the newly formed Aranesp LTC business unit.  Mr. Ryan had a degree in pharmacy and experience running nursing home health systems.   He promoted Relator Kurnik to Aranesp Director of LTC & Home Health Care and assigned one full-time field representative from within Amgen, Eddy Hobbs, to help canvas the long term care market for ways to successfully promote Aranesp.

68.     In 2002, Relator and Eddy Hobbs met with nursing home chains and LTCPPs, including the LTCPP Defendants in this case.  Their purpose was to research the long term care market environment.  Relator learned that prescription decisions at nursing homes and skilled nursing facilities were heavily influenced by the LTCPPs, particularly Defendants Omnicare, PharMerica, and Kindred, which had contracts with large networks of nursing homes and skilled nursing facilities, including Beverly Enterprises Inc. and Sava Senior Care LLC.

69.     LTCPPs play a key role in influencing drug utilization in nursing homes.  Because of the complexities of serving the pharmaceutical needs of large patient populations on a daily basis, LTC facilities often do not have their own on-site pharmacies, but contract with entities like Defendants Omnicare, PharMerica and Kindred to provide drugs and certain services, including but not limited to: consultant pharmacists available to assist in medication decisions 24 hours a day, medical education programs related to serving the needs of nursing home patients, the development of disease management guidelines or treatment protocols (i.e., suggested treatment regimens for particular diseases), legal compliance consulting and specialty packaging of pharmaceuticals, such as "blister packages" for each resident, for each day.

20

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

70.     To secure Aranesp sales in the long term care setting, Relator and Mr. Hobbs met with Omnicare and PharMerica in late 2002 to market Aranesp's advantages over Procrit and determine how Amgen could persuade these companies and their consultant pharmacists to choose Aranesp rather than Procrit. At one such meeting in 2002, Omnicare's CEO and President, Joel Gemunder, and Omnicare's Sr. Vice President of Business Development, Tim Bien, told Relator and Hobbs that the key to competing with J&J for ESA sales involved providing the best price to Omnicare for the product.  Specifically, Gemunder and Bien told Relator and Hobbs that J&J provided rebates to Omnicare based on the amount of prescriptions Omnicare dispensed for Procrit.  At the time, J&J was leading the ESA market in the long term care setting and Gemunder and Bien made it clear to Relator and Hobbs that Amgen's rebate deals would have to compete with the rebates being provided by J&J.

71.     In their discussions, Omnicare's Tim Bien further urged Relator to hire John Thompson, a former Pfizer sales employee, who had negotiated Omnicare rebate contracts for Pfizer.  In order to obtain Omnicare's business, Amgen agreed to hire John Thompson.  Once hired by Amgen in 2002, as a National Account Manager for Aranesp, Mr. Thompson devised a comprehensive plan to secure Aranesp business at the LTCPPs, including Omnicare, based on contracts and side agreements requiring Amgen to pay a number of financial inducements or kickbacks to the LTCPPs, including but not limited to quarterly rebates to the LTCPPs, in exchange for the LTCPP agreements to switch patients already on Procrit to Aranesp and place patients on Aranesp who were not already taking an ESA, thus, expanding  the "market" for Aranesp within nursing homes serviced by the LTCPPs.

72.     The terms of the illegal kickbacks or inducements were memorialized in rebate contracts and other side agreements between the LTCPP Defendants and Amgen, including

21

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

comprehensive plans ensuring that nursing home physicians prescribed Aranesp rather than Procrit and that the pool of patients, using Aranesp, was expanded to include patients who were not already being treated by an ESA.

73.    By 2003, Amgen entered into rebate contracts, resembling those given by their competitor J&J, with all the Defendant LTCPPs. Amgen's rebate contracts paid the LTCPPs based on the volume and/or market share of Aranesp purchased by the LTCPPs.

74.    At first, Amgen focused on targeting Omnicare and PharMerica for rebate contracts. This is because data, prepared for Amgen by Dan Shellenbarger, a Biotechnology Consultant at an outside marketing firm called ZS Associates, showed 88% of all long term care patients were serviced by large national accounts including the two largest LTCPPs, Omnicare and PharMerica. This data was shared with Amgen managers at least as early as April 8, 2003, via a presentation made by Karen Daniels, Amgen's Executive Director of Corporate Accounts. *Id.*

75.    In order to maximize the profits and rebates secured by agreements providing discounts to the LTCPPs based on volume and/or market share,[9] Amgen and the LTCPP Defendants embarked on a highly coordinated scheme to influence prescriber behavior within the nursing homes. Amgen's proscribed efforts have included:

(a) devising "Therapeutic Interchange" programs that required patients to be automatically switched from Procrit to Aranesp;

(b) pressing the LTCPP consultant pharmacists, via marketing and purported "educational" campaigns, to encourage LTC physicians to switch patients from Procrit to Aranesp;

(c) devising and paying for purported "educational" programs misstating the safety, efficacy and legitimate need for ESAs in the geriatric population;

---

[9] While the rebate contracts negotiated with the LTCPP Defendants varied by pharmacy and throughout the years, all the Amgen contracts incentivized the LTCPPs to purchase increasingly greater quantities of Aranesp.

22

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

(d) paying kickbacks, through the guise of honoraria, to physicians and medical directors who were high prescribers of Aranesp to conduct Continued Medical Education ("CME") and other purported medical education programs, promoting Aranesp for both on and off-label uses;

(e) paying kickbacks, through the guise of grants, to medical organizations -- such as the American Medical Directors Association ("AMDA") and the Association of Consultant Pharmacists ("ASCP") -- to devise bogus clinical guidelines that encouraged on-label and off-label use of Aranesp for anemia;

(f) paying for a PharMerica call-center, which made direct contact with physicians to urge them to switch patients from Procrit to Aranesp;

(g) paying kickbacks to PharMerica prescription data that Amgen already received from other vendors; and

(h) devising "anemia protocols" for nursing homes, which encourage switching from Procrit to Aranesp and expanding Aranesp's use for patients whose chronic kidney progression is outside the drug's package insert.

### 3. In Order To Secure Aranesp Sales Amgen Paid the LTCPP Defendants Kickbacks Pursuant to Illegal Rebate Contracts

76. Defendants' coordinated efforts to increase the sales of Aranesp violated the FDCA, the Anti-Kickback Statute and the FCA.

77. By 2003, Amgen entered into rebate contracts for Aranesp with Omnicare, PharMerica and NeighborCare. While the terms of each contract differed, all of the Amgen contracts provided rebates to the LTCPPs based on the volume or market share of Aranesp prescribed by physicians at nursing homes and skilled nursing facilities serviced by LTCPPs. Without any clinical justification for switching patients already treated by Procrit and/or without proper regard for the drugs' different indications, the LTCPPs were incentivized to ensure that LTC patients received Aranesp over Procrit, even if that meant switching a patient already stabilized on Procrit to Aranesp. The rebate contracts and other inducements paid by Amgen to increase Aranesp sales also provided a strong incentive for the Defendant LTCPPs and Amgen to

23

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

expand the number of prescriptions of Aranesp to patients whose kidney stage and anemia symptoms were outside the drug's indication.

78.    Upper level managers at Amgen approved, ratified, and/or participated in the development and implementation of the rebate contracts.  These Amgen upper level managers, known as the "Core Team" included: Mike Ryan, Vice President of Corporate Accounts; Bernie Tobin, Executive Director of Corporate Accounts; Karen Daniels, Executive Director of Corporate Accounts; Rob Jacobson, Director of Marketing; Dave Kern, Director of Marketing; Rick Cepull, Director of Marketing; Neil Bankston, Director of Contracting; Beverly Simmons, Director of Contracting; Jeff Weisiger, Director of Contracting; Angela Sciarra, Director of Medical Affairs; Mark Knapp, Sales Incentive Operations; Debbie Kleinman, Business Development Analysts; Chris Thompson, National Sales Director Senior Care Team; Tom Rice, Business Information Analyst and Relator Kurnik.  Relator reported to and was directed by Karen Daniels, Executive Director of Corporate Accounts. All contracts, plans of action, and negotiations with Omnicare, PharMerica and Kindred were at the instruction, supervision or knowledge of the Core Team. This Core Team met frequently to discuss and approve initiatives alleged herein, including but not limited to, rebate contracting, promotion of the Therapeutic Interchange programs and selecting continued medical education programs for the purpose of converting patients taking Procrit to Aranesp.

79.    Amgen's Core Team at all times was aware that Medicaid was the dominant payor in the LTC market, paying for nearly 70% of all ESA prescriptions.  Amgen's LTC rebate contracts with Omnicare, PharMerica, Neighborcare and Kindred were seen as an essential mechanism to capture Government funds in the LTC ESA market.  The role of Medicaid and other government payors, including Medicare, was specifically discussed at meetings of the core

24

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

team members. The Core Team was well aware of and paid attention to the role of government money in regard to Defendants' unlawful schemes to increase revenue from Aranesp sales.

