## UNITED STATES DISTRICT COURT
## DISTRICT SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESOTA, MARYLAND, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA and the CITY OF CHICAGO, | : : : : : : : : : : : : : : : | **CASE NO. 3:11-cv-1464-JFA** |
| Plaintiffs, | : : | **JURY TRIAL DEMANDED** |
| *Ex rel.* | : : | |
| FRANK KURNIK, | : | |
| Plaintiff-Relator, | : | **AMENDED COMPLAINT** |
| v. | : : | |
| PHARMERICA CORP., PHARMERICA CORP, as successor in interest to PHARMERICA INC., and KINDRED HEALTHCARE, INC., | : : : : : | |
| Defendants. | : : : : : | |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. JURISDICTION AND VENUE .............................................................................. 6

III. PARTIES ............................................................................................................... 7

IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ............................................... 10

    A. FEDERAL GOVERNMENT HEALTH PROGRAMS ........................................ 10

    B. FDCA AND FDA REGULATIONS ............................................................... 12

    C. THE FALSE CLAIMS ACT AND THE MEDICARE FRAUD & ABUSE/ANTI-KICKBACK STATUTE ................................................................. 15

V. BACKGROUND ..................................................................................................... 19

    A. ARANESP'S REGULATORY HISTORY AND FDA APPROVED INDICATIONS .............. 19

    B. AMGEN VIEWED THE LAUNCH OF ARANESP AS A FAILURE ................................. 20

    C. IN 2002, AMGEN EXPANDED ITS MARKETING OF ARANESP TO THE LONG TERM CARE MARKET .................................................. 22

VI. SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS ........................... 25

    A. DEFENDANTS SOLICITED AND ACCEPTED INDUCEMENTS OR KICKBACKS FOR SECURING ARANESP PRESCRIPTIONS ............................... 25

        1. PharMerica ...................................................................................... 28

            (a) Aranesp Therapeutic Interchange and/or Conversion Programs ................................. 31

            (b) PharMerica Used Its P&T Committee To Facilitate Kickback Payments .............................. 36

            (c) PharMerica's Clinical HUB ............................................. 39

            (d) Clinicare Concepts Programs and Other Speaker Programs ......... 40

        2. Kindred ........................................................................................... 41

    B. AMGEN AND THE LTCCP DEFENDANTS TRANSFORMED PAID SPEAKER'S EVENTS INTO MARKETING VEHICLES FOR ARANESP ............................ 42

    C. AMGEN AND THE DEFENDANTS UNLAWFULLY CONSPIRED TO MISBRAND ARANESP IN ORDER TO EXPAND THE MARKET FOR THE DRUG. ........................ 49

1.     Background ................................................................................... 49

2.     Misbranding and Kickbacks ........................................................ 54

3.     The Anemia Protocols................................................................. 59

COUNT ONE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A)
        AGAINST ALL DEFENDANTS ....................................................... 62

COUNT TWO FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B)
        AGAINST ALL DEFENDANTS ....................................................... 63

COUNT THREE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 (A)(1)(C)
        AGAINST ALL DEFENDANTS ....................................................... 63

COUNT FOUR CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE § 12651
        *ET SEQ.* AGAINST ALL DEFENDANTS ...................................... 64

COUNT FIVE COLORADO MEDICAID FALSE CLAIMS ACT, COLO. REV. STAT.
        §§ 25.5-4-303.5*, ET SEQ*. AGAINST ALL DEFENDANTS ......................................... 65

COUNT SIX CONNECTICUT FALSE CLAIMS ACT, CONN. GEN. STAT. §§ 17B-
        301A -17B301P (2010 SUPPLEMENT) AGAINST ALL DEFENDANTS .................. 65

COUNT SEVEN DELAWARE FALSE CLAIMS ACT, 6 DEL. C. § 1201, § 1201 ET SEQ.
        AGAINST ALL DEFENDANTS…………………………………………………66

COUNT EIGHT FLORIDA FALSE CLAIMS ACT, FLA. STAT. ANN. § 68.081 *ET
        SEQ*. AGAINST ALL DEFENDANTS............................................................ 67

COUNT NINE GEORGIA FALSE MEDICAID CLAIMS ACT, GA. CODE ANN. § 49-
        4-168.1 *ET SEQ*. AGAINST ALL DEFENDANTS........................................ 68

COUNT TEN HAWAII FALSE CLAIMS ACT, HAW. REV. STAT. § 661-22 *ET SEQ*.
        AGAINST ALL DEFENDANTS ................................................................. 69

COUNT ELEVEN ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION
        ACT,  740 III. COMP. STAT. 175/1 *ET SEQ*. AGAINST ALL DEFENDANTS .......... 70

COUNT TWELVE INDIANA FALSE CLAIMS AND WHISTLEBLOWER
        PROTECTION ACT,  INDIANA CODE § 5-11-5.5 AGAINST ALL
        DEFENDANTS ...................................................................................... 70

COUNT THIRTEEN LOUISIANA MEDICAL ASSISTANCE PROGRAMS
        INTEGRITY LAW,  LA. REV. STAT. ANN. § 46:439.1 *ET SEQ*. AGAINST
        ALL DEFENDANTS.............................................................................. 71

COUNT FOURTEEN MARYLAND FALSE HEALTH CLAIMS ACT OF 2010, MD. CODE ANN. §§ 2-601 *ET SEQ*. AGAINST ALL DEFENDANTS ............................... 72

COUNT FIFTEEN MASSACHUSETTS FALSE CLAIMS ACT, MASS. ANN. LAWS CH. 12, § 5(A)-(0) AGAINST ALL DEFENDANTS ....................................... 73

COUNT SIXTEEN MICHIGAN MEDICAID FALSE CLAIMS ACT, MCLA § 400.601 *ET SEQ*. AGAINST ALL DEFENDANTS .................................................... 74

COUNT SEVENTEEN MINNESOTA FALSE CLAIMS ACT MINN. STATE MINN. STAT § 15C.01 ET SEQ. AGAINST ALL DEFENDANTS .......................................... 74

COUNT EIGHTEEN MONTANA FALSE CLAIMS ACT; MONT. CODE ANNO. §17-8-401 *ET SEQ*. AGAINST ALL DEFENDANTS ........................................... 75

COUNT NINETEEN NEVADA FALSE CLAIMS ACT, NEV. REV. STAT. §357.010 *ET SEQ*. AGAINST ALL DEFENDANTS ..................................................... 76

COUNT TWENTY NEW HAMPSHIRE MEDICAID FRAUD AND FALSE CLAIMS ACT, N.H. REV. STAT. ANN. § 167:61-B, *ET SEQ*. AGAINST ALL DEFENDANTS ................................................................................. 77

COUNT TWENTY ONE NEW JERSEY FALSE CLAIMS ACT; N.J. STAT. § 2A:32C-1 *ET SEQ*. AGAINST ALL DEFENDANTS .................................................... 78

COUNT TWENTY TWO NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. ANN.,1978, § 27-14-1 *ET SEQ*. AGAINST ALL DEFENDANTS ..................... 78

COUNT TWENTY THREE NEW YORK FALSE CLAIMS ACT, N.Y. STATE FIN. LAW § 187 *ET SEQ*. AGAINST ALL DEFENDANTS ................................................. 79

COUNT TWENTY FOUR NORTH CAROLINA FALSE CLAIMS ACT, 52 N.C.G.S. § 1-605 *ET SEQ*. AGAINST ALL DEFENDANTS ............................................. 80

COUNT TWENTY FIVE OKLAHOMA MEDICAID FALSE CLAIMS ACT; 63 OKL. ST. ANN. § 5053 *ET SEQ*. AGAINST ALL DEFENDANTS ........................................ 81

COUNT TWENTY SIX RHODE ISLAND FALSE CLAIMS ACT; R.I. GEN. LAWS § 9-1.1-1 *ET SEQ*. AGAINST ALL DEFENDANTS ........................................ 82

COUNT TWENTY SEVEN TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE ANN. § 71-5-181 *ET SEQ*. AGAINST ALL DEFENDANTS ............................ 82

COUNT TWENTY EIGHT TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE ANN. § 36.001 *ET SEQ*. AGAINST ALL DEFENDANTS ............ 83

COUNT TWENTY NINE VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. §8.01-216.1 *ET SEQ*. AGAINST ALL DEFENDANTS .......................... 84

COUNT THIRTY WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT,  REV. CODE WASH. §§ 48.80.010 *ET SEQ*. AGAINST BOTH DEFENDANTS ................... 85

COUNT THIRTY ONE WISCONSIN FALSE CLAIMS ACT; WIS. STAT. § 20.931 *ET SEQ*. AGAINST ALL DEFENDANTS .............................................................. 86

COUNT THIRTY TWO DISTRICT OF COLUMBIA FALSE CLAIMS ACT,  D.C. ST. § 2-308.14 *ET SEQ*. AGAINST ALL DEFENDANTS .................................................... 86

COUNT THIRTY THREE CITY OF CHICAGO FALSE CLAIMS ACT, CHICAGO MUN. CODE CHAPTER 1-22-010, *ET SEQ*. AGAINST ALL DEFENDANTS ........... 87

PRAYER ................................................................................................................ 88

REQUST FOR JURY TRIAL ............................................................................... 90

## I.     INTRODUCTION

1.     Defendant PharMerica Corp. ("PharMerica")[1] and Defendant Kindred Healthcare, Inc. ("Kindred") (together "Defendants") caused false claims to be submitted in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"),  and analogous state and municipal false claims statutes when the companies independently or in conjunction with each other when they:  (1) accepted and solicited kickbacks from Amgen, Inc. ("Amgen") for switching nursing home patients from Procrit, a powerful anemia drug, to Aranesp, a similar anemia drug, for the purpose of increasing utilization of Aranesp in nursing homes in violation of the Anti-Kickback Statute;[2] and (2) aided and/or conspired with Amgen to misbrand Aranesp, in violation of the Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301, *et seq.*, causing unlawful prescriptions of Aranesp to be submitted for payment by federal, state and municipal health care payors. Defendants' unlawful conduct was orchestrated by Amgen, the manufacturer of Aranesp, during the course of its battle over market share with its competitor Johnson & Johnson ("J&J"), which was engaged in similar unlawful sales tactics with regard to the promotion and sale of Procrit. Defendants PharMerica and Kindred, together with Amgen, designed their violations so as to go undetected by federal and state regulators.

2.      On June 14, 2011, through counsel, Relator Frank Kurnik filed a Complaint under seal against Amgen, Inc., Omincare, Inc., PharMerica Corp. and Kindred Healthcare, Inc. pursuant to the Federal False Claims Act and numerous State False Claims Acts.  The Government intervened in Relator's Complaint against Amgen and Omnicare for the purpose of

---

[1] PharMerica Corp. is sued itself and sued as successor in interest to PharMerica Inc.

[2] 42 U.S.C. § 1320a-7b(a).

settling Relator's claims against these companies. Relator received a share of the bounty pursuant to the FCA.

3. Specifically, on April 16, 2013, Amgen agreed to pay the United States $24.9 million to settle allegations that the company violated the Federal False Claims Act and similar state statutes. The settlement resolved allegations that Amgen paid kickbacks to long-term care pharmacy providers Omnicare Inc., PharMerica Corporation and Kindred Healthcare Inc., at least in part, for implementing "therapeutic interchange" programs that were designed to unlawfully switch Medicare and Medicaid beneficiaries from a competitor drug to Aranesp. The settlement agreement states:

> The United States contends that it has certain civil claims against Amgen for engaging in the following conduct (hereinafter referred to as the "Covered Conduct") during the period from September 1, 2003 through December 31, 2011. *The United States alleges that Amgen offered and paid illegal remuneration to long-term care pharmacy providers Omnicare Inc. (Omnicare), PharMerica Corporation (PharMerica), and Kindred Healthcare Inc. (Kindred) in the form of purported market-share rebates, purported volume-based rebates, grants honoraria, speaker fees, consulting services, dinners, travel, or the purchase of unnecessary data, and that this illegal remuneration was offered and paid for the purpose of inducing Omnicare, PharMerica, and Kindred to recommend Aranesp and to influence health care providers' selection and utilization of Aranesp within nursing homes, skilled nursing facilities, and long-term care settings*. The United States alleges that Amgen encouraged the implementation of "Therapeutic Interchange" programs (also known as "switching" programs) intended to identify patients who were taking a competitor drug and switch those patients to Aranesp.

(emphasis added). Amgen Settlement Agreement at ¶ E, p.2 (available at http://www.justice.gov/iso/opa/resources/9802013416197597986687.pdf) (April 5, 2015).

4. Likewise, on February 27, 2014, Omnicare agreed to pay $4.19 million to settle allegations brought by Relator in this case. The settlement with the Department of Justice states:

> From the period between September 1, 2003 and June 30, 2005, *the United States alleges that Omnicare solicited and received remuneration from Amgen Inc. in the form of purported discounts, purported market-share rebates, grants, honoraria, speakers fees, consulting services, dinners, travel, or fees for the purchase of data, and this remuneration was solicited and received in exchange*

> *for Omnicare's influencing heath care providers' selection and utilization of Aranesp within long-term care settings, and for implementing "Therapeutic Interchange" programs (also known as "switching" programs) intended to identify patients who were taking a competitor drug and to switch those patients to Aranesp.* The United States alleges that as a result of the foregoing Covered Conduct, Omnicare knowingly caused false and/or fraudulent claims for Aranesp to be submitted to Medicare, Medicaid, and other Federal health care programs.

(emphasis added). Omnicare Settlement Agreement at ¶ E, p.2, Dkt # 75-1.

5.     Although the Government attempted to negotiate a settlement with PharMerica, PharMerica "claim[ed] that it [did] not have sufficient assets to pay." Fourth Mot. of the U.S. for an extension of time to consider intervention and to retain the statutory seal, at 4 (May 17, 2013) (Dkt. # 38-1). Relator's allegations are unresolved as to Defendants PharMerica and Kindred, both of which are or were engaged the business of providing consultant pharmacy services to a large number of nursing homes across the country. Defendants are known within the nursing home business as Long Term Care Pharmacy Providers ("LTCPPs"). Defendants were or are competitors of Omnicare, also an LTCPP, which has settled with the United States and a number of states, as alleged above, for engaging in similar conduct as alleged herein.

6.     Accordingly, on behalf of the United States of America and on behalf of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Maryland, Michigan, Montana, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, the District of Columbia and the City of Chicago, pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and similar state and municipal law provisions, Plaintiff and "Relator" Frank Kurnik files this *qui tam* Amended Complaint against Defendants PharMerica and Kindred, alleging the following.

3

7.    In violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and similar state and municipal law provisions, Defendants PharMerica and Kindred knowingly caused false and/or fraudulent claims for Aranesp to be submitted to Medicare, Medicaid, and other Federal health care programs, from 2003 until the present, when Defendants:

- solicited and received remuneration from Amgen Inc. in the form of purported discounts, purported market-share rebates, grants, honoraria, speakers fees, consulting services, dinners, travel, or fees for the purchase of data, and this remuneration was solicited and received in exchange for the Defendants' influencing heath care providers' selection and utilization of Aranesp within long-term care settings, and for implementing "Therapeutic Interchange" programs (also known as "switching" programs) intended to identify patients who were taking a competitor drug and to switch those patients to Aranesp, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b);

- engaged in, aided in and/or abetted Amgen's illegal misbranding, including off-label marketing of Aranesp in violation of the Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 331-(a)-(b), 352 (a),(f), *inter alia,* by sanctioning and allowing Amgen to illegally market Aranesp to long term care pharmacy providers and other health care professionals employed by Defendants and/or physicians, nurses and other health care professionals employed by nursing homes serviced by Defendants; and

- furthered the unlawful marketing of Aranesp by Amgen, through violations of continuing medical education ("CME") rules and regulations by developing and controlling physician speaker programs that purported to be unbiased.