80.    In order to facilitate the rebate contract scheme, Amgen management organized an LTC team to work with the Relator. This team included three National Account Managers ("NAMs"): 1) John Thompson who worked on contracts with Omnicare and Kindred; 2) Roy Sandoval who worked on contracts with Neighborcare; and 3) Eddy Hobbs who worked on contracts with Neighborcare and PharMerica. Under the NAMs were a group of Corporate Account Mangers ("CAMs") that worked within specified geographical areas within the LTCPPs and LTC facilities they serviced. CAMs included: Sam Daniel, southeast; Brad Nutter, west; Yvette Grimaldi, mid-Atlantic; and Carlos Valladares, east.[10]

### a.    The Omicare and NeighborCar Rebate Contracts

81.    Amgen viewed maximizing rebate contract usage within LTCPPs as a first step in growing sales of Aranesp.  In August 2003, Karen Daniels, Amgen Director of Corporate Accounts, worked with Tim Bien, Senior Vice President of Business Development from Omnicare to construct the framework for an Omnicare rebate contract.  On September 2, 2003, Omnicare management met with Amgen to discuss rebate contracts and build continuing partnerships.  Amgen's Core Team and other upper level managers from Amgen and Omnicare approved of, participated in, and negotiated the Amgen/Omnicare rebate contracts.  Executives from Omnicare who had knowledge of and participated in the scheme included:  1) Joel Gemunder, CEO and President of Omnicare, who oversaw all major corporate decisions including contracting; 2) Tim Bien, Omnicare Senior Vice President of Business Development, Omnicare's key decision maker and negotiator for all of Omnicare's rebate contracting,

---

[10] In 2004 CAMs became Regional Account Mangers ("RAMs"). As Aranesp sales goals increased, Amgen expanded their sales force to include 17 RAMs.

25

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

therapeutic interchange and anemia protocol programs; 3) Dan Maloney, Omnicare Vice President of Purchasing, who had a key role in Omnicare's rebate contracting, but deferred to Tim Bien on all major decisions and 4) Gary Erwin, Omnicare's Vice President of Clinical, who headed Omnicare's effort to design purported educational programs encouraging its consultant pharmacists to switch from Procrit to Aranesp.

82.     At a September 2003 meeting, Amgen proposed a rebate contract to Omnicare covering October 2003 to December 2005.  John Thompson, the Amgen NAM hired at the recommendation of Omnicare's Tim Bien, presented the contract proposal to Dan Maloney, Omnicare's Vice President of Purchasing, and later to Bien.  At that meeting, Omnicare agreed to an October 1, 2003 start date for the contract and to begin converting patients from Procrit to Aranesp at LTC facilities serviced by Omnicare. These economically driven schemes were never disclosed to patients whose drug regimens were changed.

83.     On October 1, 2003, an Amgen/Omnicare "Long Term Pharmacy Agreement" providing rebates to Omnicare took effect.  Under the contract, Omnicare was eligible to earn a rebate based on the amount of Aranesp it purchased.  To calculate Omnicare's total rebate, Amgen multiplied the amount of Aranesp purchased by an agreed upon "sliding scale" of percentage discounts.  For example, the Omnicare/Amgen contract specified that if Omnicare purchased $9,900,000 or more of Aranesp from October 1, 2005 to December 31, 2005, Omnicare would earn a 3% rebate (i.e. the rebates started at $297,000.00), however, if Omnicare purchased $13,400,000 or more of Aranesp, Omnicare would receive a 23% rebate (i.e. the rebates started at $3,082,000.00).   Amgen's contracts also granted Omnicare a rebate on Aranesp's market share in the ESA market (i.e. as compared to Procrit) as an additional incentive for Omnicare to convert patients from Procrit to Aranesp.

26

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2)

84.    Amgen reviewed the size of the rebates paid to Omnicare on a quarterly, monthly and weekly basis with Omnicare's Dan Maloney.  Contracts were frequently amended because J&J, hoping to retain or exceed its market share with Omnicare, continued to offer Omnicare rebate terms that were increasingly lucrative.

85.    In October 2003, when Amgen initiated rebate contracting with Omnicare, Aranesp had an ESA market share of only 6%.  This means that other ESAs, primarily Procrit, were prescribed 94% of the time in 2003.  Nine months later, Aranesp controlled 33% of Omnicare's ESA "market share."

86.    The impact of the rebate contracts on Omnicare's purchasing behavior is evidenced by Omnicare sales data.  In 2003, Omnicare purchased  $6.2 million worth of Aranesp. Total purchases of Aranesp grew to $30.3 million in 2004 and  $54.3 million in 2005. For example, Omnicare's Shore Pharmacy and Med World Pharmacy dispensed $1,000,000 more Aranesp from 2005 to 2006 than in previous years.  Likewise, some LTC facilities serviced by Omnicare increased their Aranesp prescriptions by 1000% once Omnicare was under contract with Amgen.

87.    The terms of Amgen/Omnicare rebate contracts were often amended and adjusted to keep pace with rebates and other illegal inducements being offered by J&J on Procrit and its other drugs.  For example, Relator was told that J&J offered rebates to Omnicare requiring the purchase of multiple drugs, including Risperdal.  Some of J&J's rebate contracts also required Omnicare to purchase a particular "market share" or percentage of Procrit versus other ESAs in order for Omnicare to receive a financial incentive.  For this reason, Omnicare told Amgen that it purchases of Aranesp could not exceed  50% of the entire ESA "market" within Omnicare.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

88.    Upper level managers from both Amgen and Omnicare worked together to implement and perpetuate the scheme. While Amgen and Omnicare's upper level managers and officials met many times concerning rebates from 2002 to at least 2008, an Amgen internal document indicates that in October of 2006, Omnicare's Joel Gemunder and Tim Bien met Amgen's Core Team members and upper level management: Mike Ryan, Vice President of Corporate Accounts; Chris Thompson, National Sales Director; John Thompson, NAM; and Rick Cepull, Director of Marketing to discuss the rebate contracts.

89.    Relator estimates that Amgen paid Omnicare approximately $60,775,000.00 in total rebates from the period of 2003 to 2008.  Based on Amgen internal sales data, Relator estimates the following yearly rebates paid to Omnicare, exclusive of other inducements paid to Omnicare, such as funds to promote the therapeutic interchange programs, protocols and speakers events:  (1) 2003 (11% discount) = $1.155 million; (2) 2004 (20% discount) = $6.4 million; (3) 2005 (23% discount) = $11.5 million; (4) 2006 (28% discount) = 17.92 million; (5) 2007 (28% discount) = $13.72 million; 2008 (28%) = $10.08 million.

#### b.    The PharMerica and Kindred Rebate Contracts

90.    Amgen also conspired with PharMerica and Kindred to promote Aranesp sales through rebate contracting, including targeted programs designed to influence prescriptions of Aranesp in the nursing home and skilled nursing facilities serviced by these LTCPPs.

91.    Amgen and PharMerica first agreed to the terms of a rebate contract for Aranesp in September 2003.

92.    Upper level managers from PharMerica approved of and negotiated the terms of the Amgen/PharMerica rebate contracts:  including: (1) Janice Rutkowski, PharMerica Senior Vice President of Clinical Services and Program Development, who made all major corporate

28

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

decisions for PharMerica, including contracting decisions; (2) Rob Godwin, PharMerica Vice President of Clinical Program Development; (3) Ron Perry, PharMerica Executive Director of Utilization Management, who contributed to decisions regarding contracting and including drugs on PharMerica's formulary; 4) Max Daugherty, Director of Strategic Clinical Services Information Systems; and 5) Mike Stout, Director of Contracting.  Amgen Core Team Members Angela Sciarra, Director of Medical Affairs, and Karen Daniels, Director of Corporate Accounts, frequently met with PharMerica senior management including Janice Rutowski, Ron Perry, Mike Stout and Max Daugherty in furtherance of the scheme.   For example on June 8, 2005 Angela Sciarra, David Kern, Karen Daniels, and Rob Jacobson took Rob Godwin to dinner in Las Vegas, Nevada.

93.    Internal Amgen documents also indicate that on September 25, 2006, in Tampa, Florida, Amgen and PharMerica held a meeting to discuss the results of rebate contracting and the companies' joint plans for the following year.  For example at the September 25, 2006 meeting, the following individuals were in attendance: Mike Ryan; Rick Cepull, Barbara Phillips; Eddy Hobbs; and Relator (from Amgen) and  Bill Shields, President; Janice Turoski; Rob Godwin; Rob Perry; and Mike Stout, Director of Contracting (from PharMerica). The meeting started at 9:00 a.m. at the Tampa Waterside Marriott and later was moved to PharMerica's headquarters at 11:00 a.m.  PharMerica's President Bill Shields gave opening statements.  The discussions proceeded through the day and into a 6:30 p.m. dinner at Ruth's Chris Steak House.  These meetings were held quarterly, usually at upscale hotels and restaurants in large cities or resort locations, and were viewed by the participants as a "perk" for being able to increase profits for their companies.

94.    By 2005, Aranesp accounted for 50% of the ESA market at PharMerica.

29

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

95.     While the terms of the Amgen/PharMerica rebate contracts varied from 2003 to 2008, the contracts generally paid discounts to PharMerica equaling 10% to 20%.  In 2005, the rebate contracts between PharMerica and Amgen paid a flat 18% discount rate, which Amgen agreed to pay on any volume of Aranesp sales.  The rebate contracts between PharMerica and Amgen in 2007 offered PharMerica a sliding scale of discounts up to 20% based on the volume of Aranesp purchases.   PharMerica was eligible for the 20% discount if it bought over $5,200,000.00 of Aranesp during the periods specified by the rebate contracts.   The rebate amounts were calculated based upon three month periods, corresponding with the financial quarters, such as October 1, 2007 to December 31, 2007; January 1, 2008 to March 31, 2008; April 1, 2008 to June 30,2008.  Like the Amgen/Omnicare rebate contracts, Amgen paid the rebates PharMerica earned in a lump sum each quarter.

96.     In 2003, Amgen entered into rebate contracts for Aranesp with Kindred through an intermediary Group Purchasing Organization ("GPO") called Broadlane, which negotiated rebate contracts for Kindred and a number of other long term care pharmacy providers. At that time,  Amgen did not deal directly with Kindred because its purchases of Aranesp did not justify an exclusive contract.  The impact of GPO rebate contracts on Aranesp prescriptions purchased by Kindred is illustrated through Amgen sales documents, showing a steady increase of Aranesp purchases by the  LTC facilities served by Kindred.  In 2004, Kindred purchased $1.413 million of Aranesp and the drug had a 19.41% share of the ESA market at Kindred. By 2005, Aranesp's total sales rose to over $3 million, representing  30% of Kindred's total ESA purchases.