8.    Relator Frank Kurnik has knowledge of Defendants' national scheme to illegally market Aranesp and pay kickbacks to LTCPPs, including Defendants. Relator was tasked with helping to start a new division, created by Amgen in 2002, called Long Term Care/Home Health Care, whose primary purpose was to market Aranesp to long term care facilities such as nursing homes and skilled nursing facilities. This division had sales representatives serving the entire nation, including the states and municipalities encompassed in this Amended Complaint. Relator has personal knowledge that Defendants solicited and accepted remuneration in the form of discounts, rebates, grants, honoraria, and speakers' fees, among other things, for implementing

4

Therapeutic Interchange Programs or switching programs, which were not justified by any medical rationale.

9. Defendants' illegal conduct made it possible for Amgen to exponentially increase the market for Aranesp, and, therefore, markedly increased the revenue of the drug and profits to the Defendants at the expense of public payors. Specifically, Amgen marketed Aranesp to anemia patients whose chronic kidney disease progression was outside the drug's package insert, despite Amgen's knowledge that the drug caused increased risk of cardiovascular events, stroke and death. Defendants knowingly facilitated Amgen's illegal marketing of Aranesp by allowing Amgen to market Aranesp for uses outside the label at programs conducted at nursing homes serviced by Defendants and at meetings where Defendant's consultant pharmacists were present. Moreover, Amgen paid PharMerica to develop and conduct purportedly educational programs that were biased in violation of the rules regarding CME, through a company called Clinicare Concepts, that was owned or controlled by PharMerica.

10. In 2007, the FDA required Amgen to place a black box warning in Aranesp's package insert regarding these dangerous side effects. Had federal and state programs, including Medicare and Medicaid, known that such prescriptions were induced by illicit incentives (such as the payment of kickbacks) and illegal marketing to physicians, consultant pharmacists, and other medical professionals, they would not have reimbursed claims for Aranesp. In sum, this is a case about a conspiracy between Amgen and the individual LTCPP Defendants herein to market and treat vulnerable elderly nursing home patients – most of whom had no symptoms of anemia – with a very powerful drug that had known serious side effects.

11. Through their efforts, the Defendants successfully altered the treatment of tens of thousands of patients, many of whom were/are in long term care facilities, and incapable of

5

detecting that their pharmaceutical regimen was being altered for the primary purpose of meeting a giant pharmaceutical company's bottom line projections.

12.     Defendants' unlawful conduct caused government health care programs to expend hundreds of millions of dollars.  Amgen's internal documents show that from 2003 to 2008 Aranesp sales in the Long Term Care market increased by more than $440 million.

13.     Relator Frank Kurnik discovered Defendants' wrongful conduct while he was an employee of Amgen.  He has conducted his own investigation in furtherance of this False Claims Act *qui tam* action and disclosed his findings to the United States Government, twenty-eight States, the District of Columbia, and the City of Chicago prior to filing his initial Complaint.

## II.     JURISDICTION AND VENUE

14.     Relator brings this action on behalf of himself and on behalf of the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and the States, the District of Columbia, and the City of Chicago for violations of their False Claims Act statutes.  This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and supplemental jurisdiction over the counts relating to the States, the District of Columbia and the City of Chicago False Claims Act statutes pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

15.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District.  In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District, 31 U.S.C. § 3732(a).

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

6

17.     Relator's claims and this Amended Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(3).[3]

18.     To the extent that there has been a public disclosure unknown to the Relator, he is the "original source" and meets the requirements pursuant to 31 U.S.C. § 3730I(4)(B).[4]

## III.     PARTIES

19.     Until 2013, Relator Frank Kurnik was an Amgen employee working as a Corporate Account Manager in Reno, Nevada.     Relator was a top performer, winning commendations from Defendant Amgen.   Mr. Kurnik began his employment with Amgen in 1999 as its Director of Channel Sales.   Thereafter, from 2002-2008, he served as Amgen's Director of LTC & Home Health Care ("LTC"), which was created in or about 2002, about a year after the launch of Aranesp.   In this capacity, Relator managed the LTC sales team for the drug Aranesp.   Relator has direct knowledge of Defendants' concerted and repeated efforts to illegally secure prescriptions for Aranesp tainted by kickbacks.   Relator also has direct knowledge of Defendants' conspiracy to influence health care professionals to prescribe Aranesp for uses outside the drug's indication and to misbrand the drug in violation of the Food Drug and Cosmetics Act ("FDCA") and the False Claims Act ("FCA").

20.     PharMerica, Inc., a predecessor-in-interest of Defendant PharMerica Corp., was a New York Corporation headquartered in Tampa, Florida.   It was acquired as a wholly-owned subsidiary by leading pharmaceutical distributor and services company Bergen Brunswig

---

[3] To the extent that conduct alleged in this Amended Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.*, 31 U.S.C. § 3730 (e), as amended, October 27, 1986 and May 20, 2009).

[4] *Id*.

Corporation on April 26, 1999. Bergen Brunswig then merged with AmeriSource Health Corporation on March 29, 2001 to form AmerisourceBergen Corporation ("AmerisourceBergen"). According to AmerisourceBergen's Form 10-K filed with the SEC on December 8, 2006 and Form 10-K filed with the SEC on November 27, 2012, AmerisourceBergen generated total revenue for the 2006 fiscal year of more than $61 billion and total revenue for the 2012 fiscal year of more than $79 billion.

21. PharMerica, Inc., on behalf of itself and its affiliates, entered into agreement number 200208978, a rebate contract, with Amgen effective March 1, 2003, and subsequently executed amendments through November 1, 2006.

22. In March 2005, PharMerica entered into a Corporate Integrity Agreement with the Office of the Inspector General of the Office of Health and Human Services. Part of this agreement required PharMerica to create procedures reasonably designed to ensure that any sales of products or services that are reimbursable by Medicare or Medicaid do not violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

23. Prior to 2007, PharMerica, Inc. and/or AmerisourceBergen controlled and operated a subdivision titled PharMerica Long-Term Care, Inc. ("ABCPharMerica LTC"). ABCPharMerica LTC provided pharmacy products and services to patients in long-term care and alternate site settings, including skilled nursing facilities, assisted living facilities, and residential living communities. ABCPharMerica LTC's institutional pharmacy business involved the purchase of bulk quantities of prescription and nonprescription pharmaceuticals and the dispensing of those products to residents in long-term care and alternate site facilities.

24. Defendant Kindred Healthcare, Inc. ("Kindred"), founded in 1985 as Vencor, Inc., is incorporated in Delaware and has its principal offices in Kentucky. Kindred is a healthcare

8

services company that through its subsidiaries operates hospitals, nursing centers and a contract rehabilitation services business throughout the United States. In its Form 10-K filed with the SEC on February 23, 2011, Kindred posted revenues of more than $4.26 billion for the fiscal year ending December 31, 2010 and a net income of more than $56 million in 2010. In its Form 10-K filed with the SEC on February 29, 2012, Kindred posted revenues of more than $5.52 billion for the fiscal year ending December 31, 2011. Kindred entered into agreement number 20060086, a rebate contract, with Amgen effective January 1, 2006. Prior to 2007, Kindred operated a division called Kindred Pharmacy Services, Inc. ("KPS"), another predecessor-in-interest to Defendant PharMerica.

25.    In 2007, AmerisourceBergen and Kindred merged their respective institutional pharmacy businesses, ABCPharMerica LTC and KPS, to form Defendant PharMerica Corporation ("PharMerica"). Pursuant to the transaction, AmerisourceBergen and Kindred shareholders each received 50% of PharMerica's stock while PharMerica was left with $295 million in outstanding debt at the close of the transaction. The goal of PharMerica was "to be the nation's leading provider of institutional pharmacy programs and services," according to Gregory S. Weishar, PharMerica's Chief Executive Officer. PharMerica, an independent, publicly traded company, began trading on the New York Stock Exchange on August 1, 2007. PharMerica is incorporated in Delaware. Its principal executive offices are located in Louisville, Kentucky.

26.    PharMerica is a pharmaceutical distribution and services company serving institutional healthcare providers, such as nursing centers, assisted living facilities, hospitals and other long-term alternative care settings. PharMerica is the primary source of supply of pharmaceuticals for its customers. PharMerica operates more than 120 institutional pharmacies

9

in 40 states.  According to PharMerica's 2010 Form 10-K filed with the SEC on February 24, 2011, PharMerica had revenues of more than $1.84 billion for the fiscal year ending December 31, 2010 and a net income of $192 million in 2010.  According to PharMerica's 2011 Form 10-K filed with the SEC on February 9, 2012, PharMerica had revenues of more than $2.08 billion for the fiscal year ending December 31, 2011 and a net income of $234 million in 2011.

27.     PharMerica entered into agreement number 200700374, a rebate contract, with Amgen shortly after it was formed, and subsequently amended the agreement at least once.  In addition, although now a purportedly independent company, PharMerica entered into a Prime Vendor Purchasing Agreement with AmerisourceBergen, in which PharMerica agreed to purchase at least 95% of all prescription pharmaceutical products from AmerisourceBergen.  See PharMerica's S-4/A, Exhibit 10.4 filed with the SEC on July 13, 2007.  PharMerica is still engaged in a Prime Vendor Purchasing Agreement with AmerisourceBergen and is required to purchase at least 98% of all branded prescription drugs from AmerisourceBergen.  See PharMerica's 10-K/A, Exhibit 10.40 filed with the SEC on May 25, 2011.  These Prime Vendor Purchasing Agreements allow AmerisourceBergen to capture significant profits from PharMerica while distancing AmerisourceBergen from the long-term care market.

## IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A.     FEDERAL GOVERNMENT HEALTH PROGRAMS

28.     The federal, state and local governments, through their Medicaid, Medicare, Tricare, Veteran's Administration, and other Government health care payors, are among the principal purchasers of Amgen's pharmaceutical products.

29.     Medicare is a federal government health program primarily benefiting the elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security Act.  Medicare

10

is administered by the Centers for Medicare and Medicaid Services ("CMS"). It provides coverage for prescriptions through two programs, Medicare Part B, which primarily reimburses for physician-administered drugs, and Medicare Part D, which primarily reimburses for self-administered drugs. Aranesp can be covered by either Part B or Part D depending on the patient's diagnosis and the setting in which it is administered.

30.     Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act. Medicaid is a public assistance program providing payment of medical expenses to low-income patients. Funding for Medicaid is shared between the federal government and state governments. The federal government also separately matches certain state expenses incurred in administering the Medicaid program. While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid usually provides more expansive coverage than does Medicare.

31.     Medicaid has broad coverage for prescription drugs, including both physician- and self-administered drugs. Nearly every state has opted to include basic prescription drug coverage in its Medicaid plan.

32.     Tricare is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and career military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. Tricare is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider

11

organizations and fee-for-service benefits. Five managed-care support contractors create networks of civilian health care providers.

33.     Whereas Tricare treats active duty military and their dependents, the Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its nationwide network of hospitals and clinics.

34.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.

### B.     FDCA AND FDA REGULATIONS

35.     The Food and Drug Administration ("FDA") regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a).

36.     The FDA reviews pharmaceutical manufacturers' applications for new drugs to determine whether the drugs' intended uses are safe and effective. *See* 21 U.S.C. § 355. Once a drug is approved for a particular use, doctors are free to prescribe the drug for "non-indicated" or off-label purposes. While doctors may independently request information from drug manufacturers about such off-label uses, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses, *i.e.* "indications," not approved by the FDA. As described above, "off-label" refers to the marketing of an FDA-approved drug for uses that have not undergone FDA review and approval, *i.e.*, for purposes not approved by the FDA.

37.     With the exception of purely scientific medical information provided by qualified medical professionals, sales and marketing presentations, promotions, or marketing to physicians for uses other than that approved by the FDA are considered off-label marketing or "misbranding" proscribed by the FDA. *See* 21 U.S.C. §§ 331(a)-(b), 352(a), (f).  Additional proscribed marketing activity includes any attempts by pharmaceutical sales representatives to solicit discussions with physicians concerning off-label use.

38.     Strong policy reasons exist for strict regulation of off-label marketing.  Off-label promotion bypasses the FDA's strict review and approval process and removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

39.     Pursuant to the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301, *et seq*., the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

40.     The FDA interprets "labeling" in its regulations broadly to include items that are "1) descriptive of a drug; 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel."  21 C.F.R. § 202.1.  Labeling includes, among other things, brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio visual material.  21 C.F.R. § 202.1 (l)(2).

41.     FDA regulations deem "advertising" to include media-based activities that appear in magazines, newspapers, professional journals, and on television, radio, and telephone communications systems.  *See* 21 C.F.R. § 202.1(l)(1).  Courts have consistently held that oral statements made by a company's sales representative relating to a pharmaceutical product

13

constitute commercial advertising or promotion. *See Abbott Labs. V. Mead Johnson & Co.*, 971 F.2d 6, 10 (7th Cir. 1992) (interpreting the Lanham Act).

42.     The FDCA defines both misleading statements and the failure to reveal material facts in a label or product labeling as "misbranding." 21 U.S.C. § 321(n).  Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371;  21 C.F.R. § 202.1I(6), I(7); 21 C.F.R. § 1.21.

43.     Such violations exist where promotional marketing materials and presentations (*i.e*., advertisements) for an FDA approved drug, among other things:

- Minimize, understate, or misrepresent the side effects, contraindications and/or effectiveness of the drug;

- Overstate or misrepresent the side effects, contraindications, and/or effectiveness of competing drugs;

- Expressly or implicitly promote uses, dosages, or combination usage of the drug that is not contained in the FDA approved labeling (*i.e*., off-label uses);

- Fail to reveal material facts with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement;

- Contain representations or suggestions, not approved or permitted in the labeling, that the drug is better, more effective, useful in a broader range of conditions or patients, safer, or has fewer, or less incidence of, or less serious side effects or contraindications than demonstrated by substantial evidence or substantial clinical experience;

- Present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does;

- Use a quote or paraphrase out of context to convey a false or misleading idea; and/or

- Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

*See* 21 C.F.R. § 202.1 I(4)(5)(6), (7).

14

44.     Oral statements and written materials presented at industry-supported activities, including lectures and teleconferences, provide evidence of a product's intended use.  If these statements or materials promote a use inconsistent with the product's FDA-approved labeling, the drug is misbranded, as the statements and materials fail to provide adequate directions for all intended uses.

45.     Amgen's unlawful marketing and misrepresentations of Aranesp repeatedly violated the FDCA, which in turn resulted in violations of the False Claims Act, because Amgen's unlawful activity induced physicians to prescribe Aranesp when physicians otherwise would not have done so for prescriptions paid for by government funded health insurance programs.  U.S. ex rel. Franklin v. Parke-Davis, 147 F. Supp. 2d 39, 53 (D. Mass. 2001).  Defendants PharMerica, and Kindred conspired with Amgen to violate the FDCA.  Had federal, state and local Governments known about the misbranding, they would not have paid for the prescriptions. *Id*.

### C.     THE FALSE CLAIMS ACT AND THE MEDICARE FRAUD & ABUSE/ANTI-KICKBACK STATUTE

46.     The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government.  31 U.S.C. § 3729(a)(1)(A) & (B).  Twenty-eight states, the District of Columbia, and the City of Chicago have enacted False Claims Act statutes that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by state or municipal funds.

47.     The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), makes

15

it illegal for an individual knowingly and willfully to offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(2). In accordance with the Anti-Kickback Statute, Medicare regulations also prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or value of any referrals or business generated. *See* 42 C.F.R. § 1001.952(f). "Remuneration" is broadly defined to include anything of value (including any kickback, bribe, or rebate) paid directly or indirectly, overtly or covertly, in return for purchasing, ordering, or recommending the purchase or order of any item that is reimbursable. *Id*.

48. The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a)(10).

49. The purpose of the Anti-Kickback Statute is to ensure proper medical treatment and referrals, and to limit unnecessary treatment, services, or goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services.

50. Paying kickbacks taints an entire prescription, regardless of the medical necessity and/or the propriety of its use. The kickback inherently interferes with the doctor-patient relationship and creates a conflict of interest, potentially putting the patient's health at risk.