97.     After Kindred's Aranesp sales grew significantly, Amgen negotiated its first direct contract with Kindred in 2006. Once under contract, some LTC facilities serviced by

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

Kindred and PharMerica increased their total prescriptions of Aranesp by over 500% percent from year to year.

98.     PharMerica merged with Kindred Healthcare's pharmacy business in July 2007. The new company, known as PharMerica, was and is the second largest in the institutional pharmacy services market with a customer base of 330,000 potential patients or "beds" in 41 states. Until the merger was complete, Amgen had separate rebate contracts with PharMerica and Kindred.

99.     Kindred's upper level managers approved of and participated in negotiating the Amgen rebate contracts, including: Jan Allen, Kindred Vice President of Clinical Services; and Bob Weir, Kindred Vice President of Purchasing, in charge of contract management.

100.    Relator estimates that Amgen paid PharMerica and Kindred together approximately $20,625,000.00 in total rebates from the period of 2003 to 2008. Based on Amgen internal sales data, Relator estimates the following yearly rebates paid to PharMerica and Kindred, exclusive of other inducements paid, such as funds to promote the therapeutic interchange programs, protocols and speakers events:  (1) 2003 (10% discount) = $480,000.00; (2) 2004 (15% discount) = $2.205 million; (3) 2005 (18% discount) = $4.14 million; (4) 2006 (20% discount) = 5.94 million; (5) 2007 (20% discount) = $4.56million; 2008 (20%) = $3.3 million.

> **4.     Amgen and the LTCPP Defendants Employed Illegal Switching Arrangements Called Therapeutic Interchanges In Violation of The Anti-Kickback Statute, the False Claims Act, and the FDCA**

> **a.     The Therapeutic Interchange Programs**

101.    In order to increase prescriptions of Aranesp within nursing homes and increase payments under the Amgen rebate contracts, the LTCPP Defendants instituted drug selection

31

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

policies, called "therapeutic interchange programs," requiring LTCPP consultant pharmacists to promote switching patients already on Procrit to Aranesp. The therapeutic interchange programs sought to ensure that the LTCPPs met the volume goals in the Amgen rebate contracts.

102.    For example, Defendant PharMerica instituted a comprehensive therapeutic interchange requiring switching patients from Procrit to Aranesp by July 2003.

103.    A 2004 slide show presentation titled "Aranesp Initiative Review" presented by PharMerica's Senior Vice President of Purchasing and Program Development, Janice Rutkowski; PharMerica's Director of Clinical Program Development, Rob Godwin; and PharMerica's Executive Director of Utilization Management, Ron Perry, indicated that PharMerica sought 100% conversion from Procrit to Aranesp, which was projected to create a "[g]ross margin pick-up [of] $3.0 mil[lion]" for PharMerica. These slides were presented to Amgen upper level managers at a "quarterly business review." As stated, quarterly business reviews, were held four times a year to evaluate the progress of the rebate programs and the "pull through" initiatives, including the therapeutic interchange program.

104.    The 2004 PharMerica Aranesp Initiative Review slideshow presentation discussed several "Strategies For Success" for "Procrit to Aranesp Conversion" or the therapeutic interchange. The slideshow centered around numerous efforts to encourage its consultant pharmacists to promote switching to physicians. The 2004 Aranesp Initiative Review called for: (a) educating consultant pharmacists through "[i]nservice programs in facilities, direct mail, teleconferences;" (b) providing a "list of high Procrit prescribers to Amgen representatives;" (c) using PharMerica's "Clinical HUB" to send "Aranesp TI [therapeutic interchange] letters batched and Fed Ex to physicians" encouraging switching patients from Procrit to Aranesp; (d) distributing "Aranesp clinical and dosing information material," (e) screening patients for

32

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

"untreated anemia [to] grow [the] market;" and (f) setting up a "pilot" program in PharMerica's Southeast Region, which required dispensing pharmacists to make selective "direct calls to physicians," urging a switch from Procrit to Aranesp.   In short, the Aranesp Initiative Review set forth the primary schemes adopted and utilized by PharMerica and Amgen to switch patients from Procrit to Aranesp from 2004 to, at least, 2008.  These plans are also memorialized in a December 2003 Amgen Account Strategy & Planning, written by Amgen's Christine Johnson and Eddy Hobbs.

105.    In addition to pressing its consultant pharmacists to promote switching ESA regimens to physicians, PharMerica directly solicited the physicians working in nursing homes that it serviced.  PharMerica hired nurses and other health care professions to staff a "call center" in Houston called the "Clinical HUB,"  which was tasked with encouraging physicians to switch from Procrit to Aranesp via direct solicitations over the phone and letters sent by mail.

106.    An example of a direct written request by PharMerica to physicians, encouraging them to switch from Procrit to Aranesp is included in a PowerPoint entitled "Amgen Senior Accounts Monthly Review," prepared on February 21, 2008 by Amgen's Corporate Accounts Department.  Slide 38 shows a template request form, requesting that physicians discontinue their use of Procrit and switch to Aranesp once their current supply of Procrit runs out.    The PowerPoint slide is titled, "PharMerica and Amgen have goals that are in alignment."

107.    According to the 2004 PharMerica Aranesp Initiative Review, PharMerica also utilized a "pilot program," requiring some of its consultant pharmacists in PharMerica's Southeast Region to directly call physicians to encourage switching from Procrit to Aranesp. The pilot program discussed in the 2004 Aranesp Initiative Review, was but one small part of

33

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

PharMerica's overarching scheme to place the primary responsibility for switching or converting patients from Procrit to Aranesp on its own consultant pharmacists.

108.    PharMerica and Amgen believed that the consultant pharmacists were the key driver for switching and employed a number of efforts designed to encourage them. For example, a July 8, 2003 slide show called "LTC S2 Segment Plan," developed by Julie Terhark of Amgen's Corporate Customer Marketing, states that "[w]ithin each facility that the PSRs [Amgen sales representatives] will be calling on, there are a number of key individuals.  The first and PRIMARY TARGET should be the consultant pharmacist." (Emphasis in original).    Also an Amgen Account Strategy & Planning document pertaining to PharMerica drafted by Christine Johnson and Eddy Hobbs in or about December 2003 stated that in order for the rebate agreements to succeed  "[l]ead Consultants & staff RPhs must get involved in TI [Therapeutic Interchange program] in addition to [the call center] Hub."

109.    Amgen and the LTCPP Defendants also seized on laws requiring consultant pharmacists to "provide a drug regimen review (DRR) for patients every 30 days and recommend necessary changes to the attending physician," as a mechanism that could be regularly manipulated to serve the goal of switching patients from Procrit to Aranesp.

110.    The 2004 PharMerica Aranesp Initiative discusses educating consultant pharmacists through "[i]nservice programs in facilities, direct mail, teleconferences."   On May 18, 2004, PharMerica's Rob Goodwin, Director of Clinical Program Development, and David B. Barker, Executive Director of Consulting, transmitted a memorandum requiring all PharMerica General Managers and Lead Consultants – which were the consultant pharmacists --  to attend a "Mandatory Teleconference" pertaining to the "Aranesp Conversion Project."   The May 18, 2004 memorandum stated, "PharMerica's Clinical Department has scheduled five regional

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

Aranesp educational teleconferences for General Managers, Lead Consultants, or designated Pharmacy Managers at each pharmacy. Participants in this program will be expected to convey information learned to all pharmacy staff." *Id.* The memorandum stated:

> PharMerica's therapeutic interchange initiative, converting Procrit to Aranesp, represents a significant opportunity to increase your pharmacy's gross margin while reducing the cost for our customers. In order for this project to be successful, all pharmacists, dispensing and consultants, must understand the clinical, dosing conversion, and financial issues of the Procrit/Aranesp conversion.

*Id.* The memorandum also bluntly stated, "[o]ur objective is to evaluate all Procrit orders for conversion to Aranesp. Providing the clinical and financial impact of this conversion will help achieve these goals." *Id.*

111.    PharMerica also provided direct financial incentives to their employees to implement therapeutic interchange programs. Each PharMerica region had a "score card," which tracked their success and was used to determine bonuses.

112.    While it is true that switching patients from Procrit to Aranesp provided a beneficial "financial impact" to PharMerica pursuant to the Amgen contracts, the beneficial "clinical impact" for patients is dubious as there are no studies showing that Aranesp is more efficacious or safe than Procrit. The May 18, 2004, PharMerica memorandum fails to mention a single medical or health benefit received by patients switching from Procrit to Aranesp. Moreover, because Aranesp is only indicated for anemia associated with chronic renal failure and for anemia associated with chemotherapy, PharMerica and Amgen's plan to convert all Procrit patients to Aranesp encouraged physicians and pharmacists to prescribe and dispense Aranesp for uses outside the drug's label in violation of the FDCA and the FCA.

113.    Amgen and PharMerica devised the switching or conversion program with full knowledge that their actions would induce prescriptions by nursing home physicians of the

35

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

prescription drug, Aranesp, which was reimbursable by Medicare, Medicaid or other federal and state health care payors. Amgen and PharMerica knew that a switching arrangement would impact Medicare and Medicaid and other government payor patients because the vast majority of patients treated at the nursing homes served by PharMerica, many over 65 years of age, are eligible for Medicare, Medicaid or other federal and state health care benefit programs. Specifically, an Amgen draft "CRI Long-Term Care Playbook," dated June 19, 2003 acknowledges that "Medicaid is the dominant payer for drugs in longer-term care with nearly 70% of all claims" and that "[n]early 10% of the drugs are paid by the SNF [skilled nursing facility] for patients covered under Medicare." In short, Amgen's payments to PharMerica, via rebates, for the purpose of knowingly inducing physicians to switch patients, receiving public health care benefits, from Procrit to Aranesp, is a violation of the Anti-Kickback Statute and the False Claims Act.