51. The Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C.

16

§ 1320a-7b(b)(3).  However, none of the statutory exceptions or regulatory safe harbors protect the Defendants' conduct in this case.

52.     In 1994, the U.S. Department of Health and Human Services Office of the Inspector General ("HHS OIG") issued an "OIG Special Fraud Alert" related to "Prescription Drug Marketing Schemes," warning that "any payment, including cash or other benefit, given to a patient, provider or supplier for changing a prescription, or recommending or requesting a change, from one product to another …" may implicate a violation of the Anti-Kickback Statute, unless the payment is made consistent with a "safe harbor" pursuant to 42 C.F.R. 1001.952.  59 FR 65372; December 19, 1994.  The HHS OIG Fraud Alert explained the impact that such drug switching arrangements have on federal health care programs:

> In recent years, prescription drug companies in the United States have increased their marketing activities among providers, patients and suppliers such as pharmacies.   Many prescription drug marketing activities go far beyond traditional advertising and educational contacts.   Physicians, suppliers and, increasingly patients, are being offered valuable, non-medical benefits in exchange for selecting specific prescription drug brands.   Traditionally, physicians and pharmacists have been trusted to provide treatments . . . in the best interest of the patient. *In an era of aggressive drug marketing, however, patients may now be using prescription drug items, unaware that their physician or pharmacist is being compensated for promoting the selection of a specific product*.   Prescription drugs supplied under one of these programs are often reimbursed under Medicaid.

*Id.* (emphasis added.)

53.     The HHS OIG Fraud Alert also identified an example of an illegal marketing scenario involving payments by a drug manufacturer to pharmacies for "each time a drug prescription was changed" from one drug to another.  *Id.*  Like Amgen and Defendants' scheme to induce physicians to switch from Procrit to Aranesp, in the HHS OIG Fraud Alert scenario, the "pharmacies were induced to help persuade physicians, who were unaware of the pharmacies' financial interest, to change [the] prescription."  According to the HHS OIG, such a

17

scheme would subject the manufacturer and pharmacy to a criminal violation of the Anti-Kickback Statute "[i]f one purpose" of the marketing scheme "is to induce the provision of a prescription drug item reimbursable by Medicaid." *Id.* In such a scenario, HHS opined that "[t]here is no statutory exception or 'safe harbor' to protect such activities." *Id.*

54. In 2003, the HHS OIG issued its "Compliance Program Guidance for Pharmaceutical Manufacturers" (the "2003 Guidance"), which explained that "practices that may be common or longstanding in other businesses are not necessarily acceptable or lawful when soliciting federal health care program business," and that such practices would be illegal if "any *one* purpose of the remuneration [is] to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program. Importantly, a lawful purpose will not legitimize a payment that also has an unlawful purpose." *Id*. at 13, 14 (emphasis in original). The 2003 Guidance then identified several questions that should be asked to determine if a practice violates the Anti-Kickback Statute, including:

- Does the arrangement or practice have a potential to interfere with, or skew, clinical decision-making?

- Does it have a potential to undermine the clinical integrity of a formulary process?

- Does the arrangement or practice have a potential to increase costs to the federal health care programs, beneficiaries, or enrollees?

- Does the arrangement or practice have a potential to increase the risk of overutilization or inappropriate utilization?

- Does the arrangement or practice raise patient safety or quality of care concerns?

*Id*. at 15.

55. As set forth in this Amended Complaint, the answer to each of these questions with respect to PharMerica and Kindred's acceptance and solicitation of rebates from Amgen for Aranesp is "Yes."

18

56.     Recently, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the False Claims Act.  The PPACA also amended the statute's "intent requirement" to make clear that violations of the anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation."  *Id*. at Sec. 6402(h).

57.     As detailed below, Amgen's promotion and misrepresentations of Aranesp repeatedly violated provisions of the Anti-Kickback Statute, which in turn resulted in violations of the False Claims Act, because Amgen's improper kickbacks and incentives to Defendants PharMerica and Kindred induced physicians and pharmacists to prescribe Aranesp when they otherwise would not have, and many of those prescriptions were paid for by Medicare, Medicaid and other government funded health insurance programs.

58.     Further, knowingly paying kickbacks, including rebates and other incentives, to PharMerica and Kindred pharmacists to prescribe a prescription drug on-label or off-label (or to influence physician prescriptions) for individuals who seek reimbursement for the drug from a federal government health program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates municipal, state and federal False Claims Acts.

## V.     BACKGROUND

### A.     ARANESP'S REGULATORY HISTORY AND FDA APPROVED INDICATIONS

58.     Erythropoetin stimulating agents ("ESAs") are bioengineered versions of a natural protein made by a healthy kidney that stimulates the bone marrow to grow red blood cells.  There

19

are two such drugs on the market: epoetin alfa and darbepoetin.  Amgen holds the patents for both and manufactures them both.

59.     Epoetin was approved by the FDA in 1989 for treating "a lower than normal number of red blood cells (anemia) caused by chronic kidney failure in patients on dialysis."

60.     Amgen markets epoetin alfa as Epogen.  Amgen also licenses epoetin alfa to J&J, which distributes it as Procrit.  In order to raise capital for the clinical trials of Epogen, Amgen licensed to Ortho Biotech L.P., a subsidiary of J&J, all potential uses of epoetin except the treatment of anemia related to chronic kidney failure in patients on dialysis.[5]

61.     Despite the limitations of the licensing agreement, Epogen has been a blockbuster drug with sales of over $2 billion a year.

62.     In 1989, J&J secured FDA approval for additional indications for Procrit (epoetin alfa), including the treatment of anemia associated with AZT or cancer chemotherapy, or prior to surgery to reduce transfusion requirements.  It, too, was a blockbuster drug.

63.     Amgen developed darbepoetin, a second generation ESA marketed as Aranesp, to compete with Procrit in precisely the markets it had given away to J&J in the licensing agreement for epoetin alfa.  In 2001, the FDA approved Aranesp for the "treatment of anemia associated with chronic renal disease in patients on dialysis and patients not on dialysis."  Amgen obtained an indication for darbepoetin in the anemia of cancer chemotherapy in July 2002.

**B.     AMGEN VIEWED THE LAUNCH OF ARANESP AS A FAILURE**

64.     The development and launch of Aranesp was designed to allow Amgen to capture the very business that it gave away to J&J in 1985.  At the time of Aranesp's 2001 launch, pharmaceutical industry analysts viewed Amgen as having a near-monopoly on the ESA

---

[5]     *See*, Kerry A. Dolan, *Amgen's Enemies*, Forbes.com (Oct. 30, 2006), http://www.forbes.com/forbes/2006/1030/126_print.html.

market.[6]  When Epogen was launched in 1989, Amgen held an unprecedented 26-year patent on Epogen (that ends in 2015) and, by the terms of its 1985 deal with J&J, Amgen was able to secure most of the ESA market for dialysis patients with anemia associated with chronic kidney failure.  *Id.*  The Amgen deal precluded J&J from marketing Procrit to dialysis patients, but J&J was left free to market Procrit to non-dialysis patients who had anemia associated with chronic kidney failure and for other uses for which J&J later secured FDA approval.

65.    At Aranesp's launch, Procrit sales were $2 billion per year.  Through a conversion strategy, Amgen believed that it could cut into J&J's ESA market share.  In support of this goal, Amgen recruited George Morrow ("Morrow"), as the company's Vice President of Sales and Marketing, to run the Aranesp launch in 2001.  Morrow, a pharmaceutical industry veteran from GlaxoSmithKline, set the company's sights on capturing as much of Procrit's $2 billion sales as possible.

66.    At Aranesp's launch, J&J had marketed Procrit in a variety of health care markets, including the long-term care market.  J&J successfully sold Procrit at a discount through rebate contracts, making it difficult for Amgen to penetrate the ESA market.

67.    While Amgen dispatched significant nephrology, oncology, and hospital sales forces, each containing approximately 150 to 250 Aranesp sales representatives, it vastly underestimated Procrit's strength in the market place, which was a factor of its market longevity and J&J's unlawful sales tactics.  At the end of its first year, Aranesp returned a profit of $40 million and Amgen executives viewed the drug's launch as a complete failure.  In 2003, Aranesp's market share in the LTC segment was below 5%.

---

[6] *See*, Andrew Pollack, *Amgen's Blockbuster Anemia Drugs Facing Patent Challenge*, N.Y. Times, Dec. 25, 2005.

68.     Even though Kevin Shear, Amgen's CEO, recognized market share barriers for Aranesp, he still predicted a dramatic increase in sales for Amgen in 2003.[7] By earning a total revenue between $7.3 to $7.8 billion dollars, Amgen publicly predicted that its 2003 earnings would be higher than analysts' projections.

**C.     IN 2002, AMGEN EXPANDED ITS MARKETING OF ARANESP TO THE LONG TERM CARE MARKET**

69.     Pressed by representations to the financial markets, and struggling to meet the aggressive sales goals for Aranesp set by Morrow and Amgen's upper level management, Amgen decided to expand its Aranesp marketing efforts to the long-term care ("LTC") market. This market included private and state-run nursing homes and skilled nursing facilities (collectively called "LTC facilities") that were primarily serviced by long-term care pharmacy providers, such as Defendants PharMerica and Kindred. Amgen determined the market for ESA drugs in the LTC market was approximately $163 million per year and that the LTC market was one of the fastest growing markets – growing 15% year -- in the pharmaceutical industry at large.

70.     In 2002, Amgen promoted Mike Ryan to Vice President of Corporate Accounts, which encompassed the newly formed Aranesp LTC business unit. Mr. Ryan had a degree in pharmacy and experience running nursing home health systems. He promoted Relator Kurnik to Aranesp Director of LTC & Home Health Care and assigned one full-time field representative from within Amgen, Eddy Hobbs, to help canvas the LTC market for ways to successfully promote Aranesp.

71.     In 2002, Relator and Eddy Hobbs met with nursing home chains and LTCPPs, including the Defendants in this case. Their purpose was to research the LTC market environment. Relator learned that prescription decisions at nursing homes and skilled nursing

---

[7] Transcript of Amgen Inc.'s Investor Conference Call (Dec. 12, 2002) (Fair Disclosure Financial Network).

facilities were heavily influenced by the LTCPPs, particularly Omnicare and Defendant PharMerica, which had contracts with large networks of nursing homes and skilled nursing facilities, including Beverly Enterprises Inc. and Sava Senior Care LLC.

72.     LTCPPs play a key role in influencing drug utilization in nursing homes. Because of the complexities of serving the pharmaceutical needs of large patient populations on a daily basis, LTC facilities often do not have their own on-site pharmacies, but contract with entities like Omnicare, Defendant PharMerica and Defendant Kindred to provide drugs and certain services, including but not limited to: consultant pharmacists available to assist in medication decisions 24 hours a day, medical education programs related to serving the needs of nursing home patients, the development of disease management guidelines or treatment protocols (i.e., suggested treatment regimens for particular diseases), legal compliance consulting and specialty packaging of pharmaceuticals, such as "blister packages" for each resident, for each day.

73.     To secure Aranesp sales in the long term care setting, Relator and Mr. Hobbs met with Omnicare and Defendant PharMerica in late 2002 to market Aranesp's advantages over Procrit and determine how Amgen could persuade these companies and their consultant pharmacists to choose Aranesp rather than Procrit. At one such meeting in 2002, Omnicare's CEO and President, Joel Gemunder, and Omnicare's Sr. Vice President of Business Development, Tim Bien, told Relator and Hobbs that the key to competing with J&J for ESA sales involved providing the best price to Omnicare for the product. Specifically, Gemunder and Bien told Relator and Hobbs that J&J provided rebates to Omnicare based on the amount of prescriptions Omnicare dispensed for Procrit. At the time, J&J was leading the ESA market in the long term care setting and Gemunder and Bien made it clear to Relator and Hobbs that Amgen's rebate deals would have to compete with the rebates being provided by J&J.

74.     In their discussions, Omnicare's Bien further urged Relator to hire John Thompson, a former Pfizer sales employee, who had negotiated Omnicare rebate contracts for Pfizer.  In order to obtain Omnicare's business, Amgen agreed to hire John Thompson.  Once hired by Amgen in 2002, as a National Account Manager for Aranesp, Mr. Thompson devised a comprehensive plan to secure Aranesp business at the LTCPPs, including Defendants, based on contracts and side agreements requiring Amgen to pay a number of financial inducements or kickbacks to the LTCPPs, including but not limited to quarterly rebates to the LTCPPs, in exchange for the LTCPP agreements to switch patients already on Procrit to Aranesp and place patients on Aranesp who were not already taking an ESA, thus, expanding  the "market" for Aranesp within nursing homes serviced by the LTCPPs.

75.     The terms of the illegal kickbacks or inducements were memorialized in rebate contracts and other side agreements between the Defendants and Amgen, including comprehensive plans ensuring that nursing home physicians prescribed Aranesp rather than Procrit and that the pool of patients using Aranesp was expanded to include patients who were not already being treated by an ESA.

76.     By 2003, Amgen entered into rebate contracts, resembling those given by their competitor J&J, with several LTCPPs, including Defendant PharMerica.  Amgen's rebate contracts paid the LTCPPs based on the volume and/or market share of Aranesp purchased by the LTCPPs.

77.     At first, Amgen focused on targeting Omnicare and Defendant PharMerica for rebate contracts.  This is because data, prepared for Amgen by Dan Shellenbarger, a Biotechnology Consultant at an outside marketing firm called ZS Associates, showed 88% of all long term care patients were serviced by large national accounts including the two largest

24

LTCPPs, Omnicare and Defendant PharMerica.  This data was shared with Amgen managers at least as early as April 8, 2003, via a presentation made by Karen Daniels, Amgen's Executive Director of Corporate Accounts.  *Id.*

78.     In order to maximize profits and rebates secured by agreements providing discounts to the Defendants based on volume and/or market share, Amgen and the Defendants embarked on a highly coordinated scheme to influence prescriber behavior within the nursing home by: (a) devising "Therapeutic Interchange" programs that required patients to be automatically switched from Procrit to Aranesp; (b) pressing LTCPP consultant pharmacists, via marketing and purported "educational" campaigns, to encourage LTC physicians to switch patients from Procrit to Aranesp; (c) devising "anemia protocols" for nursing homes, which encourage switching from Procrit to Aranesp and expanding Aranesp's use for patients whose chronic kidney progression is outside the drug's package insert; and (d) conducting speaker's programs to increase utilization of Aranesp.  In addition, Amgen paid PharMerica to (a) staff a call-center, in Houston, Texas, to make direct contact with physicians to urge them to switch patients from Procrit to Aranesp; (b) generate sham prescription data that was never intended to be provided to Amgen because the company secured the data from other vendors; and (c) devise and conduct purported "educational" programs misstating the safety, efficacy and legitimate need for ESAs; specifically Aranesp, in the geriatric population.

## VI.     SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS

### A.     DEFENDANTS SOLICITED AND ACCEPTED INDUCEMENTS OR KICKBACKS FOR SECURING ARANESP PRESCRIPTIONS

79.     The coordinated efforts to increase the sales of Aranesp by Amgen and the individual Defendants violated the FDCA, the Anti-Kickback Statute and the FCA.

25

80.     By 2003, Amgen entered into numerous rebate contracts for Aranesp, including one with Defendant PharMerica.  While the terms of each contract differed, all of the Amgen contracts provided rebates to the LTCPPs based on the volume or market share of Aranesp prescribed by physicians at nursing homes and skilled nursing facilities serviced by LTCPPs. Without any clinical justification for switching patients already treated by Procrit and/or without proper regard for the drugs' different indications, the LTCPPs were incentivized to ensure that LTC patients received Aranesp over Procrit, even if that meant switching a patient already stabilized on Procrit to Aranesp.  The rebate contracts and other inducements paid by Amgen to increase Aranesp sales also provided a strong incentive for the Defendants and Amgen to expand the number of prescriptions of Aranesp to patients whose kidney stage and anemia symptoms were outside the drug's indication.  Defendants were highly incentivized to ensure that LTC patients received Aranesp over Procrit, even if that meant switching a patient already stabilized on Procrit to Aranesp.  The rebates and other inducements paid by Amgen to increase Aranesp sales also provided a strong incentive for the Defendants and Amgen to expand the number of prescriptions of Aranesp to patients whose kidney stage and anemia symptoms were outside the drug's indication.