114. The U.S. Department of Health and Human Services Office of the Inspector General ("HHS OIG") issued an "OIG Special Fraud Alert" related to "Prescription Drug Marketing Schemes," published in the Federal Register on December 19, 1994, warning that "any payment, including cash or other benefit, given to a patient, provider or supplier for changing a prescription, or recommending or requesting a change, from one product to another …" may implicate a violations of the Anti-Kickback Law, unless the payment is made consistent with a "safe harbor" pursuant to 42 C.F.R. 1001.952. 59 FR 65372; December 19, 1994. The HHS OIG Fraud Alert explained the impact that such drug switching arrangements have on federal health care programs:

> In recent years, prescription drug companies in the United States have increased their marketing activities among providers, patients and suppliers such as pharmacies. Many prescription drug marketing activities go far beyond traditional advertising and educational contacts. Physicians, suppliers and,

36

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

increasingly patients, are being offered valuable, non-medical benefits in exchange for selecting specific prescription drug brands. Traditionally, physicians and pharmacists have been trusted to provide treatments in the best interest of the patient. *In an era of aggressive drug marketing, however, patients may now be using prescription drug items, unaware that their physician or pharmacist is being compensated for promoting the selection of a specific product*. Prescription drugs supplied under one of these programs are often reimbursed under Medicaid.

*Id.* (Emphasis added.)

115. The HHS OIG Fraud Alert also identified an example of an illegal marketing scenario, involving payments by a drug manufacturer to pharmacies for "each time a drug prescription was changed" from one drug to another. *Id.* In the HHS OIG Fraud Alert scenario, similar to Amgen and PharMerica's scheme to induce physicians to switch from Procrit to Aranesp, the "pharmacies were induced to help persuade physicians, who were unaware of the pharmacies' financial interest, to change [the] prescription." According to HHS, such a scheme would subject the manufacturer and pharmacy to a criminal violation of the Anti-Kickback Statute "[i]f one purpose" of the marketing scheme "is to induce the provision of a prescription drug item reimbursable by Medicaid." *Id.* In such a scenario, HHS opined that "[t]here is no statutory exception or 'safe harbor' to protect such activities." *Id.*

116. Omnicare and Amgen also worked on a similar therapeutic interchange programs for Aranesp from 2003 to 2005. Initially, in 2003 Omnicare instituted a therapeutic interchange "pilot program," requiring switching patients from Procrit to Aranesp.

117. At an October 14, 2003 Core Team meeting, Amgen managers targeted Omnicare's Tim Bien as their number one priority for "[i]mplementation of Interchange" from Procrit to Aranesp within Omnicare. Lisa Weldford, Omnicare's Vice President of Clinical Operations, was also targeted by Amgen Core Team member Angela Sciarra.

37

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

118.    In July 2005, Angela Sciarra helped Omnicare's Barbara J. Zariwutz, Chief Clinical Officer prepare a letter sent to all Omnicare pharmacists and regional clinical directors reinforcing the "therapeutic interchange" from Procrit to Aranesp.

119.    Some nursing homes serviced by Omnicare complained that the therapeutic interchange or switch from Procrit to Aranesp was not financially beneficial to them, especially for patients receiving less than 10,000 units of Procrit.  In those situations, the switch to an equivalent amount of Aranesp cost the nursing home more per patient.  In 2005, yielding to the pressure of the nursing homes, Omnicare agreed to strike a deal with Amgen on a limited therapeutic interchange program, which provided for switching patients from Procrit to Aranesp only for patients already taking 10,000 units or more of Procrit.

120.    At some point in or around 2005 or 2006, the program ended, but the companies reinstituted it again in 2007.   During that time, Relator and Amgen sales personnel received negative feedback from the nursing homes Amgen called upon concerning the Amgen/Omnicare therapeutic interchange programs.  The nursing homes complained that their physicians were constantly being asked to switch patients back and forth on Procrit and Aranesp, not because of patient care or pricing that helped the nursing homes, but based on the rebates that J&J and Amgen were able to give to Omnicare.

121.    Kindred also agreed to a therapeutic interchange program or conversion initiative for Aranesp.  An Amgen internal document indicates that in March 2004, Kindred's Jan Allen coordinated with Amgen's Roy Sandoval to develop an "Anemia Management Protocol," focusing on converting Procrit to Aranesp.  In order to increase rebates under the contracts, Kindred agreed to have Amgen provide "anemia management" presentations to clinical nurses at Kindred's annual meetings. Kindred also distributed newsletters addressing anemia management

38

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

for Amgen and provided lists of physicians, practicing within the nursing homes served by Kindred, to Amgen RAMs so Amgen could directly solicit physicians to use the Aranesp therapeutic interchange program.

122.    For the same reasons alleged  above, the  agreements between Amgen and Omnicare and Amgen and Kindred to switch patients from Procrit to Amgen in exchange for rebates are also violations of the Anti-Kickback Statute and the False Claims Act because a purpose of the payments was to induce Aranesp prescriptions that were payable by public health care assistance programs, such as Medicare, Medicaid and other government payors.

### b.      Speaker's Programs Promoting Switching

123.    To assist the therapeutic interchange programs, Amgen, Omnicare and PharMerica designed, paid for and conducted hundreds of "inservices" or speaker's programs from 2004 to, at least, 2008 encouraging the LTCPPs consultant pharmacists to recommend that physicians convert patients from Procrit to Aranesp.  Educational programs ensured that consultant pharmacists would encourage physicians to switch from Procrit to Aranesp.

124.    For example, in or  about June 2004, Amgen agreed to pay $60,0000.00 to PharMerica's CliniCare Concepts Division, for "assist[ance] in design, development, and coordination of an educational program designed to improve clinical knowledge and expertise of consulting pharmacists, clinical staff and physicians in the use of hematopoietic growth factors [ESAs] in the geriatric population."  Amgen and PharMerica planned to provide 10 speakers programs with the funds.  The goals for the program were, *inter alia*, to "[e]hance CliniCare Concept's and Amgen's image as a industry leader in providing quality health care education" and "[e]nhance the medical director's, consultant's, physician's, and nurse's role in recommending cost-effective drug therapy regimens… that indicate the use of Hematopoietic

39

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

growth factors in the long-term care elderly patient." Amgen and PharMerica entered into multiple similar $60,000.00 contracts for these programs from 2003 through 2005.

125. Amgen also jointly funded as many or more programs with Omnicare. From 2004 to at least 2008, Amgen devised, paid for and conducted hundreds of inservices for the LTCPP Defendants directed at encouraging consultant pharmacists and other nursing home health care professionals to switch patients from Procrit to Aranesp.

### c.     The Anemia Protocols

126. The Defendants also developed and influenced the development of "anemia protocols," which were designed to encourage health care professionals to switch patients from Procrit to Aranesp and identify untreated anemia patients. The protocols primarily addressed dosing regimens for converting patients from Procrit to Aranesp and criteria for determining whether a patient suffering from anemia associated with chronic kidney disease should be placed on Aranesp.

127. Amgen funded programs and meetings designed to reach key LTC health care professionals who could be influenced by these protocols. For example, Amgen provided funds for meetings of the National Association of Directors of Nursing Administrators ("NADNA") and the National Conference of Gerontological Nurse Practitioners. In 2006, Amgen provided numerous grants to such organizations, including: (a) AANAC (for a presentation on anemia in the Elderly); (b) NADONA (for an LTC conference on anemia); (c) Senior Med Alliance, Inc. (for a presentation on Anemia of Chronic Kidney Disorder in the Long-Term Care Setting); and (d) NCGNP (for the Anemia of Chronic Kidney Disease  24th Annual Convention).

128. Often nursing homes sought Amgen's help in designing anemia protocols. In some instances Amgen sent Clinical Specialists, who were employed in Amgen's Medical

40

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

Affairs division, to develop anemia protocols for particular nursing homes. In these cases, the nursing homes approved the anemia protocol designed by Amgen, without making any significant changes.

129.   Beginning in 2005, Amgen challenged its sales representatives, CAMS and NAMs to bring as many beds as possible under anemia protocols directly developed or influenced by Amgen. Using a checklist created with PharMerica and "toolkit" available to all the sales representatives in LTC division, Amgen held a bed protocol contest. When a long term care facility agreed to use an anemia protocol, Amgen sales employees received "credit" for the amount of beds at the facility. At the end of the contest, Amgen sales employees receiving the most number of points earned bonuses.

130.   Amgen and the LTCPP Defendants also created individual interchange protocols for specific facilities to be implemented by long term care facilities. This was accomplished with the knowledge and or direction of  Amgen's Yvette Girmaldi, Sam Daniel, Eddy Hobbs, and Marc Knapp. In one situation, Ann Semperi, a consultant pharmacist for PharMerica, was able to convince a Medical Director at Jewish Nursing Home in Connecticut to implement an anemia protocol, called the Aranesp Guidelines, for all existing and newly admitted nursing home patients.

131.   In 2006, Amgen Senior Care division hired Nurse Clinical Specialists ("NCSs") directly from their speaker's bureau to develop and promote the use of anemia protocols in long term care facilities.  Amgen had been successful using nurses and physician's assistants to develop similar protocols for hospitals targeted for Aranesp sales.  NCSs were required to work closely with RAMs to influence protocol adoption and changes.  NCSs were part of the sales team and earned bonuses based on their impact on Aranesp sales.