81.     Upper level managers at Amgen approved, ratified, and/or participated in the development and implementation of the rebate contracts.  These Amgen upper level managers, known as the "Core Team" included: Mike Ryan, Vice President of Corporate Accounts; Bernie Tobin, Executive Director of Corporate Accounts; Karen Daniels, Executive Director of Corporate Accounts; Rob Jacobson, Director of Marketing; Dave Kern, Director of Marketing; Rick Cepull, Director of Marketing; Neil Bankston, Director of Contracting; Beverly Simmons, Director of Contracting; Jeff Weisiger, Director of Contracting; Angela Sciarra, Director of

26

Medical Affairs; Mark Knapp, Sales Incentive Operations; Debbie Kleinman, Business Development Analysts; Chris Thompson, National Sales Director Senior Care Team; Tom Rice, Business Information Analyst and Relator Kurnik. Relator reported to and was directed by Karen Daniels, Executive Director of Corporate Accounts. All contracts, plans of action, and negotiations with PharMerica and Kindred were at the instruction, supervision or knowledge of the Core Team. This Core Team met frequently to discuss and approve initiatives alleged herein, including but not limited to, rebate contracting, promotion of the Therapeutic Interchange programs and the selection of continued medical education programs for the purpose of converting patients taking Procrit to Aranesp.

82.     Amgen's Core Team at all times was aware that Medicaid, prior to January 2006, was the dominant payor in the LTC market, paying for nearly 70% of all ESA prescriptions. Thereafter, Aranesp was eligible to be paid for by Medicare, including Medicare Part D. Amgen's LTC rebate contracts with PharMerica, Kindred and other LTCPPs were seen as an essential mechanism to capture Government funds in the LTC ESA market. The role of Medicaid and other government payors, including Medicare, was specifically discussed at meetings of the core team members. The Core Team was well aware of and paid attention to the role of government money in regard to Defendants' unlawful schemes to increase revenue from Aranesp sales.

83.     In order to facilitate the rebate contract scheme, Amgen management organized an LTC team to work with the Relator.

84.     This team included three National Account Managers ("NAMs"): 1) John Thompson who worked on contracts with Omnicare and Defendant Kindred; 2) Roy Sandoval who worked on contracts with Neighborcare; and 3) Eddy Hobbs who worked on contracts with

27

Neighborcare and Defendant PharMerica. Under the NAMs were a group of Corporate Account Mangers ("CAMs") that worked within specified geographical areas within the LTCPPs and LTC facilities they serviced. CAMs included: Sam Daniel, southeast; Brad Nutter, west; Yvette Grimaldi, mid-Atlantic; and Carlos Valladares, east.[8]

85.    Relator estimates that Amgen paid PharMerica and Kindred together approximately $20,625,000 in total rebates from the period of 2003 to 2008. Based on Amgen internal sales data, Relator estimates the following yearly rebates paid to PharMerica and Kindred, exclusive of other inducements paid, such as funds to promote the therapeutic interchange programs, protocols and speakers events:  (1) 2003 (10% discount) = $370,000; (2) 2004 (15% discount) = $1.43 million; (3) 2005 (18% discount) = $3.36 million; (4) 2006 (20% discount) = 4.47 million; (5) 2007 (20% discount) = $3.22 million; 2008 (20%) = $2.2 million.

### 1.    PharMerica

86.    Amgen entered into rebate contracts with PharMerica to unlawfully induce utilization of Aranesp and introduced targeted programs designed to influence prescriptions of Aranesp in the nursing home and skilled nursing facilities serviced by these LTCPPs.

87.    On August 19, 2003, upper level PharMerica managers Janice Rutkowski, Robert Godwin, Max Dougherty, PhaMerica's Director of Clinical Services Information Systems, and Mike Stout, PharMerica's Director of Contracting, met with key personnel from Amgen including the Relator in Tampa, Florida to discuss the co-promotion of Aranesp, switching programs and rebate contracts. Thereafter, in September 2003, a number of PharMerica managers and officials negotiated the terms of the Amgen/PharMerica rebate contracts, including (1) Janice Rutkowski, PharMerica Senior Vice President of Clinical Services and Program

---

[8] In 2004 CAMs became Regional Account Mangers ("RAMs"). As Aranesp sales goals increased, Amgen expanded their sales force to include 17 RAMs.

Development, who made major corporate decisions for PharMerica, including contracting decisions; (2) Robert Godwin, PharMerica Vice President of Clinical Program Development; (3) Ron Perry, PharMerica Executive Director of Utilization Management, who contributed to decisions regarding contracting and including drugs on PharMerica's formulary; 4) Max Daugherty, Director of Strategic Clinical Services Information Systems; and 5) Mike Stout, Director of Contracting.

88.     From 2003 until at least 2008 (and possibly beyond) PharMerica has employed a therapeutic interchange program with Amgen to switch patients from Procrit to Aranesp in exchange for "rebate payments" under the contract.  An Amgen 10Q Business Plan created by Amgen indicates that the therapeutic interchange program with PharMerica was still ongoing in or about April 2008.

89.     While the terms of the Amgen/PharMerica rebate contracts varied from 2003 to 2008, the contracts generally paid discounts to PharMerica equaling 10% to 20%.  In 2005, the rebate contracts between PharMerica and Amgen paid a flat 18% discount rate, which Amgen agreed to pay on any volume of Aranesp sales.  The rebate contracts between PharMerica and Amgen in 2007 offered PharMerica a sliding scale of discounts up to 20% based on the volume of Aranesp purchases.   PharMerica was eligible for the 20% discount if it bought over $5,200,000 of Aranesp during the periods specified by the rebate contracts.  The rebate amounts were calculated based upon three month periods, corresponding with the financial quarters, such as October 1, 2007 to December 31, 2007; January 1, 2008 to March 31, 2008; April 1, 2008 to June 30, 2008.  Amgen paid the rebates PharMerica earned in a lump sum each quarter.

90.     The success of these rebate contracts or inducements coupled with the therapeutic interchange programs and other programs was memorialized in a 2008 Amgen 10Q Business

29

Plan, stating that in the first year alone, 2003, Amgen gained 60% of the ESA market within PharMerica facilities.  By 2005, Aranesp accounted for 50% of the ESA market at PharMerica.

91.     PharMerica regional Vice Presidents were tasked with monitoring the Therapeutic Interchange programs and reporting back to ensure enough patients were switched to meet the rebate goals.

92.     Amgen and PharMerica met frequently to discuss the rebate contracts as well as other inducements paid by Amgen to increase Aranesp utilization.  For example, an internal Amgen document indicates that on September 27, 2005, Ms. Rutkowski and Mr. Godwin met in Tampa, Florida at PharMerica's headquarters with members of Amgen's Core Team to discuss the rebate contracts and the development of anemia education programs designed to promote the use of Aranesp for patients with chronic kidney disease whose anemia was either symptomatic or asymptomatic.

93.     Likewise, on September 25, 2006, in Tampa, Florida, Amgen and PharMerica held a meeting to discuss the results of the rebate contracts and the companies' joint plans for the following year.  Present were: Mike Ryan, Rick Cepull, Barbara Phillips, Eddy Hobbs and Relator (from Amgen) and Bill Shields, President; Rutkowski; Rob Godwin; Rob Perry; and Mike Stout, Director of Contracting (from PharMerica). The meeting started at 9:00 a.m. at the Tampa Waterside Marriott and later was moved to PharMerica's headquarters at 11:00 a.m. PharMerica's President Bill Shields gave opening statements.  The discussions proceeded through the day and into a 6:30 p.m. dinner at Ruth's Chris Steak House.  Meetings like these were held quarterly, usually at upscale hotels and restaurants in large cities or resort locations, and were viewed by the participants as a "perk" for being able to increase profits for their companies.

94.     While the raw amount of the rebates PharMerica received may have been disclosed, the terms and conditions of their payment were not.

### (a)     Aranesp Therapeutic Interchange and/or Conversion Programs

95.     As discussed above, in order to increase prescriptions of Aranesp within nursing homes and increase payments under the Amgen rebate contracts, Amgen and the Defendants coordinated to institute drug selection policies, called "therapeutic interchange programs," requiring PharMerica's consultant pharmacists to promote switching patients already on Procrit to Aranesp.  While the contracts operated as the vehicle which would award PharMerica kickbacks, therapeutic interchange and/or conversion programs facilitated to accomplish the true purpose of the contracts, to switch patients from Procit to Aranesp within PharMerica facilities. The therapeutic interchange programs, begun in 2003, sought to ensure that PharMerica met the volume and market share goals in the Amgen rebate contracts.

96.     For example, Defendant PharMerica instituted a comprehensive therapeutic interchange requiring switching patients from Procrit to Aranesp by July 2003.  This therapeutic interchange program was uninterrupted or nearly uninterrupted until at least February 2008.

97.     PharMerica also utilized a "pilot program," requiring some of its consultant pharmacists in PharMerica's Southeast Region to directly call physicians to encourage switching from Procrit to Aranesp.  According to the 2004 PharMerica Aranesp Initiative Review, the pilot program was but one small part of PharMerica's overarching scheme to place the primary responsibility for switching or converting patients from Procrit to Aranesp on its own consultant pharmacists.

98.     PharMerica and Amgen believed that the consultant pharmacists were the key driver for switching, and employed a number of efforts designed to encourage them.

31

99. For example, a July 8, 2003 slide show called "LTC S2 Segment Plan," developed by Julie Terhark of Amgen's Corporate Customer Marketing, states that "[w]ithin each facility that the PSRs [Amgen sales representatives] will be calling on, there are a number of key individuals. The first and PRIMARY TARGET should be the consultant pharmacist." (Emphasis in original). Also, an Amgen Account Strategy & Planning document pertaining to PharMerica drafted by Christine Johnson and Eddy Hobbs in or about December 2003 stated that in order for the rebate agreements to succeed, "[l]ead Consultants & staff RPhs must get involved in TI [Therapeutic Interchange program] in addition to [the call center] Hub."

100. Amgen and the LTCPP Defendants also seized on laws requiring consultant pharmacists to "provide a drug regimen review (DRR) for patients every 30 days and recommend necessary changes to the attending physician," as a mechanism that could be regularly manipulated to serve the goal of switching patients from Procrit to Aranesp.

101. The 2004 PharMerica Aranesp Initiative also discussed educating consultant pharmacists through "[i]nservice programs in facilities, direct mail, teleconferences." On May 18, 2004, PharMerica's Goodwin, Director of Clinical Program Development, and David B. Barker, Executive Director of Consulting, transmitted a memorandum requiring all PharMerica General Managers and Lead Consultants – which were the consultant pharmacists – to attend a "Mandatory Teleconference" pertaining to the "Aranesp Conversion Project." The May 18, 2004 memorandum stated, "PharMerica's Clinical Department has scheduled five regional Aranesp educational teleconferences for General Managers, Lead Consultants, or designated Pharmacy Managers at each pharmacy. Participants in this program will be expected to convey information learned to all pharmacy staff." *Id.* The memorandum stated:

> PharMerica's therapeutic interchange initiative, converting Procrit to Aranesp,
> represents a significant opportunity to increase your pharmacy's gross margin

while reducing the cost for our customers. In order for this project to be successful, all pharmacists, dispensing and consultants, must understand the clinical, dosing conversion, and financial issues of the Procrit/Aranesp conversion.

*Id.* The memorandum also bluntly stated, "[o]ur objective is to evaluate all Procrit orders for conversion to Aranesp. Providing the clinical and financial impact of this conversion will help achieve these goals." *Id.*

102. While it is true that switching patients from Procrit to Aranesp provided a beneficial "financial impact" to PharMerica pursuant to the Amgen contracts, the beneficial "clinical impact" for patients is dubious as there are no studies showing that Aranesp is more efficacious or safe than Procrit. The May 18, 2004 PharMerica memorandum fails to mention a single medical or health benefit received by patients switching from Procrit to Aranesp. Moreover, because Aranesp is only indicated for anemia associated with chronic renal failure and for anemia associated with chemotherapy, PharMerica and Amgen's plan to convert all Procrit patients to Aranesp encouraged physicians and pharmacists to prescribe and dispense Aranesp for uses outside the drug's label in violation of the FDCA and the FCA.

103. In short, PharMerica exploited its quasi-fiduciary status as an independent reviewer of patient medications to recommend Aranesp in exchange for kickbacks disguised as payments for data, grants, speakers' fees and other remuneration.

104. A 2004 slide show presentation titled "Aranesp Initiative Review" presented by PharMerica's Senior Vice President of Purchasing and Program Development, Janice Rutkowski; PharMerica's Director of Clinical Program Development, Rob Godwin; and PharMerica's Executive Director of Utilization Management, Ron Perry, evidences PharMerica's agreement to move Amgen's market share of ESA prescriptions to 100% in nursing homes serviced by PharMerica. Converting all patients from Procrit to Aranesp was projected by

33

PharMerica to create a "[g]ross margin pick-up [of] $3.0 mil[lion]" for PharMerica. These slides were presented to Amgen upper level managers at a quarterly business review. As stated, quarterly business reviews, were held four times a year to evaluate the progress of the rebate programs and the "pull through" initiatives, including the therapeutic interchange program.

105.    The 2004 PharMerica Aranesp Initiative Review slideshow presentation discussed the vehicles or "Strategies For Success" for "Procrit to Aranesp Conversion," also known as the therapeutic interchange. The slideshow outlines PharMerica's numerous efforts to encourage its consultant pharmacists to promote switching to physicians. The 2004 Aranesp Initiative Review called for:  (a) educating consultant pharmacists through "[i]nservice programs in facilities, direct mail, teleconferences;" (b) providing a "list of high Procrit prescribers to Amgen representatives;" (c) using PharMerica's "Clinical HUB" to send "Aranesp TI [therapeutic interchange] letters batched and Fed Ex to physicians" encouraging switching patients from Procrit to Aranesp; (d) distributing "Aranesp clinical and dosing information material," (e) screening patients for "untreated anemia [to] grow [the] market;" and (f) setting up a "pilot" program in PharMerica's Southeast Region, which required dispensing pharmacists to make selective "direct calls to physicians," urging a switch from Procrit to Aranesp. In short, the Aranesp Initiative Review set forth the primary schemes agreed to and utilized by PharMerica and Amgen to switch patients from Procrit to Aranesp from 2004 to, at least, 2008. These plans are also memorialized in a December 2003 Amgen Account Strategy & Planning, written by Amgen's Christine Johnson and Eddy Hobbs.

106.    As part of the Aranesp Initiative, Amgen and PharMerica coordinated high pressure sales tactics to market Aranesp. Specifically, Amgen sent sales reps to high volume prescribers and, then, PharMerica employees emailed or called the same prescribers to encourage

34

them to switch all Procrit prescriptions to Aranesp.  These tactics were discussed in Amgen's October 31, 2007 Senior Care Month Business Review.

107.    PharMerica also provided direct financial incentives to their employees to implement therapeutic interchange programs.  Each PharMerica region had a "score card," which tracked their success and was used to determine bonuses.

108.    Amgen and PharMerica devised the switching or conversion program with full knowledge that their actions would induce prescriptions by nursing home physicians of the prescription drug, Aranesp, which was reimbursable by Medicare, Medicaid or other federal and state health care payors.  Amgen and PharMerica knew that a switching arrangement would impact Medicare and Medicaid and other government payor patients because the vast majority of patients treated at the nursing homes served by PharMerica, many over 65 years of age, are eligible for Medicare, Medicaid or other federal and state health care benefit programs. Specifically, an Amgen draft "CRI Long-Term Care Playbook," dated June 19, 2003 acknowledges that "Medicaid is the dominant payor for drugs in longer-term care with nearly 70% of all claims" and that "[n]early 10% of the drugs are paid by the SNF [skilled nursing facility] for patients covered under Medicare."