41

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

132.    Amgen set goals for the NCS group, requiring an increase treatment penetration in LTC market, even though these professionals were viewed by physicians as individuals that Amgen paid to provide unbiased medical and scientific information about Aranesp.

133.    Amgen later conducted an internal review of the use of NCSs to develop and promote anemia protocol.   Relator pointed out to Amgen investigators that Amgen's job description for the NCS position required, *inter alia*, the development of anemia protocols. Realtor believes that Amgen's findings were never reported to the Government.   Moreover, NCSs continued to work with health care professionals that Amgen paid to promote Aranesp, including a nephrologist, Dr. Jacqueline Vance, Director of Clinical Affairs for AMDA who provided assistance to Amgen Senior Care Marketing and Dr. Albert Riddle, a paid Aranesp speaker and author of anemia guidelines.

### 5.    Amgen and the LTCPP Defendants Unlawfully Conspired To Misbrand Aranesp In Order to Expand The Market For The Drug

134.    Amgen's FDA-approved indication for Aranesp and Epogen is to treat "anemia associated with chronic renal failure for patients who are either on dialysis or not on dialysis." This language is quite specific: Aranesp is not indicated for all patients with chronic kidney disease, a much larger group.

135.    In 2001, nephrologists working with the National Kidney Foundation developed a staging system for all patients with chronic kidney disease, depending on their glomerular filtration rate ("gfr" is a general measure of kidney function) and other evidence of kidney damage (e.g. proteinuria).   Chronic kidney disease itself is defined as either kidney damage despite a normal gfr or a gfr below 60 for 3 months or more.   Stage 1 of chronic kidney disease requires some evidence of kidney damage disease despite a gfr over 90.   Stage 2 of chronic kidney disease requires evidence of kidney damage and a gfr 60-89.    Stage 3 is satisfied by

42

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

moderate reduction of gfr alone or gfr of 30-59.    Stage 4 of chronic kidney disease is severe reduction of gfr or gfr 15 to 29.    Stage 5 of chronic kidney disease is a gfr less that 15 or a patient on dialysis and  is designated "chronic kidney failure."  Stage 5  patients are generally eligible for dialysis and/or transplant and are precisely the patients covered by the FDA indication for the ESAs.

136.    Amgen already monopolized the market for ESAs for patients with chronic kidney failure on dialysis with its drug Epogen because its licensing agreement with J&J precluded J&J from marketing Procrit to dialysis patients.  When Amgen launched Aranesp, it did not want to compete Aranesp against its own product Epogen for dialysis patients with anemia.  The number of patients with chronic kidney failure "not on dialysis" (i.e. those being treated by Procrit) was a smaller group of patients than were encompassed by Aranesp's package insert.  Rather than restrict Aranesp's potential profits to this smaller group of patients with chronic kidney failure (i.e. Stage 5 patients) who were not on dialysis, Amgen decided to illegally market Amgen to all patients with chronic kidney disease and anemia, no matter how mild, no matter how asymptomatic, despite the absence of an FDA approved indication. Amgen's target market (i.e. patients with anemia caused by chronic kidney disease in Stages 1-4) is exponentially larger than the market for patients with chronic renal failure.

137.    The Third National Health and Examination Survey ("NHANES III")[11] estimated that in about 2004 some 19.2 million people in the United States had chronic kidney disease, of whom only 300,000 had chronic kidney failure.  Patients in stages 3 and 4 generally have

---

[11] According to the Centers for Disease Control and Prevention, "NHANES is a major program of the National Center for Health Statistics (NCHS). NCHS is part of the Centers for Disease Control and Prevention (CDC) and has the responsibility for producing vital and health statistics for the Nation." See, http://www.cdc.gov/nchs/nhanes/about_nhanes.htm.  The CDC's website states that "NHANES is a program of studies designed to assess the health and nutritional status of adults and children in the United States. The survey is unique in that it combines interviews and physical examinations." *Id*.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

anemia, although it may be mild and asymptomatic, just like chronic kidney disease itself  in those stages.

138.    Defendants deliberately substituted the term "chronic kidney disease" for "chronic kidney failure."  Most of Amgen's promotional sales pitches and materials, adopted for use by Defendant LTCPPs, use or used the term "chronic kidney disease" rather than "chronic kidney failure" when promoting the use of Aranesp.  For example, a PowerPoint presentation called "Aranesp (darbepoetin alfa) for the Treatment of Anemia of Chronic Kidney Disease (CKD)," presented by Amgen's Angela Sciarra (who held a degree in Pharmacy) to Amgen sales representatives and managers in or about 2003,  focused on chronic kidney disease not anemia associated with chronic kidney failure.  Ms. Sciarra's PowerPoint presentation mislead Amgen sales personnel about the disease state.  Ms. Sciarra stated, "Aranesp may be used across the entire continuum of Chronic Renal Failure (CRF). CRF includes chronic renal insufficiency (CRI) and end-stage renal disease (ESRD)."  However, Amgen is approved only for chronic kidney failure (ESRD), not chronic renal insufficiency (the old nomenclature for chronic kidney disease).  Ms. Sciarra's PowerPoint correctly sets out the National Kidney Foundation's staging system for chronic kidney disease in a "note to the presenter," but fails to acknowledge that Aranesp is FDA-approved for use only in patients with stage 5 chronic kidney disease, namely chronic kidney failure.

139.    Making unsupported claims about a drug is considered illegal "misbranding" under the FDCA, yet that is exactly what Amgen did.  The studies submitted to FDA in support of the indication were designed only to show that Aranesp could raise hemoglobin levels safely in patients with chronic kidney failure: no evidence was sought or presented that this brought about clinically significant improvements in a patient's condition, such as a reduction in fatigue,

44

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

an increase in energy, or a reduction in cardiovascular events known to be associated with chronic kidney failure and anemia. Indeed, Aranesp's Package Insert states that two of the most common side effects of treatment with Aranesp are fatigue and congestive heart failure.

140. As discussed previously in this Complaint, before the development of ESAs, physicians limited the number of transfusions in chronic renal failure to the minimum needed to keep patients comfortable, functional, and above the level of dangerous complications. No one knew what would happen if these patients were treated to "normal" levels of hemoglobin, 13 g/dl for men, 12 g/dl for women. The answers were not long in coming. Using ESAs to "correct" patients' anemia (both those with chronic kidney failure and those with chronic kidney disease only) beyond about 10-11 g/dl showed no significant benefit—neither improved symptoms nor fewer cardiovascular events—but instead a trend to increased cardiovascular problems, including, in Amgen's own study, [12] a statistically significant increased risk of stroke. Indeed, the first two studies, the Normal Hematocrit Study published in 1999 and the "Correction of Hemoglobin and Outcomes in Renal Insufficiency" study ("CHOIR") published in 2006 were both stopped early because of an unfavorable trend towards serious cardiovascular events (death, heart attacks, strokes, etc.) in those whose hemoglobins had been normalized. The only important statistically significant finding in Amgen's own TREAT study was an increased incidence of strokes in the treated group.

141. Amgen's marketing materials make no mention of these findings, all published in the New England Journal of Medicine. Instead, Amgen highlights the well-known association between progressive kidney disease, progressive anemia, and increased morbidity and mortality from cardiovascular events. But then, Amgen goes further: it suggests that treating anemia to normal will reduce cardiovascular events (despite all the empirical evidence showing just the

45

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

opposite). Amgen's message to doctors is that if they do not treat anemia "as aggressively as hypertension, dyslipidemia and diabetes" as encouraged by the company's 2003 sales training materials, their patients will suffer or die.

142. Amgen regularly asserts that Aranesp improves patient quality of life for all chronic kidney disease patients with any degree of anemia, despite the absence of data supporting such a conclusion. For example, 2003 training materials, designed for Aranesp sales representatives, indicate that one "core message" for Aranesp was "Message 6: Treating anemia makes patients feel better, as measured by improvements in quality of life and functional capacity." The message that Aranesp makes patients "feel better" is also contained in two Amgen created and approved slide show presentations, called Anemia Management Institute I ("AMI One") and Anemia Management Institute II ("AMI Two"), which were used by physicians and other health professionals paid by Amgen to market Aranesp.

143. In fact, Amgen does not offer any data to suggest that patients with anemia associated with earlier stages of chronic kidney disease actually suffer from fatigue, reduced quality of life or state a desire to "feel better." Indeed, Amgen's Angela Sciarra's training PowerPoint correctly pointed out that "[a]nemia is a common but often asymptomatic consequence of CRI [chronic renal insufficiency, or CRI is an old term for chronic kidney disease]."

144. The false and misleading marketing messages pitched by Amgen and the LTCPP Defendants to physicians working in long term care facilities was and is especially egregious because long term care physicians typically are not nephrologists who have the appropriate training and experience with chronic kidney disease to sufficiently understand the complex

---

[12] "Trial to Reduce Cardiovascular Events with Aranesp Therapy" ("TREAT").

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

mechanisms of anemia.     It is well known in the medical community that the causes of anemia are diverse and often difficult to pinpoint, even for nephrologists.

145.     Amgen and the LTCPP Defendants mislead consultant pharmacists in the same way. A "Corporate Accounts Business Unit Long Term Care Market Strategy Recommendation," prepared by ZS Associates for Amgen on April 8, 2003, indicates that Amgen was acutely aware that it could easily influence LTC medical staff, including medical directors and consultant pharmacists to write prescriptions for Aranesp.   The "Strategy Recommendation" stated, "[t]here is additional opportunity to grow the market as anemia is presently under-penetrated – Medical staff and consultant pharmacists are not fully trained in identifying and diagnosing anemia."