109.    Similarly, a power point presentation prepared by PharMerica in 2005 in anticipation of the implementation of Medicare Part D, stated that one strategy was for "PharMerica [to] assist customers to enroll beneficiaries during voluntary enrollment to ensure that preferred PDP is selected."  This presentation had a pie chart showing Medicare Part D would cover 65% of LTC prescriptions.  Indeed, as part of the data agreements with PharMerica, PharMerica provided Amgen with a breakdown of payor types including Medicaid and Medicare.  Relator personally reviewed these breakdowns and was well aware that a significant

portion of PharMerica's income was derived directly from claims for payment for Aranesp to Medicare and Medicaid.  In short, Amgen's payments to PharMerica, via rebates and market share agreements, for the purpose of knowingly inducing physicians to switch patients receiving public health care benefits from Procrit to Aranesp is a violation of the Anti-Kickback Statute, making every claim for Aranesp submitted to a public payor for payment a false claim.

#### (b)     PharMerica Used Its P&T Committee To Facilitate Kickback Payments

110.    In or about 2003, in order to facilitate its agreement with Amgen to secure 100% of the ESA market share at nursing homes serviced by PharMerica, PharMerica's Pharmacy and Therapeutics Committee ("P&T Committee") selected Aranesp for its formulary for the sole purpose of obtaining kickbacks to be paid by Amgen.

111.    P&T Committees are utilized by health care providers, such as hospitals and LTCPPs to evaluate the clinical use of drugs, develop policies for managing drug use and drug administration, and manage formularies.  They are usually comprised of physicians, pharmacists, and other health professionals.  Their primary purpose is to make policy recommendations to medical staff and administrators.  *See generally*, a consensus guideline published by American Society of Hospital Pharmacists, entitled *ASHP Statement on the Pharmacy and Therapeutics Committee and The Formulary System*,[9] Am J Health-Syst Pharm. 2008; 65:1272–83.

112.    P&T Committees are also charged with developing an "evidence based" formulary of medications to be used within the organizations they serve.  *Id.*  According to ASHP's Guidelines, an appropriate formulary is:

---

[9] ASHP's position is that the "principles" stated in its guidelines should be followed "in order to optimize patient care by ensuring access to clinically appropriate, safe, and cost-effective medications." *Id*.

. . .based on the best clinical evidence available and reflects the current clinical judgment of the medical staff, pharmacists, and other health care experts.  The selection of items to be included in the formulary should be based on objective evaluation of their relative economic, clinical and humanistic outcomes.  The decisions should not be based solely on economic factors.  The committee should identify potential safety concerns for each medication considered for inclusion in the formulary and should ensure those safety concerns are addressed if the medication is added to the formulary or used in the health system.

*ASHP Guidelines on the Pharmacy and Therapeutics Committee and the Formulary System,* Am. Soc'y of Health-System Pharmacists, http://www.ashp.org/DocLibrary/BestPractices/FormStPTCommFormSyst.pdf (last visited Apr. 2014).

113.    P&T Committees often recommend – legitimately – the use of less expensive generics over branded drugs when the safety and efficacy of the drugs are comparable.  This is not the case here:  Aranesp is a branded medication, and PharMerica had little incentive to consider cost-savings because most of the elderly patients in the nursing homes serviced by PharMerica were covered by government health care plans.

114.    Moreover by all accounts, it is clear that the PharMerica P&T Committee's decision to place Aranesp on the formulary in or about 2003 was nothing more than a rubber stamp justifying PharMerica's prior decision to enter into an illegal kickback arrangement with Amgen.  That arrangement was ratified by individuals who had a financial interest in the PharMerica/Amgen agreements to increase utilization of the drug.  Specifically, the P&T Committee was comprised of PharMerica employees and officials who stood to gain from kickbacks and physicians who had been paid to promote Aranesp on Amgen's behalf.

115.    For example, Janice Rutowski, PharMerica's Senior Vice President of Clinical Services and Program Development, a chief negotiator of the PharMerica/Amgen rebate contracts served on the P&T Committee.  Ms. Rutowski supervised the 2004 Aranesp Initiative

37

with Amgen, the primary purpose of which was to facilitate switching or Therapeutic Interchange.

116.   Rob Godwin, PharMerica's Vice President of Clinical Program Development, also served on the P&T Committee.  Mr. Godwin was in charge of the Therapeutic Interchanges at PharMerica, including for Aranesp, and held at least one mandatory teleconference for all of PharMerica pharmacy consultants on the "Aranesp Conversion Project."  Correspondence to PharMerica's pharmacy consultants touted the Conversion Project as "[a] significant opportunity to increase PharMerica's margins."  Mr. Godwin also received honoraria from Amgen to speak at Amgen's sales meetings.

117.   Likewise, Dr. Mario Cornacchione, another member of the P&T Committee, received more than $50,000 from Amgen for speaking engagements promoting Aranesp while he has a member of the P&T Committee.  Dr. Cornacchione was one of Amgen's highest paid speakers.

118.   Other emoluments were provided by Amgen to P&T Committee members.  For example, Amgen often met with PharMerica P&T Committee members at lavish dinner functions. In fact, it was well known at Amgen that Ms. Rutowski often ordered a steak and two lobsters at these meals so she could take one lobster home with her.  Rob Godwin was also treated to golf outings paid for by Amgen.  Eddy Hobbs, an Amgen sales employee, took Mr. Godwin golfing on several such occasions.

119.   The ASHP Guidelines eschew such conflicts of interest, recommending that:

Consideration of patient care and unbiased reviews of the biomedical literature are the cornerstone principles of formulary decision-making.  A conflict of interest (COI), financial or otherwise, may interfere with professionals' ability to make evidence-based decisions, and even the appearance of a potential COI can undermine a formulary decision.  The P&T committee has a responsibility to its patients and its organization to identify and address COI issues in its decision-

38

making processes. Professionals participating in the P&T committee should disclose financial relationships with pharmaceutical manufacturers, medical supply vendors, other health care provider organizations, and other commercial interests. Some health care organizations exclude health care professionals with COIs from P&T committee membership, whereas others allow participation in committee discussions but prohibit voting on particular items. Practitioners requesting additions or changes to the formulary should disclose financial relationships with pharmaceutical companies and other potential COIs to the P&T committee.

*ASHP Guidelines on the Pharmacy and Therapeutics Committee and the Formulary System*, Am. Soc'y of Health System Pharmacists, http://www.ashp.org/doclibrary/bestpractices/formglptcommformsyst.pdf (last visited April 2014).

120. The P&T Committee recommendations themselves were further manipulated by Rob Godwin, who was in charge of "weighting" the recommendations made by P&T Committee members. Specifically with regard to Aranesp, Rob Godwin admitted in a 2003 Amgen/PharMerica meeting that he was able to manipulate the process for gaining formulary approval.

### (c)    PharMerica's Clinical HUB

121. In addition to pressing its consultant pharmacists to promote switching ESA regimens to physicians, PharMerica directly solicited the physicians working in nursing homes that it serviced. PharMerica hired nurses and other health care professions to staff a "call center" in Houston called the "Clinical HUB," which was tasked with encouraging physicians to switch from Procrit to Aranesp via direct solicitations over the phone and letters sent by mail.

122. The HUB was set up to target Medicare patients and mini TIs were set-up to target different Medicare payors. As reported in Amgen's April 2008 Account and Strategy Plan "Aranesp will be recommended for Med A residents. There is currently a mini TI in effect through the HUB, whereby for Med A residents receiving large doses of Procrit are identified.

The HUB then e-mails recommendation to the local pharmacy to switch to Aranesp.  The local consultant will then recommend Aranesp for the Med A residents…"

123.    An example of a direct written request by PharMerica to physicians, encouraging them to switch from Procrit to Aranesp is included in a PowerPoint entitled "Amgen Senior Accounts Monthly Review," prepared on February 21, 2008 by Amgen's Corporate Accounts Department.  Slide 38 shows a template request form, requesting that physicians discontinue their use of Procrit and switch to Aranesp once their current supply of Procrit runs out.  The PowerPoint slide is titled, "PharMerica and Amgen have goals that are in alignment."

**(d)     Clinicare Concepts Programs and Other Speaker Programs**

124.    To assist the therapeutic interchange programs, Amgen and PharMerica designed, paid for, and conducted hundreds of "inservices" or speaker's programs from 2004 to, at least, 2008 encouraging the LTCPPs consultant pharmacists to recommend that physicians convert patients from Procrit to Aranesp.  Educational programs ensured that consultant pharmacists would encourage physicians to switch from Procrit to Aranesp.

125.    For example, in or about June 2004, Amgen agreed to pay $60,000 to PharMerica's CliniCare Concepts Division for "assist[ance] in design, development, and coordination of an educational program designed to improve clinical knowledge and expertise of consulting pharmacists, clinical staff and physicians in the use of hematopoietic growth factors [ESAs] in the geriatric population."  Amgen and PharMerica planned to provide 10 speakers programs with the funds.  The goals for the programs were, *inter alia*, to "[en]hance CliniCare Concept's and Amgen's image as an industry leader in providing quality health care education" and "[e]nhance the medical director's, consultant's, physician's, and nurse's role in recommending cost-effective drug therapy regimens… that indicate the use of Hematopoietic

40

growth factors in the long-term care elderly patient." Amgen and PharMerica entered into multiple similar $60,000 contracts for these programs from 2003 through 2005.

126. From 2004 to at least 2008, Amgen devised, paid for and conducted hundreds of inservices for the LTCPPs, including Defendants, directed at encouraging consultant pharmacists and other nursing home health care professionals to switch patients from Procrit to Aranesp.

### 2.     Kindred

127. In 2003, Amgen entered into rebate contracts for Aranesp with Kindred through an intermediary Group Purchasing Organization ("GPO") called Broadlane, which negotiated rebate contracts for Kindred and a number of other long term care pharmacy providers. At that time, Amgen did not deal directly with Kindred because its purchases of Aranesp did not justify an exclusive contract. The impact of GPO rebate contracts on Aranesp prescriptions purchased by Kindred is illustrated through Amgen sales documents, showing a steady increase of Aranesp purchases by the LTC facilities served by Kindred. In 2004, Kindred purchased $1.413 million of Aranesp and the drug had a 19.41% share of the ESA market at Kindred. By 2005, Aranesp's total sales rose to over $3 million, representing 30% of Kindred's total ESA purchases.

128. After Kindred's Aranesp sales grew significantly, Amgen negotiated its first direct contract with Kindred in 2006. Once under contract, some LTC facilities serviced by Kindred and PharMerica increased their total prescriptions of Aranesp by more than 500% from year to year.

129. PharMerica merged with Kindred Healthcare's pharmacy business in July 2007. The new company, known as PharMerica, was and is the second largest in the institutional pharmacy services market with a customer base of 330,000 potential patients or "beds" in 41 states. Until the merger was complete, Amgen had separate rebate contracts with PharMerica and Kindred.

41

130. Kindred's upper level managers approved of and participated in negotiating the Amgen rebate contracts, including: Jan Allen, Kindred Vice President of Clinical Services; and Bob Weir, Kindred Vice President of Purchasing, in charge of contract management.

131. Kindred also agreed to a therapeutic interchange program or conversion initiative for Aranesp. An Amgen internal document indicates that in March 2004, Kindred's Jan Allen coordinated with Amgen's Roy Sandoval to develop an "Anemia Management Protocol," focusing on converting Procrit to Aranesp. In order to increase rebates under the contracts, Kindred agreed to have Amgen provide "anemia management" presentations to clinical nurses at Kindred's annual meetings. Kindred also distributed newsletters addressing anemia management for Amgen and provided lists of physicians, practicing within the nursing homes served by Kindred, to Amgen RAMs so Amgen could directly solicit physicians to use the Aranesp therapeutic interchange program.

132. In sum, the rebates, switching programs, educational programs, and other remuneration paid by Amgen to Defendants violates the Anti-Kickback Statute and the False Claims Act because at least one purpose of the payments was to induce Aranesp prescriptions that were payable by public health care assistance programs, making all claims submitted by Kindred to public payors false claims.

### B. AMGEN AND THE LTCCP DEFENDANTS TRANSFORMED PAID SPEAKER'S EVENTS INTO MARKETING VEHICLES FOR ARANESP

133. To increase Aranesp prescriptions, Amgen and the LTCPP Defendants developed and paid for hundreds of purportedly independent educational and scientific programs directed at health care professionals charged with administering patient care at nursing homes. In 2005 alone, Amgen paid for and provided more than 115 chronic kidney disease education programs to health care professionals serving LTC facilities.

134.    The activities alleged herein were conducted to unlawfully increase prescriptions of Aranesp.

135.    Amgen and the LTCC Defendants, including PharMerica, tightly controlled all aspects of the purported educational and scientific programs they paid health care professionals to provide, including:  (a) the selection and training of speakers; (b) the development of materials used by the health care professionals paid to promote Aranesp; (c) the selection of attendees; and (d) the venue of each event.

136.    Unknown to patients whose drug regimens were altered, Defendants' efforts were specifically targeted to compromise the professional obligations and integrity of medical professionals, including medical directors, consultant pharmacists, and directors of nursing. These health care professionals provide the following services to LTC residents:

- Medical Directors ("MDs") are responsible for developing and enforcing patient care policies and ensuring appropriate medical care for all patients in the LTC facility. Medical Directors participate in the Drug Regimen Review ("DRR"), which is a thorough evaluation of the medication regimen of a resident with the goal of promoting positive outcomes and minimizing adverse consequences associated with medication. The review includes preventing, identifying, reporting and resolving medication-related problems, medication errors, or other irregularities, and collaborating with other members of the LTC team. MDs are responsible for the medications of all residents in their facilities. MDs must visit residents at least once every 30-60 days, and are authorized to switch or change medications for patients.

- Consultant Pharmacists ("CPs") are employed by LTCPPs and are responsible for reviewing the drug regimen of LTC patients every 30 days and recommending changes to the physician. Consultant Pharmacists are also required to perform a "DRR" every 30 days for each resident in nursing homes and skilled nursing facilities.

- Directors of Nursing ("DON") act as liaisons between the medical director, attending physicians, and the consultant pharmacist. They are responsible for ensuring the quality, administration, and implementation of direct patient care and supervision of the patients.

43

137. Amgen's selection of the speakers who would provide essential medical information about Aranesp to LTC health care professionals was made – not by medical professionals – but by sales and marketing personnel at Amgen. Speakers were not chosen because of their health care expertise but rather because of marketing goals.

138. Amgen created a Senior Care Speakers Bureau, including regional and national speakers. Amgen sales managers encouraged Aranesp sales representatives and Regional Account Managers (RAMs) to book speakers from the Speaker's Bureau to promote Aranesp to nursing home health care professionals.

139. Regional speakers were first identified by Amgen sales representatives and national account managers ("NAMs"), who based their decision to use a physician as an Aranesp speaker because of his or her ability to influence prescription writing. The physicians tapped to be "regional speakers" were usually high prescribers or potentially high prescribers of Aranesp.

140. Amgen upper level managers recruited national speakers to give promotional lectures for Aranesp. Amgen's national speakers for the long term care market included Dr. Albert Riddle, Dr. Sean Xio Leng, Dr. Charles Lacy, Dr. Richard Stefanacci, Dr. Mario Paul Curzi, and Dr. Jeffry Kagan. Dr. Riddle was chosen by Amgen because he was the Medical Director of a large regional nursing home chain, which Amgen marketing managers saw as a lucrative target for Aranesp sales.

141. No background checks were made of proposed speakers with regard to conflicts of interest, licensing, disciplinary records, malpractice claims, teaching credentials, or publication of articles let alone peer reviewed ones.