146.     Those health care professionals relied on Amgen to provide them with truthful information, but were intentionally mislead for the sake of profit.  Specifically, Amgen and the LTCPPs chose to distort the purported cardiovascular and mortality dangers associated with not treating anemia, among other things,  even though the FDA in 2007 issued a black box warning stating that the use of Aranesp actually increased a patient's chance of cardiovascular events.

      **6.**    **Kickbacks:   Defendants Paid Health Care Providers To Induce Aranesp Prescriptions and Highjacked CME and Other Ostensibly Independent Educational and Scientific Programs For the Unlawful Promotion of Aranesp**

          **a.**    **Amgen Transformed Paid Speaker's Events Into Marketing Vehicles for Aranesp**

147.     To increase Aranesp prescriptions, Amgen and the LTCPP Defendants developed and paid for hundreds of purportedly independent educational and scientific programs directed at health care professionals charged with administering patient care at nursing homes. In 2005

47

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

alone, Amgen provided over 115 chronic kidney disease education programs to health care professionals serving LTC facilities.

148.    The activities alleged herein were conduced to unlawfully increase prescriptions of Aranesp.

149.    Amgen tightly controlled all aspects of the purported educational and scientific programs it paid health care professionals to provide, including: (a) the selection and training of speakers; (b) the development of materials used by the health care professionals Amgen paid to promote Aranesp; and (c) the selection of attendees; and (d) the venue of each event.

150.    Unknown to patients whose drug regimens were altered, Defendants' efforts were specifically targeted to compromise the professional obligations and integrity of medical professionals including medical directors, consultant pharmacists, and directors of nursing. These health care professionals provide the following services to LTC residents:

- Medical Directors ("MDs") are responsible for developing and enforcing patient care policies and ensuring appropriate medical care for all patients in the LTC facility. Medical Directors participate in the Drug Regimen Review ("DRR"), which is a thorough evaluation of the medication regiment of a resident with the goal of promoting positive outcomes and minimizing adverse consequences associated with medication. The review includes preventing, identifying, reporting and resolving medication related problems, medication errors, or other irregularities, and collaborating with other members of the LTC team. MD's are responsible for the medications of all residents in their facilities. MDs must visit residents at least once every 30-60 days, and are authorized to switch or change medications for patients.

- Consultant Pharmacists ("CPs") are employed by LTCPPs and are responsible for reviewing the drug regiment of LTC patients every 30 days and recommending changes to the physician. Consultant Pharmacists are also required to perform a "DRR" every 30 days for each resident in nursing homes and skilled nursing facilities.

- Directors of Nursing ("DON") act as liaisons between the medical director, attending physicians, and the consultant pharmacist. They are responsible for ensuring the quality, administration and implementation of direct patient care and supervision of the patients.

48

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

151.    Amgen's selection of speakers, providing essential medical information about Aranesp to LTC health care professionals, was made – not by medical professionals -- but by sales and marketing personnel at Amgen.  Speakers were not chosen because of their health care expertise but rather because of marketing goals.

152.    Amgen created a Senior Care Speakers Bureau, including regional and national speakers.  Amgen sales managers encouraged Aranesp sales representatives and Regional Account Managers (RAMs) to book speakers from the Speaker's Bureau to promote Aranesp to nursing home health care professionals.

153.    Regional speakers were first identified by Amgen sales representatives and national account managers ("NAMs") who based their decision to use a physician as an Aranesp speaker because of his or her ability to influence prescription writing.  The physicians tapped to be "regional speakers" were usually high prescribers or potentially  high prescribers of Aranesp.

154.    Amgen upper level managers recruited national speakers to give promotional lectures for Aranesp.  Amgen's national speakers, for the long term care market, included Dr. Albert Riddle, Dr. Sean Xio Leng, Dr. Charles Lacy, Dr. Richard Stefanacci, Dr. Mario Paul Curzi and Dr. Jeffry Kagan. Dr. Riddle was chosen by Amgen because he was the Medical Director of a large regional nursing  home chain, which Amgen marketing managers saw as a lucrative target for Aranesp sales.

155.    No background checks were made of proposed speakers with regard to licensing, disciplinary records, malpractice claims, teaching credentials, or publication of articles let alone peer reviewed ones.

156.    Amgen developed and paid for several educational programs, designed to promote the use of Aranesp, including two PowerPoint presentations, concerning anemia

49

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

associated with chronic kidney disease (not chronic kidney failure), called "Anemia Management Institute One" and "Anemia Management Institute Two."  Amgen trained the healthcare professionals it chose to promote Aranesp on the use of these scripted PowerPoint presentations and other materials.  Amgen mangers and trainers told its speakers not to stray from the materials and PowerPoints provided by Amgen when promoting Aranesp.

157.   Once a speaker was selected, Amgen referred the speaker to an Amgen Regional Medical Liaison ("RML"), who was generally a nurse or other medical professional ostensibly hired by Amgen to provide purely medical or scientific information to physicians about the uses and side effects of Amgen's pharmaceutical products, including information about off-label uses that Amgen sales representatives were not allowed to provide.

158.   Amgen, however, did not separate the functions of its RMLs from Amgen's Aranesp LTC marketing and sales forces.  Amgen used its RMLs to train speakers to promote Aranesp for on-label and off-label uses of Aranesp.  Amgen also used RMLs make presentations regarding on-label and off-label uses of Aranesp to doctors and other medical professionals.

159.   Amgen speakers had numerous contacts with Amgen NAMs and RMLs. When changes were made by Amgen to the scripted presentations, RMLs contacted speakers with the updated changes.

160.   Amgen's speakers were trained at luxury hotels at resorts and in large cities, including the Philadelphia Four Seasons. Amgen paid for each physicians' travel expenses and lodging.  In addition to training provided by the RMLs, Amgen Core team members, including Angela Sciarra, trained the speakers to use the AMI One and AMI Two PowerPoint presentations. Ms. Sciarra was a member of Amgen's Medical Affairs division and the Amgen

50

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

Core Team, but she was used by the company primarily to assist in the marketing efforts for Aranesp.

161. Amgen's Director of Marketing, David Kern, and other Amgen Core Team members oversaw the speaker training programs, including a training that occurred from October 7-8, 2005, in which 40 doctors and nurses were invited, including Dr. Albert Riddle, Dr. Jeff Hoggard, Dr. David Thomas. On October 11, 2005, David Kern notified the Amgen Core Team that Amgen had completed training 20 speakers.

162. In 2006, Amgen trained 63 speakers to give presentations on Chronic Kidney Disease of Anemia, called AMI One. Core team member Angela Sciarra also evaluated and trained Amgen speakers at the direction of Amgen Director of Marketing Rob Jacobson.

163. In September 2006, Amgen Core Team members Rick Cepull and Angela Sciarra helped plan for speaker training in Atlanta, Georgia, at which 36 speakers were trained and added to the Amgen Senior Care Speaker's Bureau. To assist with training, Amgen employed, Dr. Thomas and Dr. Hoggard.

164. Amgen also developed and paid for speaker programs, including Continuing Medical Education programs, with the active assistance and participation of the LTCPP Defendants.

165. For example, Amgen paid the following grants to PharMerica: $111,850 on August 15, 2005 and $30,000 on September 6, 2006.

166. As part of the quarterly business reviews with Omnicare and PharMerica, Amgen's NAMs, including John Thompson and Eddy Hobbs, worked with upper level managers from the LTCPPs, including PharMerica's Rob Godwin, to select CME and other educational programs to be used to train LTCPP consultant pharmacists and other health care professionals.

51

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2)

167.    At these meetings, PharMerica managers also presented proposals to Amgen for purported educational funding.  At PharMerica's request, Amgen spent $165,000 in 2006 to "communicate key promotional messaging" to physicians working within LTCs; $275,000 to "communicate key promotional messaging" to LTC consultant pharmacists; and $20,000 to "communicate key promotional messaging" to LTC Nurse Administrative Coordinators.

168.    PharMerica also sought funding from Amgen for: (1) a $40,000.00 data sharing agreement; (2) the development of anemia checklists for nursing homes; (3) the development of nurse practitioner CME's to help grow the ESA market; and (4) a study to determine why prescriptions were cancelled.

169.    Amgen's grants for these programs were not used for legitimate educational purposes, but solely to increase the sales of Aranesp.  For example, upon learning that Procrit would have a favorable Omnicare contract in June 15, 2004, Karen Daniels, Amgen's Director of Corporate Accounts and Relator's supervisor,  stated in an email to Relator Kurnik:

> We'll also have to rethink our programming here- if Tim [Bien from Omnicare] wants 'anemia' educational programs, we have to be extremely careful about growing the Procrit business vs. driving conversion. This relates to Fellows programs, AMI programs-I hope he knows we would include a lot of Aranesp information/conversion instructions in these programs and he would not have a problem with this. If he does, this is going to be problematic.

**b.      Amgen Paid Kickbacks To Physicians To Promote Aranesp and Secure Aranesp Prescriptions**

170.    Amgen dedicated large budgets to induce or reward physicians for prescribing Aranesp, through the guise of honoraria and other valuable items and/or services.   Amgen spent nearly $1 million in 2007 funding field speaker and programs. From October 2004 to June 2005 Amgen spent in excess of $850,000.00 for payments to speakers and other medical grants purportedly promoting anemia education.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

171.    During the six month period from January 2008 to June 2008, Amgen spent over $300,000 total for expenses associated with speaker events, including food, honoraria, travel and lodging expenses.