142. Amgen developed and paid for several educational programs designed to promote the use of Aranesp, including two PowerPoint presentations concerning anemia associated with

44

chronic kidney disease (not chronic kidney failure) called "Anemia Management Institute One" and "Anemia Management Institute Two." Amgen trained the healthcare professionals it chose to promote Aranesp on the use of these scripted PowerPoint presentations and other materials. Amgen managers and trainers told its speakers not to stray from the materials and PowerPoints provided by Amgen when promoting Aranesp.

143. Once a speaker was selected, Amgen referred the speaker to an Amgen Regional Medical Liaison ("RML"). These speakers were generally nurses or other medical professionals ostensibly hired by Amgen to provide purely medical or scientific information to physicians about the uses and side effects of Amgen's pharmaceutical products, including information about off-label uses that Amgen sales representatives were not allowed to provide.

144. Amgen, however, did not separate the functions of its RMLs from Amgen's Aranesp LTC marketing and sales forces. Amgen used its RMLs to train speakers to promote Aranesp for on-label and off-label uses of Aranesp. Amgen also used RMLs to make presentations regarding on-label and off-label uses of Aranesp to doctors and other medical professionals.

145. Amgen speakers had numerous contacts with Amgen NAMs and RMLs. When changes were made by Amgen to the scripted presentations, RMLs contacted speakers with the updated changes.

146. Amgen's speakers were trained at luxury hotels, at resorts, and in large cities, including the Philadelphia Four Seasons. Amgen paid for each physicians' travel expenses and lodging. In addition to training provided by the RMLs, Amgen Core team members, including Angela Sciarra, trained the speakers to use the AMI One and AMI Two PowerPoint presentations. Ms. Sciarra was a member of Amgen's Medical Affairs division and the Amgen

45

Core Team, but she was used by the company primarily to assist in the marketing efforts for Aranesp.

147.   Amgen's Director of Marketing, David Kern, and other Amgen Core Team members oversaw the speaker training programs, including a training that occurred from October 7-8, 2005, in which 40 doctors and nurses were invited, including Dr. Albert Riddle, Dr. Jeff Hoggard, and Dr. David Thomas. On October 11, 2005, David Kern notified the Amgen Core Team that Amgen had completed training 20 speakers.

148.   In 2006, Amgen trained 63 speakers to give presentations on AMI One.  Core team member Angela Sciarra also evaluated and trained Amgen speakers at the direction of Amgen Director of Marketing, Rob Jacobson.

149.   In September 2006, Amgen Core Team members Rick Cepull and Angela Sciarra helped plan for speaker training in Atlanta, Georgia, at which 36 speakers were trained and added to the Amgen Senior Care Speaker's Bureau.  To assist with training, Amgen employed Dr. Thomas and Dr. Hoggard.

150.   Amgen dedicated large budgets to induce or reward physicians for prescribing Aranesp, through the guise of honoraria and other valuable items and/or services.  Amgen spent nearly $1 million in 2007 funding field speaker programs. From October 2004 to June 2005 Amgen spent in excess of $850,000.00 for payments to speakers and other medical grants purportedly promoting anemia education.

151.   During the six-month period from January 2008 to June 2008, Amgen spent over $300,000 total for expenses associated with speaker events, including food, honoraria, travel and lodging expenses.

46

152.   Amgen speakers were paid $500 to $2000 per lecture.  Speakers were also paid an additional $250 if they were required to travel more than 60 miles to present or gave more than one program.  Speakers often received up to $1,300 in additional speaker expenses not including their honorarium.  For instance, on March 10, 2008 at a speaking event at Masto's Steakhouse in Costa Mesa, California, Dr. Mario Cornacchione received $3,320 from Amgen to promote Aranesp.  As discussed, he was also member of PharMerica's P&T Committee.

153.   Some Amgen speakers earned sizeable fees for promoting Aranesp.  For example, David Kazarian, a pharmacist who was a president of the American Society of Consultant Pharmacists ("ASCP"), was paid $13,500 in honorarium and for other expenses over an eight-month period.  Mr. Kazarian gave several talks including, "Overview of Chronic Kidney Disease and Anemia," "CKD and Anemia," and AMI One "Overview of Chronic Kidney Disease and Anemia for Hospital Based Nurses."  Amgen also made significant grants to ASCP during October 2004 to June 2005, a time in which Mr. Kazarian headed the organization.

154.   Amgen paid Dr. Mario Cornacchione $29,000 in a period of just five months.  From February 19, 2008 to June 23, 2008, Dr. Cornacchione received speaker expenses and honorarium to present lectures called, "Managing the Anemia Associated with CRF in Older Adults in Pennsylvania, Texas and California."  For example, Dr. Carnacchione gave one such anemia presentation in Costa Mesa, California on March 10, 2008.

155.   Amgen paid another speaker, Dr. Albert Riddle, over $24,000 in honoraria and reimbursement expenses related to number of speaking engagements presented from January 18, 2008 to June 26, 2008.

156.   Speaker presentations were held at up-scale restaurants including: Morton's Steakhouse in Bethesda, Maryland on May 7, 2008; Pappadeux's Seafood Kitchen in Arlington,

47

Texas on April 23, 2008; Spencer's Steakhouse in San Jose, California on April 23, 2008; Mastro's Steakhouse in Cosa Mesa, California on March 10, 2008; and Ruth's Chris Steakhouse in Greensboro, North Carolina on April 30, 2008.

157.    When Agmen paid for speakers programs aimed at professionals in the nursing homes serviced by PharMerica and Kindred, it benefitted the LTCPPs in at least two ways. First, it increased utilization of Aranesp and increased profits pursuant to the rebate contracts. It was also viewed as a "perk" for the nursing homes that conducted business with PharMerica and Kindred.

158.    As part of the quarterly business reviews with Omnicare and PharMerica, Amgen's NAMs, including John Thompson and Eddy Hobbs, worked with upper level managers from the LTCPPs, including PharMerica's Godwin, to select CME and other educational programs to be used to train LTCPP consultant pharmacists and other health care professionals.

159.    PharMerica's Clinicare Concepts was paid by Amgen to develop CME speaker programs designed to promote Aranesp for on-label and off-label uses. In this way, Amgen and Pharmerica conspired to increase utilization.

160.    At these meetings, PharMerica managers also presented proposals to Amgen for purported educational funding. Pursuant to PharMerica's recommendations, Amgen spent $165,000 in 2006 to "communicate key promotional messaging" to physicians working within LTCs; $275,000 to "communicate key promotional messaging" to LTC consultant pharmacists; and $20,000 to "communicate key promotional messaging" to LTC Nurse Administrative Coordinators. Amgen also developed and paid for speaker programs, including Continuing Medical Education programs, with the active assistance and participation of the LTCPP Defendants.

48

161. For example, Amgen paid the following grants to Clinicare Concepts, which was PharMerica's conduit for educational programming such as CME: $111,850 on August 15, 2005 and $30,000 on September 6, 2006.

162. PharMerica also sought funding from Amgen for: (1) a $40,000.00 data sharing agreement that was agreed to by Amgen annually; (2) the development of anemia checklists for nursing homes; (3) the development of nurse practitioner CME's to help grow the ESA market; and (4) a study to determine why prescriptions were cancelled.

### C. AMGEN AND THE DEFENDANTS UNLAWFULLY CONSPIRED TO MISBRAND ARANESP IN ORDER TO EXPAND THE MARKET FOR THE DRUG.

163. Amgen and the LTCPP Defendants mislead consultant pharmacists, physicians, nurses, and other health care professionals about the indicated uses for the drug, as well as, the drug's safety and efficacy in order to increase utilization.

### 1. Background

164. Until the development of ESAs, the only treatment for anemia from any cause (anemia is a deficiency of red blood cells, which contain the hemoglobin molecules that carry oxygen to the tissues) was blood transfusion. Frequent blood transfusions were problematic, because patients developed antibodies against proteins in the "foreign" blood. Therefore transfusions were kept to a minimum, particularly in patients who would need them regularly for an indefinite period: the goal was to transfuse patients up to a level where they would be more comfortable and not in danger. Transfusions sufficient to reach a "normal" hemoglobin level were not necessary and might reduce the total number of transfusions a patient could ultimately receive.

165. Anemia is known to be associated with the development of cardiovascular disease and the progression of chronic kidney disease to chronic kidney failure (End-Stage Renal

49

Disease or "ESRD").  When epoetin alfa was first approved, however, no one knew whether treating anemia to normal hemoglobin levels (*i.e.* 12.0 mg/dl) would improve cardiovascular outcomes.  A few small studies[10] suggested it might.  However as time progressed, three much larger randomized controlled trials conducted to test this proposition showed just the opposite: morbidity and mortality increased with increasing hemoglobin (beyond 10.0 mg/dl to 11.0 mg/dl).[11]

166.    The first of these trials, the Normal Hematocrit Study, was published in 1999 before Amgen launched Aranesp.[12]  The study enrolled 1233 patients on Epogen, all on dialysis, all with clinical evidence of congestive heart failure and/or coronary artery disease.  The patients were randomly assigned to receive either increased doses of Epogen to reach and maintain a "normal" level of hemoglobin at about 12 g/dL, or to continue their current Epogen dose to maintain a hemoglobin level of about 10 g/dL.  The study was stopped early, when trial participants targeted to raise their hemoglobin level to 14 g/dL with Epotein suffered a higher rate of myocardial infarction, vascular access thrombosis, and other thrombotic events than individuals targeted to a lower hemoglobin level of 12 g/dL.

167.    When Amgen released Aranesp in 2002, the FDA required Amgen to warn patients of the dangers associated with raising hemoglobin levels using ESAs including Aranesp. Amgen's initial package insert included a "WARNINGS" section that stated:

> Aranesp™ and other erythropoietic therapies [ESAs] may increase the risk of cardiovascular events, including death. The higher risk of cardiovascular events

---

[10] Kuriyama S., et al., *Reversal of anemia by erythropoietin therapy retards the progression of chronic renal failure, especially in nondiabetic patients*. 77;2 Nephron 176 (Abstract) (1997).

[11] Anatole Besarab, et al., *The Effects Of Normal As Compared With Low Hematocrit Values In Patients With Cardiac Disease Who Are Receiving Hemodialysis And Epoetin*, 339:9 NEW ENG. J. MED. 584 (1998).

[12] *Id.* at 584-90.

may be associated with higher hemoglobin and/or higher rates of rise of hemoglobin. **The hemoglobin level should be managed carefully to avoid exceeding a target level of 12 g/dL.**

(emphasis added). The FDA also forced Amgen to disclose on its package insert a summary of results of the Normal Hematocrit Study, which showed an increased mortality rate for individuals who were targeted at to hemoglobin of 14 g/dL as opposed to 10 g/dL with Epoetin.[13]

168.    In 2006, J&J sought to prove that ESAs could decrease the risk of cardiac events in patients. The second trial, CHOIR, randomly set patients to target hemoglobin levels of 11.3 g/dL or 13.5 g/dL. The CHOIR trial enrolled 1432 patients with anemia and chronic kidney disease not on dialysis. Patients were randomly assigned to hemoglobin targets of 11.3 g/dL or 13.5 g/dL. The trial was cut short because individuals in the 13.5 g/dL trial group showed a statistically significant increase incident rate of stroke and heart failure.

169.    In 2007, Epogen, Procrit and Aranesp all received a black box warning, the FDA's most stringent warning, for the use of ESAs for anemia patients suffering from chronic renal failure. The warning states:

**Chronic Renal Failure:**

- In clinical studies, patients experienced greater risks for death, serious cardiovascular events, and stroke when administered erythropoiesis-stimulating agents (ESAs) to target hemoglobin levels of 13 g/dL and above.

- Individualize dosing to achieve and maintain hemoglobin levels within the range of 10 to 12 g/dL.

170.    In 2009, the third trial, TREAT, a study conducted by Amgen itself, found that treating patients with Aranesp to normalize hemoglobin levels showed "no evidence of benefit and a trend toward overall harm." The TREAT study enrolled 4038 patients with "moderate"

---

[13] Aranesp 2002 Label available at
http://www.accessdata.fda.gov/drugsatfda_docs/label/2002/darbamg071902lb.pdf.

51

anemia due to chronic kidney disease not on dialysis.  Half the patients were assigned Aranesp the other half were assigned a placebo.  The Aranesp group achieved median hemoglobin levels of 12.5 g/dL, the placebo group maintained median hemoglobin levels of 10.6 g/dl.  Patients who received Aranesp had twice the risk of stroke, a finding that was statistically significant ($p<0.001$).

171.    On June 24, 2011, the FDA issued a Safety Announcement and a revised stronger black box warning for ESAs.  The new black box warning states that:

- In controlled trials with CKD patients, patients experienced greater risks for death, serious adverse cardiovascular reactions, and stroke when administered ESAs to target a hemoglobin level of greater than 11 g/dL.

- No trial has identified a hemoglobin target level, ESA dose, or dosing strategy that does not increase these risks.

172.    Amgen's FDA-approved indication for Aranesp and Epogen is to treat "anemia associated with chronic renal failure for patients who are either on dialysis or not on dialysis." This language is quite specific: Aranesp is not indicated for all patients with chronic kidney disease, a much larger group.

173.    In 2001, nephrologists working with the National Kidney Foundation developed a staging system for all patients with chronic kidney disease, depending on their glomerular filtration rate ("gfr" is a general measure of kidney function) and other evidence of kidney damage (e.g. proteinuria).  Chronic kidney disease itself is defined as either kidney damage despite a normal gfr or a gfr below 60 for 3 months or more. Stage 1 of chronic kidney disease requires some evidence of kidney damage disease despite a gfr over 90.  Stage 2 of chronic kidney disease requires evidence of kidney damage and a gfr 60-89.  Stage 3 is satisfied by moderate reduction of gfr alone or gfr of 30-59.   Stage 4 of chronic kidney disease is severe reduction of gfr or gfr 15 to 29.  Stage 5 of chronic kidney disease is a gfr less that 15 or a patient

52

on dialysis and is designated "chronic kidney failure."  Stage 5 patients are generally eligible for dialysis and/or transplant and are precisely the patients covered by the FDA indication for the ESAs.

174.    Amgen already monopolized the market for ESAs for patients with chronic kidney failure on dialysis with its drug Epogen because its licensing agreement with J&J precluded J&J from marketing Procrit to dialysis patients.  When Amgen launched Aranesp, it did not want to have Aranesp compete against its own product, Epogen, for dialysis patients with anemia.  The number of patients with chronic kidney failure "not on dialysis" (i.e. those being treated by Procrit) was a smaller group of patients than were encompassed by Aranesp's package insert.  Rather than restrict Aranesp's potential profits to this smaller group of patients with chronic kidney failure (i.e. Stage 5 patients) who were not on dialysis, Amgen decided to illegally market Aranesp to all patients with chronic kidney disease and anemia, no matter how mild, no matter how asymptomatic, and despite the absence of an FDA-approved indication. Amgen's target market (*i.e.*, patients with anemia caused by chronic kidney disease in Stages 1-4) is exponentially larger than the market for patients with chronic renal failure.

175.    The Third National Health and Examination Survey ("NHANES III")[14] estimated that in around 2004 some 19.2 million people in the United States had chronic kidney disease, of whom only 300,000 had chronic kidney failure.  Patients in stages 3 and 4 generally have

---

[14] According to the Centers for Disease Control and Prevention, "NHANES is a major program of the National Center for Health Statistics (NCHS).  NCHS is part of the Centers for Disease Control and Prevention (CDC) and has the responsibility for producing vital and health statistics for the Nation."  *See*, http://www.cdc.gov/nchs/nhanes/about_nhanes.htm.  The CDC's website states that "NHANES is a program of studies designed to assess the health and nutritional status of adults and children in the United States.  The survey is unique in that it combines interviews and physical examinations."  *Id*.

anemia, although it may be mild and asymptomatic, just like chronic kidney disease itself in those stages.