172.    Amgen speakers were paid $500 to $2000 per lecture.  Speakers were also paid an additional $250 if they were required to travel more than 60 miles to present or gave more than one program.  Speakers often received up to $1,300 in additional speaker expenses not including their honorarium. For instance on March 10, 2008 at Masto's Steakhouse in Costa Mesa, California, Dr. Mario Cornacchione received $3,320 from Amgen to promote Aranesp at a speaking event.

173.    Some Amgen speakers earned sizeable fees for promoting Aranesp.  For example, David Kazarian, a pharmacist who was a president of the American Society of Consultant Pharmacists ("ASCP"), was paid $13,500 in honorarium and for other expenses over an eight month period. Mr. Kazarian gave several talks including, "Overview of Chronic Kidney Disease and Anemia,"  "CKD and Anemia," and  AMI One "Overview of Chronic Kidney Disease and Anemia for Hospital Based Nurses."   Amgen also made significant grants to ASCP during October 2004 to June 2005, a time in which Mr. Kazarian headed the organization.

174.    Amgen paid Dr. Mario Cornacchione $29,000 in a period of just five months. From February 19, 2008 to June 23, 2008, Dr. Cornacchione received speaker expenses and honorarium to present lectures called, "Managing the Anemia Associated with CRF in Older Adults in Pennsylvania, Texas and California."  For example, Dr. Carnacchione gave one such anemia  presentation in Costa Mesa, California on March 10, 2008.

53

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

175. Amgen paid another speaker, Dr. Albert Riddle, over $24,000 in honoraria and reimbursement expenses related to number of speaking engagements presented from January 18, 2008 to June 26, 2008.

176. Speaker presentations were held at up-scale restaurants including: Morton's Steakhouse in Bethesda, Maryland on May 7, 2008; Pappadeux's Seafood Kitchen in Arlington, Texas on April 23, 2008; Spencer's Steakhouse in San Jose, California on April 23, 2008; Mastro's Steakhouse in Cosa Mesa, California on March 10, 2008; and Ruth's Chris Steakhouse in Greensboro, North Carolina on April 30, 2008.

> **c.     Amgen Funneled Payments To Physicians Through Regional and National Health Care Associations To Disguise Payments And Induce Associations To Assist In The Marketing of Aranesp**

177. To disguise the nature of payments to physicians, Amgen sometimes paid grants to national and regional health care associations, such as AMDA and ASCP, and the LTCPPs so that it appeared that the speaker's fees came directly from these intermediaries instead of Amgen. These laundered payments were kickbacks designed to compensate health care professionals who were high prescribers or potentially high prescribers of Aranesp.

178. Amgen also worked with LTCPP Defendants to influence doctors associated with national and regional health care associations. In 2006, the AMDA, ASCP, American Association of Nurse Assessment Coordination ("AANAC"), NADONA and other organizations were paid over $1 million in purported "Medical Education Grants."

179. For example, Rob Jacobson, Amgen Director of Marketing, requested that Amgen provide a grant to AMDA and the Journal of American Medical Directors Association for their annual symposium in 2006. Amgen approved the request and paid them $293,059.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

180.    Amgen also attended professional association conferences where they paid exhibit, sponsorship and participation fees to professional associations. One example is an ASCP conference in Las Vegas.

181.    Amgen and the Defendant LTCPPs pressured physicians within AMDA and other professional organizations to switch from Procrit patients to Aranesp. Rob Godwin, PharMerica's Vice President of Clinical Development, also worked to set up therapeutic interchange programs for doctors who were members of AMDA. For example a March 15, 2008 Amgen Sales National Account Team Monthly report provided to Relator, from Eddy Hobbs, stated,"[m]et with Dr. Stone at AMDA and he indicated that he will switch to Aranesp at the end of the month. Rob Godwin [from PharMerica] told me that he had a conference call scheduled with Dr. Stone to discuss the therapeutic interchange." *Id*.

## COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[13]
### Against All Defendants

182.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

183.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

184.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented, or caused to be presented  false or fraudulent claims for improper payment or approval of prescriptions for Aranesp.

---

[13] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(1).

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

185.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

186.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

### COUNT TWO[14]
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Against All Defendants

187.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

188.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

189.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

190.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

191.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

### COUNT THREE[15]
### Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C)
### Against All Defendants

192.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

---

[14] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(2).

[15] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(3).

56

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

193. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

194. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and/or (a)(1)(B).

195. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

196. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT FOUR
### California False Claims Act., Cal. Gov't Code § 12651 *et seq*
### Against All Defendants

197. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

198. This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code § 12651 *et seq*.

199. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

200. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the California False Claims Act.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

201.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

202.    By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT FIVE
## Connecticut False Claims Act,
## Conn. Gen. Stat. §§ 17b-301a -17b301p (2010 Supplement)
## Against All Defendants

203.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

204.    This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301a – 17b-301p (2010 Supplement).

205.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

206.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Connecticut False Claims Act.

207.    The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

208.    By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

58

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## COUNT SIX
### Delaware False Claims Act, 6 Del. C. § 1201, § 1201 *et seq*.
### Against All Defendants

209.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

210.    This is a claim for treble damages and civil penalties under the Delaware False Claims Act. Del Code Ann. tit. 6, § 1201 *et seq*.

211.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

212.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Delaware False Claims Act.

213.    The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

214.    By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SEVEN
### Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.
### Against All Defendants

215.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

216.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

217. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

218. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Florida False Claims Act.

219. The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

220. By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT EIGHT
### Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168.1 *et seq*.
### Against All Defendants

221. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

222. This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 *et seq.*

223. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

60

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

224.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Georgia False Medicaid Claims Act.

225.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

226.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT NINE
### Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq*.
### Against All Defendants

227.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

228.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq*.

229.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using or causing to be made or used a false record or statement.

230.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Hawaii False Claims Act.

231.    The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

232. By reason of these payments, the Hawaii Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TEN
### Illinois Whistleblower Reward and Protection Act,
### 740 III. Comp. Stat. 175/1 *et seq*.
### Against All Defendants

233. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

234. This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 111. Comp. Stat. 175/1 *et seq*.

235. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

236. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Illinois Whistleblower Reward and Protection Act.

237. The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

238. By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

62

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## COUNT ELEVEN
### Indiana False Claims and Whistleblower Protection Act,
### Indiana Code § 5-11-5.5
### Against All Defendants

239.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

240.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

241.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

242.     Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act.

243.     The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.  By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWELVE
### Louisiana Medical Assistance Programs Integrity Law,
### La. Rev. Stat. Ann. § 46:439.1 *et seq*.
### Against All Defendants

244.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

63

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

245.　This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq*.

246.　By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

247.　Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Louisiana Medical Assistance Programs Integrity Law.

248.　The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

249.　By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT THIRTEEN
### Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0)
### Against All Defendants

250.　Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

251.　This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5(A)-(0).

252.　By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval

64

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

253.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Massachusetts False Claims Act.

254.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

255.    By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT FOURTEEN
### Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq.*
### Against All Defendants

256.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

257.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq.*

258.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

259.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Michigan Medicaid False Claims Act.

65

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

260.    The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

261.    By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT FIFTEEN
## Minnesota False Claims Act Minn. State Minn. Stat. § 15C.01 *et seq.*
## Against All Defendants

262.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

263.    This is a claim for treble damages and civil penalties under the Minnesota False Claims Act Minn. Stat. § 15C.01 *et seq.*

264.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

265.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Minnesota Medicaid False Claims Act.

266.    The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

267.    By reason of these payments, the Minnesota Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## COUNT SIXTEEN
### Montana False Claims Act; Mont. Code Anno. §17-8-401 *et seq.*
### Against All Defendants

268.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

269.    This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Anno. § 17-8-401 *et seq.*

270.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

271.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Montana False Claims Act.

272.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

273.    By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SEVENTEEN
### Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq.*
### Against All Defendants

274.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

67

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

275. This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq*.

276. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

277. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Nevada False Claims Act.

278. The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

279. By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT EIGHTEEN
### New Hampshire Medicaid Fraud and False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-b, *et seq*.
### Against All Defendants

280. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

281. This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. § 167:61-b, *et seq*.

282. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Hampshire Medicaid Program false or fraudulent claims for payment or approval

68

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

283.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Hampshire Medicaid Fraud and False Claims Act.

284.    The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

285.    By reason of these payments, the New Hampshire Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT NINETEEN
### New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*.
### Against All Defendants

286.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

287.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*.

288.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

289.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Jersey False Claims Act.

69

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

290.    The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

291.    By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY
### New Mexico Medicaid False Claims Act,
### N.M. Stat. Ann.,1978, § 27-14-1 *et seq*.
### Against All Defendants

292.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

293.    This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann., 1978, § 27-14-1 *et seq*.

294.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

295.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Mexico Medicaid False Claims Act.

296.    The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

297.    By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

70

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## COUNT TWENTY ONE
### New York False Claims Act, N.Y. State  Fin. Law § 187 *et seq*.
### Against All Defendants

298.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

299.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.

300.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

301.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New York False Claims Act.

302.    The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

303.    By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY TWO
### North Carolina False Claims Act, 52 N.C.G.S. § 1-605 *et seq*.
### Against All Defendants

304.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

305.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, 52 N.C.G.S. § 1-605 *et seq*.

71

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

306.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

307.     Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the North Carolina False Claims Act.

308.     The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

309.     By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY THREE
### Oklahoma Medicaid False Claims Act; 63 Okl. St. Ann. § 5053 *et seq*.
### Against All Defendants

310.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

311.     This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq*.

312.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be make or used a false record or statement.

72

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

313.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Oklahoma Medicaid False Claims Act.

314.    The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

315.    By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY FOUR
### Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq*.
### Against All Defendants

316.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

317.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.

318.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by using or causing to be used or made a false record or statement.