### 2.    Misbranding and Kickbacks

176.    In an effort to increase sales, Amgen conspired with the LTCPP Defendants to target the more than 2 million nursing home patients some of which had no symptoms of anemia. To capture these patients, devoid of any symptoms, Amgen directed LTCPPs to conduct chart reviews, searching for patients with hemoglobin levels less than 11 g/dL and GFR levels less than 60. Amgen used incentives from the rebate contracts as kickbacks to encourage LTCPPs to implement protocols for anemia testing. Amgen also provided kickbacks directly to pharmacists, doctors, and nurses, to ensure that LTCPP facilities were identifying asymptomatic anemia patients across the anemia spectrum.

177.    Defendants deliberately substituted the term "chronic kidney disease" for "chronic kidney failure." Most of Amgen's promotional sales pitches and materials, adopted for use by Defendant LTCPPs, use or used the term "chronic kidney disease" rather than "chronic kidney failure" when promoting the use of Aranesp. For example, a PowerPoint presentation called "Aranesp (darbepoetin alfa) for the Treatment of Anemia of Chronic Kidney Disease (CKD)," presented by Amgen's Angela Sciarra (who held a degree in Pharmacy) to Amgen sales representatives and managers in or about 2003, focused on chronic kidney disease, not anemia associated with chronic kidney failure. Ms. Sciarra's PowerPoint presentation misled Amgen sales personnel about the disease state. Ms. Sciarra stated, "Aranesp may be used across the entire continuum of Chronic Renal Failure (CRF). CRF includes chronic renal insufficiency (CRI) and end-stage renal disease (ESRD)." However, Amgen is approved only for chronic kidney failure (ESRD), not chronic renal insufficiency (the old nomenclature for chronic kidney disease). Ms. Sciarra's PowerPoint correctly sets out the National Kidney Foundation's staging

54

system for chronic kidney disease in a "note to the presenter," but fails to acknowledge that Aranesp is FDA-approved for use only in patients with stage 5 chronic kidney disease, namely chronic kidney failure. Ms. Sciarra was a member of Amgen's core team and attended LTCPP business reviews, including business reviews with Defendants.

178.    Making unsupported claims about a drug is considered illegal "misbranding" under the FDCA, yet that is exactly what Amgen did.  The studies submitted to FDA in support of the indication were designed only to show that Aranesp could raise hemoglobin levels safely in patients with chronic kidney failure: no evidence was sought or presented that this brought about clinically significant improvements in a patient's condition, such as a reduction in fatigue, an increase in energy, or a reduction in cardiovascular events known to be associated with chronic kidney failure and anemia.  Indeed, Aranesp's current Package Insert states that two of the most common side effects of treatment with Aranesp are fatigue and congestive heart failure.

179.    As discussed previously in this Amended Complaint, before the development of ESAs, physicians limited the number of transfusions in chronic renal failure to the minimum needed to keep patients comfortable, functional, and above the level of dangerous complications. Before 1998, no one knew what would happen if these patients were treated to "normal" levels of hemoglobin, 13 g/dl for men, 12 g/dl for women.  Amgen developed Aranesp to compete with J&J's Procrit in the non-dialysis market and marketed the drug to "correct" or "normalize" patients hemoglobin levels, not just get them above the transfusion threshold.  Starting in 2002, Amgen and the LTCPP Defendants successfully marketed ESA's to non-dialysis patients outside of Amgen's proper indication by targeting any patients suffering from mild or moderate

55

anemia.[15] Trials from 1998, 2007, and 2009, however, made it clear that treatment for these patients was not only unnecessary, but dangerous. Amgen and J&J each undertook studies for the specific purpose of establishing a positive correlation between ESA treatment, higher hemoglobin levels, and patient health. Instead of supporting J&J and the Defendants' marketing efforts, the results of the studies conclusively established that using ESAs to "correct" patients' anemia (both those with chronic kidney failure and those with chronic kidney disease only) beyond about 10-11 g/dl provided no significant benefit – improved symptoms or fewer cardiovascular events – and, instead, increased the frequency of cardiovascular problems and risk of stroke.

180.    As discussed *supra*, from 1998 to 2009, three large trials were conducted in an effort to connect increased hemoglobin levels above 10-11 g/dl from ESAs to lower cardiovascular events and a higher quality of life among anemia patients. All three trials were published in the New England Medical Journal of Medicine: 1) The Normal Hematocrit Study ("NHS") in 1998; 2) Correction of Hemoglobin and Outcomes in Renal Insufficiency ("CHOIR") in 2006 (sponsored by J&J); and 3) the Trial to Reduce Cardiovascular Events with Aranesp Therapy ("TREAT") in 2009 (sponsored by Amgen).

181.    NHS tested the hypothesis that normalization, as compared to partial correction, of hemoglobin in dialysis patients would improve cardiovascular outcomes. After fourteen months, a higher percentage of patients in the "normal" hemoglobin group suffered cardiovascular events than the group that maintained a lower level. This unfavorable trend was

---

[15] *See* Gardiner Harris, *FDA Urges Less Use of Anemia Drugs*, N.Y. Times, June 24, 2011 (http://www.nytimes.com/2011/06/25/health/policy/25drug.html?_r=0) ("[ESAs] were developed to help dialysis patients cut down on blood transfusions, Amgen and J&J soon persuaded doctors that the drugs helped both kidney and cancer patients feel better even when not suffering severe anemia.").

concerning enough for investigators to stop the trial early. As discussed above, the FDA incorporated NHS's interim findings onto Aranesp's initial label in its warning section.

182. CHOIR tested the hypothesis that the correction of anemia to 13.5 g/dl with a once-weekly dosing of epoetin alfa (Procrit) in patients with CKD would decrease mortality and cardiovascular morbidity. In 2006, CHOIR was also terminated early when the interim results showed a statistically significant increase in heart attack, hospitalization, and stroke in the 13.5 g/dl group.

183. The FDA responded adding a black box warning to all ESAs, stating that there was a greater risk of death, serious cardiovascular events, and stroke when ESAs were used to raise hemoglobin.

184. Amgen's own study, TREAT, tested the hypothesis that Aranesp treatment used to increase hemoglobin levels would also reduce the risk of cardiovascular events in patients. The results of the TREAT study showed no evidence of a benefit and a statistically significant increase in the rate of stroke and cardiovascular events in the treatment group.

185. In 2011, the FDA required new packaging for all ESAs, warning that there is no safe dose of Aranesp/Procrit and that doctors should use the lowest dose necessary to reduce the need for transfusions. The new label also explicitly states: "Aranesp has not been shown to improve quality of life, fatigue, or patient wellbeing (1.3)."

186. Amgen's marketing materials make no mention of these findings, all published in the New England Journal of Medicine. Instead, Amgen highlights the well-known association between progressive kidney disease, progressive anemia, and increased morbidity and mortality from cardiovascular events. Amgen goes even further: it suggests that treating anemia to normal will reduce cardiovascular events (despite all the empirical evidence showing just the opposite).

57

Amgen's message to doctors is that if they do not treat anemia "as aggressively as hypertension, dyslipidemia and diabetes" as encouraged by the company's 2003 sales training materials, their patients will suffer or die.

187. Amgen regularly asserts that Aranesp improves patient quality of life for all chronic kidney disease patients with any degree of anemia, despite the absence of data supporting such a conclusion. For example, 2003 training materials, designed for Aranesp sales representatives, indicate that one "core message" for Aranesp was "Message 6: Treating anemia makes patients feel better, as measured by improvements in quality of life and functional capacity." The message that Aranesp makes patients "feel better" is also contained in two Amgen-created and -approved slide show presentations, AMI One and AMI Two, which were used by physicians and other health professionals paid by Amgen to market Aranesp.

188. In fact, Amgen does not offer any data to suggest that patients with anemia associated with earlier stages of chronic kidney disease actually suffer from fatigue or reduced quality of life or state a desire to "feel better." Indeed, Amgen's Angela Sciarra's training PowerPoint correctly pointed out that "[a]nemia is a common but often asymptomatic consequence of CRI [chronic renal insufficiency, an old term for chronic kidney disease]."

189. The false and misleading marketing messages pitched by Amgen and the LTCPP Defendants to physicians working in long term care facilities was and is especially egregious because long term care physicians typically are not nephrologists who have the appropriate training and experience with chronic kidney disease to sufficiently understand the complex mechanisms of anemia. It is well known in the medical community that the causes of anemia are diverse and often difficult to pinpoint, even for nephrologists.

190.    Amgen and the LTCPP Defendants misled consultant pharmacists in the same way. A "Corporate Accounts Business Unit Long Term Care Market Strategy Recommendation," prepared by ZS Associates for Amgen on April 8, 2003, indicates that Amgen was acutely aware that it could easily influence LTC medical staff, including medical directors and consultant pharmacists, to write prescriptions for Aranesp.  The "Strategy Recommendation" stated, "[t]here is additional opportunity to grow the market as anemia is presently under-penetrated – Medical staff and consultant pharmacists are not fully trained in identifying and diagnosing anemia."  Those health care professionals relied on Amgen to provide them with truthful information, but were intentionally misled for the sake of profit.  Specifically, Amgen and the LTCPPs chose to distort the purported cardiovascular and mortality dangers associated with not treating anemia, among other things,  even though the FDA in 2007 issued a black box warning stating that the use of Aranesp actually increased a patient's chance of cardiovascular events.

### 3.    The Anemia Protocols

191.    The Defendants also developed and influenced the development of their own "anemia protocols," which were designed to encourage health care professionals to switch patients from Procrit to Aranesp and identify untreated anemia patients.  Untreated anemia patients included patients who had no symptoms of anemia associated with Chronic Kidney Disease. The protocols primarily addressed dosing regimens for converting patients from Procrit to Aranesp and criteria for determining whether a patient suffering from anemia associated with chronic kidney disease should be placed on Aranesp.

192.    Often nursing homes sought Amgen's help in designing anemia protocols.  In some instances Amgen sent Clinical Specialists, who were employed in Amgen's Medical Affairs division, to develop anemia protocols for particular nursing homes.  In these cases, the

59

nursing homes approved the anemia protocol designed by Amgen, without making any significant changes.

193.    Beginning in 2005, Amgen challenged its sales representatives, CAMS, and NAMs to bring as many beds as possible under anemia protocols directly developed or influenced by Amgen.  Using a checklist created with PharMerica and a "toolkit" available to all the sales representatives in the LTC division, Amgen held a bed protocol contest.  When a long term care facility agreed to use an anemia protocol, Amgen sales employees received "credit" for the amount of beds at the facility.  At the end of the contest, Amgen sales employees receiving the most number of points earned bonuses.

194.    The LTCPP Defendants, including PharMerica and Kindred, also created individual interchange protocols to be implemented by long term care facilities.  This was accomplished with the knowledge and or direction of Amgen's Yvette Girmaldi, Sam Daniel, Eddy Hobbs, and Marc Knapp.  In one situation, Ann Semperi, a consultant pharmacist for PharMerica, was able to convince a Medical Director at Jewish Nursing Home in Connecticut to implement an anemia protocol, called the Aranesp Guidelines, for all existing and newly admitted nursing home patients.

195.    PharMerica's Rob Godwin also working with national nursing home chains to implement interchange protocols.

196.    In 2006, Amgen Senior Care division hired Nurse Clinical Specialists ("NCSs") directly from their speaker's bureau to develop and promote the use of anemia protocols in long term care facilities.  Amgen had been successful using nurses and physician's assistants to develop similar protocols for hospitals targeted for Aranesp sales.  NCSs were required to work

60

closely with RAMs to influence protocol adoption and changes. NCSs were part of the sales team and earned bonuses based on their impact on Aranesp sales.

197. Amgen set goals for the NCS group, requiring an increase in treatment penetration in the LTC market, even though these professionals were viewed by physicians as individuals that Amgen paid to provide unbiased medical and scientific information about Aranesp.

198. An Amgen NCS was assigned to PharMerica to help initiate anemia protocols within nursing homes it serviced. This NCS attended all Amgen/PharMerica business reviews, where the terms of rebates and other agreements to induce prescriptions, including the Therapeutic Interchange, were discussed.

199. Amgen later conducted an internal review of the use of NCSs to develop and promote anemia protocols. Relator pointed out to Amgen investigators that Amgen's job description for the NCS position required, *inter alia*, the development of anemia protocols. Relator believes that Amgen's findings were never reported to the Government. Moreover, NCSs continued to work with health care professionals that Amgen paid to promote Aranesp, including a nephrologist, Dr. Jacqueline Vance, Director of Clinical Affairs for AMDA, who provided assistance to Amgen Senior Care Marketing, and Dr. Albert Riddle, a paid Aranesp speaker and author of anemia guidelines.

200. Marketing Aranesp to non-dialysis patients with mild or moderate anemia was enormously profitable for both Amgen and J&J. Since 1989, the Federal Government has spent

more than $60 billion on ESAs and "for years they were the biggest single expense in the federal Medicare program."[16]

## COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[17]
### Against All Defendants

201.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

202.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

203.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented, or caused to be presented false or fraudulent claims for improper payment or approval of prescriptions for Aranesp.

204.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

205.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

---

[16] See Gardiner Harris, *FDA Urges Less Use of Anemia Drugs*, N.Y. Times, June 24, 2011 (available at http://www.nytimes.com/2011/06/25/health/policy/25drug.html?_r=0).

[17] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(1).

## COUNT TWO[18]
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Against All Defendants

206.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

207.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

208.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

209.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

210.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT THREE[19]
### Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C)
### Against All Defendants

211.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

212.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

---

[18] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(2).

[19] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(3).

213.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and/or (a)(1)(B).

214.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

215.    By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT FOUR
### California False Claims Act, Cal. Gov't Code § 12651 *et seq.*
### Against All Defendants

216.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

217.    This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code § 12651 *et seq*.

218.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

219.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the California False Claims Act.

220.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

64

221.    By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT FIVE
### Colorado Medicaid False Claims Act,
### Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*.
### Against All Defendants

222.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

223.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*.

224.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

225.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Colorado False Claims Act.

226.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

227.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SIX
### Connecticut False Claims Act,
### Conn. Gen. Stat. §§ 17b-301a -17b301p (2010 Supplement)
### Against All Defendants

65

228.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint

229.    This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301a – 17b-301p (2010 Supplement).

230.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

231.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Connecticut False Claims Act.

232.    The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

233.    By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT SEVEN
### Delaware False Claims Act, 6 Del. C. § 1201, § 1201 *et seq.*
### Against All Defendants

234.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

235.    This is a claim for treble damages and civil penalties under the Delaware False Claims Act. Del Code Ann. tit. 6, § 1201 *et seq.*

66

236. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

237. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Delaware False Claims Act.

238. The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

239. By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT EIGHT**
**Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.**
**Against All Defendants**

240. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

241. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.

242. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

67

243.   Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Florida False Claims Act.

244.   The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

245.   By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT NINE
### Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168.1 *et seq*.
### Against All Defendants

246.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

247.   This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 *et seq.*

248.   By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

249.   Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Georgia False Medicaid Claims Act.

250.   The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

251.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TEN
### Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq*.
### Against All Defendants

252.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

253.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq*.

254.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using or causing to be made or used a false record or statement.

255.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Hawaii False Claims Act.

256.    The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

257.    By reason of these payments, the Hawaii Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

69

## COUNT ELEVEN
### Illinois Whistleblower Reward and Protection Act,
### 740 III. Comp. Stat. 175/1 *et seq*.
### Against All Defendants

258. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

259. This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 111. Comp. Stat. 175/1 *et seq*.

260. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

261. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Illinois Whistleblower Reward and Protection Act.

262. The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

263. By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWELVE
### Indiana False Claims and Whistleblower Protection Act,
### Indiana Code § 5-11-5.5 Against All Defendants

264. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

265.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

266.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

267.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act.

268.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.  By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTEEN**
**Louisiana Medical Assistance Programs Integrity Law,**
**La. Rev. Stat. Ann. § 46:439.1 *et seq*.**
**Against All Defendants**

269.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

270.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 et seq.

271.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval and/or

71

knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

272.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Louisiana Medical Assistance Programs Integrity Law.