319.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Rhode Island False Claims Act.

73

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

320. The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

321. By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY FIVE**
**Tennessee Medicaid False Claims Act,**
**Tenn. Code Ann. § 71-5-181** *et seq*.
**Against All Defendants**

322. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

323. This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*.

324. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

325. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Tennessee Medicaid False Claims Act.

326. The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

327. By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

74

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## COUNT TWENTY SIX
### Texas Medicaid Fraud Prevention Act,
### Tex. Hum. Res. Code Ann. § 36.001 *et seq.*
### Against All Defendants

328.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

329.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

330.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

331.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

332.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

333.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY SEVEN
### Virginia Fraud Against Taxpayers Act,
### Va. Code Ann. §8.01-216.1 *et seq.*
### Against All Defendants

334.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

335.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq*.

336.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

337.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Virginia Fraud Against Taxpayers Act.

338.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

339.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY EIGHT**
**Wisconsin False Claims Act; Wis. Stat. § 20.931 *et seq*.**
**Against All Defendants**

340.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

341.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act, Wis. Stat. § 20.931 *et seq*.

342.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval and/or

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

343.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Wisconsin False Claims Act.

344.    The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

345.    By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY NINE**
**District of Columbia False Claims Act,**
**D.C. St. § 2-308.14 *et seq*.**
**Against All Defendants**

346.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

347.    This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq*.

348.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by using or causing to be used or made a false record or statement.

77

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2)

349.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the District of Columbia False Claims Act.

350.    The District of Columbia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

351.    By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTY**
**City of Chicago False Claims Act,**
**Chicago Mun. Code Chapter 1-22-010,** *et seq*.
Against All Defendants

352.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

353.    This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act, Chicago Municipal Code Chapter 1-22-010, et seq.

354.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the City of Chicago false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by using or causing to be used or made a false record or statement.

355.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the City of Chicago False Claims Act.

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

356.    The City of Chicago, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

357.    By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

## VI.    PRAYER

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the state and municipal false claims acts;

b.      Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, et seq. plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States and municipalities under similar provisions of their false claims acts;

c.      The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state and municipal false claims acts;

d.      The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

e.      Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g.      The United States, the States, the City of Chicago, and the Relator recover such other relief as the Court deems just and proper.

79

FILED UNDER SEAL
PURSUANT TO 31U.S.C. §3730(b)(2)

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands

a trial by jury.

DATED:  June ___, 2011

/s/Richard A. Harpootlian
Richard A. Harpootlian
Bar No. 1730
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: 803- 252-4848
Facsimile:  803-252-4810
rah@harpootlianlaw.com

Reuben A. Guttman*
Traci Buschner*
GRANT & EISENHOFER P.A.
1920 L Street, N.W., Suite 400
Washington, DC 20036
Telephone:     202-386-9500
Facsimile:     202-350-5908
rguttman@gelaw.com
tbuschner@gelaw.com

Jay W. Eisenhofer *
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: 646-722-8500
Facsimile:  646-722-8501
jeisenhofer@gelaw.com

Justin K. Victor*
GRANT & EISENHOFER P.A.
1201 N. Market Street
Wilmington, DE 19801
Telephone:     302-622-7053
Facsimile:     302-622-7055
jvictor@gelaw.com

* Not admitted in this jurisdiction, but will file *Pro Hac Vice* Motions shortly.

Attorneys for Relator Frank Kurnik

80

## CERTIFICATE OF SERVICE

On June ___ 2011, I hereby certify that a copy of the Relator's Complaint was served

upon the following persons via United States Postal Service certified return receipt.


/s/Richard A. Harpootlian
Richard A. Harpootlian Bar No.1730
rah@harpootlianlaw.com
1410 Laurel Street
P.O. Box 1090
Columbia, SC  29202
Tel.:  (803) 252-4848
rah@harpootlianlaw.com


## VIA CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

United States Attorney General Eric H. Holder
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

United States Attorney General Eric H. Holder
c/o Ms. Joyce R. Branda
Deputy Director
Commercial Litigation Branch
Fraud Section
U.S. Department of Justice
Ben Franklin Station
Washington, D.C.  200044
(202) 307-0231
(202) 616-3085

The Honorable William Nettles
United States Attorney
District of South Carolina
1441 Main Street, Suite 500
Columbia, S.C. 29201

Inspector General Daniel R. Levinson
Office of the Inspector General
Office of Public Affairs
Department of Health
    and Human Services
Room 5541 Cohen Building
330 Independence Avenue, SW
Washington, D.C.  20201
(202) 619-1343
(202) 260-8512 (fax)
pafairs@oig.hhs.gov

Attorney General Kamala D. Harris
Office of the Attorney General
1300 "I" Street
Sacramento, CA  94244-2550
(916) 445-9555

Attorney General Pam Bondi
Office of the Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL  32399-1050
(850) 414-3300
(487) 487-9475 (fax)
Ag.mccollum@myfloridalegal.com

Mr. Brian Finkel
California Department of Justice
Bureau of Medi-Cal Fraud
    and Elder Abuse
1455 Frazee Road, Suite 315
San Diego, CA  92108

Attorney General David M. Louie
Office of the Attorney General
425 Queen Street
Honolulu, HI  96813
(808) 586-1500
(808) 586-1239 (fax)

Attorney General Joseph R. Biden, III
Carvel State Office Building
820 North French Street
Wilmington, DE  19801
(302) 577-8400
(302) 577-2496 (fax)
Attorney.General@State.DE.US

Mara S. Georges, Corporation Counsel
City of Chicago, Law Department
121 North LaSalle Street, Room 600
Chicago, IL  60602
(312) 744-0220
(312) 744-8538 (fax)

Ms. Alex Sink, Chief Financial Officer
c/o Pete Dunbar
Division of Legal Services
Florida Department of
    Financial Services
200 East Gaines Street
Tallahassee, FL  32399
(850) 513-3110
(850) 413-7460 (fax)

Attorney General Greg Zoeller
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington Street, 5th Floor
Indianapolis, IN  46204
(317) 232-6201
(317) 232-7979 (fax)
constituent@atg.in.gov

Miguel del Valle, City Clerk
City of Chicago
121 North LaSalle Street, Room 107
Chicago, IL  60602
(312) 742-5375
cityclerk@cityofchicago.org

Allen Pope, Director, MFCU
Medicaid Fraud Control Unit of Indiana
Office of the Attorney General
8005 Castleway Drive
Indianapolis, IN 46250-1946
(317) 915-5300

Attorney General Lisa Madigan
Chicago Main Office
100 West Randolph Street
Chicago, IL  60601
(312) 814-3000
(312) 814-3806 (fax)

Attorney General Lori Swanson
Office of the Minnesota Attorney General
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101
(651) 296-3353

Attorney General Catherine Cortez Masto
Office of the Attorney General
100 North Carson Street
Carson City, NV  89701
(775) 684-1100
(775) 684-1108 (fax)

Attorney General Paula T. Dow
Office of the Attorney General
25 Market Street
Trenton, NJ  08625-0080
(609) 292-4925
(609) 292-3508 (fax)

Attorney General Eric Schneiderman
Office of the Attorney General
Dept. of Law- The Capitol, 2nd Fl.
Albany, NY  12224-0341
(800) 771-7755
serveAG@oag.state.ny.us

Attorney General Peter Kilmartin
Office of the Attorney General
150 South Main Street
Providence, RI  02903
(401) 274-4400

F. Edward Kirby, Jr.
Special Deputy Attorney General
Medicaid Investigations Unit
3824 Barrett Drive, Ste. 200
Raleigh, NC  27609
(919) 881-2328

David O. Thomas
Inspector General of Indiana
315 West Ohio St., Room 104
Indianapolis, IN  46204
(317) 232-3850

Attorney General Martha Coakley
Office of the Attorney General
One Ashburton Place
Boston, MA  02108-1698
(617) 727-2200
(617) 727-3251 (fax)

Attorney General Steve Bullock
Department of Justice
215 North Sanders Street
Helena, MT  59620-1401
(406) 461-1264
steve@stevebullock.com

Attorney General Michael Delaney
33 Capitol Street
Concord, NH  03301
(603) 271-3658
(603) 271-2110 (fax)

Attorney General Gary King
408 Galisteo Street, Villagra Building
Santa Fe, NM  87501
(505) 827-6000
(505) 827-5826 (fax)

Attorney General Scott Pruitt
313 NE 21st Street
Oklahoma City, OK  73105
(405) 521-3921

Attorney General Irvin B. Nathan
Office of the Attorney General
441 4th Street, NW
Washington, D.C.  20001
(202) 727-3400
(202) 347-8922 (fax)

Attorney General George Jepsen
P.O. Box 120
Hartford, CT  06141-0120
(860) 808-5318

Attorney General James D. Caldwell
P.O. Box 94095
Baton Rogue, LA 70804-4095
(225) 326-6000

Attorney General Robert E. Cooper
425 5th Avenue North
Nashville, TN  37243
(615) 741-3491

Attorney General J.B. Van Hollen
State Capitol, Ste 114 E.
P.O. Box 7857
Madison, WI  53707-7857
(608) 266-1221

Attorney General Kenneth T. Cuccinelli
Office of the Attorney General
900 East Main Street
Richmond, VA  23219
804-786-2071

Attorney General Sam Olens
40 Capitol Square, SW.
Atlanta, GA  30334-1300
(404) 656-3300

Attorney General Bill Schuette
P.O. Box 30212
525 W. Ottawa
Lansing, MI  48909-0212
(517) 373-1110

Attorney General Greg Abbott
Capitol Station
P.O. Box 12548
Austin, TX  78711-2548
(512) 463-2100