273.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

274.    By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT FOURTEEN**
**Maryland False Health Claims Act of 2010,**
**Md. Code Ann. §§ 2-601 *et seq*.**
**Against All Defendants**

275.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

276.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code Ann. §§ 2-601 *et seq.*

277.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Maryland Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

278.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Maryland False Health Claims Act.

72

279.    The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed. By reason of these payments, the Maryland Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT FIFTEEN**
**Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0)**
**Against All Defendants**

280.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

281.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5(A)-(0).

282.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

283.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Massachusetts False Claims Act.

284.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

285.    By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

73

### COUNT SIXTEEN
**Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq*.**
**Against All Defendants**

286.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

287.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq.*

288.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

289.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Michigan Medicaid False Claims Act.

290.    The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

291.    By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT SEVENTEEN
**Minnesota False Claims Act Minn. State Minn. Stat. § 15C.01 *et seq.***
**Against All Defendants**

292.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

293.    This is a claim for treble damages and civil penalties under the Minnesota False Claims Act Minn. Stat. § 15C.01 *et seq.*

294. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

295. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Minnesota Medicaid False Claims Act.

296. The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

297. By reason of these payments, the Minnesota Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT EIGHTEEN
### Montana False Claims Act; Mont. Code Anno. §17-8-401 *et seq*.
### Against All Defendants

298. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

299. This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Anno. § 17-8-401 *et seq.*

300. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

75

301.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Montana False Claims Act.

302.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

303.    By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT NINETEEN**
**Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq*.**
**Against All Defendants**

304.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

305.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq*.

306.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

307.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Nevada False Claims Act.

308.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

309.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY
### New Hampshire Medicaid Fraud and False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-b, *et seq*.
### Against All Defendants

310.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

311.    This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. § 167:61-b, *et seq*.

312.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Hampshire Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

313.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Hampshire Medicaid Fraud and False Claims Act.

314.    The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

315.    By reason of these payments, the New Hampshire Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

77

**COUNT TWENTY ONE**
**New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*.**
**Against All Defendants**

316. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

317. This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*.

318. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

319. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Jersey False Claims Act.

320. The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

321. By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY TWO**
**New Mexico Medicaid False Claims Act,**
**N.M. Stat. Ann.,1978, § 27-14-1 *et seq*.**
**Against All Defendants**

322. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

78

323. This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann., 1978, § 27-14-1 *et seq*.

324. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

325. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Mexico Medicaid False Claims Act.

326. The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

327. By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY THREE
### New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.
### Against All Defendants

328. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

329. This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.

330. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval and/or

79

knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

331. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New York False Claims Act.

332. The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

333. By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY FOUR**
**North Carolina False Claims Act, 52 N.C.G.S. § 1-605 *et seq*.**
**Against All Defendants**

334. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

335. This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, 52 N.C.G.S. § 1-605 *et seq*.

336. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

337. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the North Carolina False Claims Act.

338.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

339.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY FIVE**
**Oklahoma Medicaid False Claims Act; 63 Okl. St. Ann. § 5053 *et seq*.**
**Against All Defendants**

340.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

341.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq*.

342.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

343.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Oklahoma Medicaid False Claims Act.

344.    The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

345.    By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

81

## COUNT TWENTY SIX
### Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq*.
### Against All Defendants

346.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

347.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.

348.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by using or causing to be used or made a false record or statement.

349.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Rhode Island False Claims Act.

350.    The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

351.    By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY SEVEN
### Tennessee Medicaid False Claims Act,
### Tenn. Code Ann. § 71-5-181 *et seq*.
### Against All Defendants

352.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

353.     This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*.

354.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

355.     Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Tennessee Medicaid False Claims Act.

356.     The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

357.     By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY EIGHT
### Texas Medicaid Fraud Prevention Act,
### Tex. Hum. Res. Code Ann. § 36.001 *et seq*.
### Against All Defendants

358.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

359.     This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

360.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval and/or

83

knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

361. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

362. The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

363. By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY NINE**
**Virginia Fraud Against Taxpayers Act,**
**Va. Code Ann. §8.01-216.1 *et seq*.**
**Against All Defendants**

364. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

365. This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq*.

366. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

367. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Virginia Fraud Against Taxpayers Act.

84

368.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

369.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTY**
**Washington Medicaid Fraud False Claims Act,**
**Rev. Code Wash. §§ 48.80.010** *et seq.*
**Against Both Defendants**

370.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

371.    This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. §§ 48.80.010 *et seq.*

372.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Washington Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

373.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Washington Medicaid Fraud False Claims Act.

374.    The Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed. By reason of these payments, the Washington Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT THIRTY ONE
### Wisconsin False Claims Act; Wis. Stat. § 20.931 *et seq.*
### Against All Defendants

375. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

376. This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act, Wis. Stat. § 20.931 *et seq.*

377. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

378. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Wisconsin False Claims Act.

379. The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

380. By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT THIRTY TWO
### District of Columbia False Claims Act,
### D.C. St. § 2-308.14 *et seq.*
### Against All Defendants

381. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

382.    This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq*.

383.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by using or causing to be used or made a false record or statement.

384.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the District of Columbia False Claims Act.

385.    The District of Columbia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

386.    By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTY THREE**
**City of Chicago False Claims Act,**
**Chicago Mun. Code Chapter 1-22-010, *et seq*.**
**Against All Defendants**

387.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

388.    This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act, Chicago Municipal Code Chapter 1-22-010, et seq.

389.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented

87

to the City of Chicago false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by using or causing to be used or made a false record or statement.

390.     Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the City of Chicago False Claims Act.

391.     The City of Chicago, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

## PRAYER

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a.     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the state and municipal false claims acts;

b.     Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, et seq. plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States and municipalities under similar provisions of their false claims acts;

c.     The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state and municipal false claims acts;

88

d.      The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

e.      Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g.      The United States, the States, the City of Chicago, and the Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands

a trial by jury.

DATED:  April 24, 2014

/s/ Richard A. Harpootlian
Richard A. Harpootlian
Bar No. 1730
1410 Laurel Street
Post Office Box 1090
Columbia, SC  29202
Telephone: 803-252-4848
Facsimile:  803-252-4810
rah@harpootlianlaw.com

Reuben A. Guttman*
Traci L. Buschner*
GRANT & EISENHOFER P.A.
1747 Pennsylvania Avenue, N.W.
Suite 875
Washington, DC  20006
Telephone: 202-386-9500
Facsimile:  202-386-9505
rguttman@gelaw.com
tbuschner@gelaw.com

Jay W. Eisenhofer *
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone: 646-722-8500
Facsimile:  646-722-8501
jeisenhofer@gelaw.com

Justin K. Victor*
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE  19801
Telephone: 302-622-7053
Facsimile:  302-622-7055
jvictor@gelaw.com

*Not admitted in this jurisdiction, but will file *Pro Hac Vice* Motions shortly.

Attorneys for Relator Frank Kurnik

90

## CERTIFICATE OF SERVICE

On April 24, 2014, I hereby certify that a copy of Relator's Amended Complaint was served upon the following persons and Defendants via the means indicated below.

/s/ *Richard A. Harpootlian*
Richard A. Harpootlian Bar No. 1730
1410 Laurel Street
Post Office Box 1090
Columbia, SC  29202
Tel.:  (803) 252-4848
rah@harpootlianlaw.com

**VIA ECF**

| | |
|---|---|
| Deborah B. Barbier (S.C. Fed. Bar #6920) Deborah B. Barbier, LLC 1531 Laurel Street Columbia, SC 29201  (803) 445-1032 (phone)  (803) 445-1036 (fax) EMAIL: dbb@deborahbarbier.com  Attorney for PharMerica Corp. | Jack Eugene Fernandez Marcos E. Habun Morris Weinberg, Jr. Zuckerman Spaeder 101 East Kennedy Blvd Suite 1200 Tampa, FL 33602 813-221-1010 813-223-7961 (fax) jfernandez@zuckerman.com  Attorneys for Kindred Healthcare, Inc. |
| Michael Manthei Jeremy M. Sternberg David M. Glynn HOLLAND & KNIGHT LLP 10 St. James Avenue Boston, MA  02116 (617) 523-2700 (phone) michael.manthei@hklaw.com Jeremy.sternberg@hklaw.com david.glynn@hklaw.com  Attorneys For PharMerica Corp. | James C. Leventis, Jr. US Attorney's Office 1441 Main Street Suite 500 Columbia, SC 29201 803-343-3172 (phone) 803-254-2943 (fax) james.leventis@usdoj.gov  Attorney for the United States of America |
| James M. Griffin, Fed ID 1053 Margaret N. Fox, Fed ID 10576 Lewis, Babcock, & Griffin LLP 1513 Hampton Street (29201) P.O. Box 11208 | Frances C. Trapp US Attorney's Office 1441 Main Street Suite 500 Columbia, SC 29201 |

| | |
|---|---|
| Columbia, South Carolina<br>(803) 771-8000 (phone)<br><br>Attorneys for Kindred Healthcare, Inc. | 803-929-3000 (phone)<br>803-733-5966 (fax)<br>fran.trapp@usdoj.gov<br><br>Attorney for the United States of America |
| | |

## VIA U.S. FIRST CLASS MAIL

The Honorable William Nettles
United States Attorney
District of South Carolina
1441 Main Street, Suite 500
Columbia, SC  29201

United States Attorney General Eric H. Holder
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

Inspector General Daniel R. Levinson
Office of the Inspector General
Office of Public Affairs
Department of Health
   and Human Services
Room 5541 Cohen Building
330 Independence Avenue, SW
Washington, D.C.  20201
(202) 619-1343
(202) 260-8512 (fax)
pafairs@oig.hhs.gov

United States Attorney General Eric H. Holder
c/o Ms. Joyce R. Branda
Deputy Director
Commercial Litigation Branch
Fraud Section
U.S. Department of Justice
Ben Franklin Station
Washington, D.C.  200044
(202) 307-0231
(202) 616-3085

Mark Bodner, Bureau Chief
Medicaid Fraud Control Unit
Complex Civil Enforcement
   Bureau
PL-01 The Capitol
Tallahassee, FL  32399-1050

Mr. Brian Finkel
California Department of Justice
Bureau of Medi-Cal Fraud
   and Elder Abuse
1455 Frazee Road, Suite 315
San Diego, CA  92108

Attorney General David M. Louie
Office of the Attorney General
425 Queen Street
Honolulu, HI  96813
(808) 586-1500
(808) 586-1239 (fax)

Attorney General Joseph R. Biden, III
Carvel State Office Building
820 North French Street
Wilmington, DE  19801
(302) 577-8400
(302) 577-2496 (fax)
Attorney.General@State.DE.US

Mara S. Georges, Corporation Counsel
City of Chicago, Law Department
121 North LaSalle Street, Room 600
Chicago, IL  60602
(312) 744-0220
(312) 744-8538 (fax)

Ms. Alex Sink, Chief Financial Officer
c/o Pete Dunbar
Division of Legal Services
Florida Department of
    Financial Services
200 East Gaines Street
Tallahassee, FL  32399
(850) 513-3110
(850) 413-7460 (fax)

Attorney General Greg Zoeller
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington Street, 5th Floor
Indianapolis, IN  46204
(317) 232-6201
(317) 232-7979 (fax)
constituent@atg.in.gov

Miguel del Valle, City Clerk
City of Chicago
121 North LaSalle Street, Room 107
Chicago, IL  60602
(312) 742-5375
cityclerk@cityofchicago.org

Allen Pope, Director, MFCU
Medicaid Fraud Control Unit of Indiana
Office of the Attorney General
8005 Castleway Drive
Indianapolis, IN 46250-1946
(317) 915-5300

Attorney General Lisa Madigan
Chicago Main Office
100 West Randolph Street
Chicago, IL  60601
(312) 814-3000
(312) 814-3806 (fax)

Attorney General Lori Swanson
Office of the Minnesota Attorney General
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101
(651) 296-3353

David O. Thomas
Inspector General of Indiana
315 West Ohio St., Room 104
Indianapolis, IN  46204
(317) 232-3850

Attorney General Catherine Cortez Masto
Office of the Attorney General
100 North Carson Street
Carson City, NV  89701
(775) 684-1100
(775) 684-1108 (fax)

Attorney General Martha Coakley
Office of the Attorney General
One Ashburton Place
Boston, MA  02108-1698
(617) 727-2200
(617) 727-3251 (fax)

New Jersey Division of Criminal Justice
Medicaid Fraud Control-Unit
25 Market Street
P.O. Box 085
Trenton, NJ  08625-0085
(609) 292-1272

Attorney General Eric Schneiderman
Office of the Attorney General
Dept. of Law- The Capitol, 2nd Fl.
Albany, NY  12224-0341
(800) 771-7755
serveAG@oag.state.ny.us

Attorney General Peter Kilmartin
Office of the Attorney General
150 South Main Street
Providence, RI  02903
(401) 274-4400

F. Edward Kirby, Jr.
Special Deputy Attorney General
North Carolina Department of Justice
Medicaid Investigations Unit
3824 Barrett Drive, Ste. 200
Raleigh, NC  27609
(919) 881-2328

Attorney General Irvin B. Nathan
Office of the Attorney General
441 4th Street, NW
Washington, D.C.  20001
(202) 727-3400
(202) 347-8922 (fax)

Attorney General George Jepsen
P.O. Box 120
Hartford, CT  06141-0120
(860) 808-5318

Robert B. Teitelman
Assistant Attorney General
55 Elm Street
Hartford, CT  06106-1774
robert.teitelman@ct.gov

Attorney General Tim Fox
Department of Justice
215 North Sanders Street
Helena, MT  59620-1401
(406) 461-1264
steve@stevebullock.com

Attorney General Joseph Foster
33 Capitol Street
Concord, NH  03301
(603) 271-3658
(603) 271-2110 (fax)

Attorney General Gary King
408 Galisteo Street, Villagra Building
Santa Fe, NM  87501
(505) 827-6000
(505) 827-5826 (fax)

Attorney General Scott Pruitt
313 NE 21st Street
Oklahoma City, OK  73105
(405) 521-3921

Attorney General Mark Herring
Office of the Attorney General
900 East Main Street
Richmond, VA  23219
804-786-2071

Attorney General Sam Olens
40 Capitol Square, SW.
Atlanta, GA  30334-1300
(404) 656-3300

Attorney General James D. Caldwell
P.O. Box 94095
Baton Rouge, LA 70804-4095
(225) 326-6000

4

Deputy Attorney General Peter M. Coughlan
P.O. Box 20207
Nashville, TN  37202
(615) 741-3694

Attorney General J.B. Van Hollen
State Capitol, Ste 114 E.
P.O. Box 7857
Madison, WI  53707-7857
(608) 266-1221

Attorney General Pam Bondi
Office of the Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Attorney General Kamala D. Harris
Office of the Attorney General
1300 "I" Street
Sacramento, CA  94244-2550
(916) 445-9555

Mark Coffee
Assistant Attorney General
Civil Medicaid Fraud Division
300 W. 15th Street
Austin, TX  78711-2458

Chris Lott
Special Agent
1835 Assembly Street, St. 1442
Columbia, SC 29201

Attorney General Bill Schuette
P.O. Box 30212
525 W. Ottawa
Lansing, MI  48909-0212
(517) 373-1110

Attorney General Greg Abbott
Capitol Station
P.O. Box 12548
Austin, TX  78711-2548
(512) 463-2100

Attorney General Robert E. Cooper
425 5th Avenue North
Nashville, TN  37243

Jeffrey A. Wertkin
U.S. Department of Justice
Commercial Litigation, Fraud
601 D. Street, NW
Washington, D.C. 20004

Elizabeth Valentine, Esquire
Assistant Attorney General
Michigan Attorney General's Office
Health Care Fraud Division
2860 Eyde Parkway
East Lansing, MI  48823

Katie Rose Fink
Associate Counsel
Administrative and Civil Remedies Branch
Room 5527, Cohen Building
330 Independence Avenue, SW
Washington, DC 20201

5